# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

Integrated Technology Corporation, )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )   CV 06-02182-PHX-ROS
                                   )
Applied Precision, LLC; Applied    )
Precision Holdings, LLC; and       )
Applied Precision, Inc.,           )
                                   ) Phoenix, Arizona
                    Defendants.    ) January 23, 2008
_____) 10:14 a.m.


BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MARKMAN HEARING

Official Court Reporter:
Elaine Cropper, RDR, CRR, CCP
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street,
Suite 312, Spc. 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

**I N D E X**

**T E S T I M O N Y**

|                                              | Page | Line |
|----------------------------------------------|------|------|
| RODNEY SCHWARTZ                               |      |      |
| RODNEY SCHWARTZ - Direct                      |      |      |
| BY MR. CAMPBELL                               | 35   | 19   |
| RODNEY SCHWARTZ - Cross                       |      |      |
| BY MR. BLANKENHEIMER                          | 44   | 24   |
| RODNEY SCHWARTZ - Redirect                    |      |      |
| BY MR. CAMPBELL                               | 66   | 19   |
| JOHN STROM                                    |      |      |
| JOHN STROM - Direct                           |      |      |
| BY MR. BLANKENHEIMER                          | 90   | 10   |
| JOHN STROM - Cross                            |      |      |
| BY MR. TUCKER                                 | 106  | 17   |
| JOHN STROM - Redirect                         |      |      |
| BY MR. BLANKENHEIMER                          | 114  | 13   |
| PAUL WRIGHT, Ph.D.                            |      |      |
| PAUL WRIGHT, Ph.D - Direct                    |      |      |
| BY MS. UNDERWOOD-MUSCHAMP                     | 126  | 13   |
| PAUL WRIGHT, Ph.D - Cross                     |      |      |
| BY MR. CAMPBELL                               | 146  | 23   |
| PAUL WRIGHT, Ph.D - Redirect                  |      |      |
| BY MS. UNDERWOOD-MUSCHAMP                     | 160  | 14   |

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1                          **E X H I B I T S**                          10:14:53

2                                          Received in Evidence

3   Number                                  Page   Line

4   Applied Precision's Remarks              92     20
    Plaintiff's Supplemental Notice         180      3
5   Plaintiff's Exhibits 1-5, 5a, and 6     179     24            10:14:53
    Defendants' Exhibits 100 through 110     92     12

6

7

8                          **RECESSES**

9                                          Page   Line

10  (Recess at 11:19; resumed at 11:35.)     44     21            10:14:53
    (Recess at 12:13; resumed at 1:08.)      70     23
11  (Recess at 2:24; resumed at 2:43.)      117      3
    (Recess at 4:02; resumed at 4:12.)      168     10
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

1                        A P P E A R A N C E S                        10:14:53

2

3    For the Plaintiff:
          JAY R. CAMPBELL, ESQ.
4         TODD R. TUCKER, ESQ.
          JOSHUA M. RYLAND, ESQ.
5         Renner, Otto, Boisselle & Sklar, L.L.P.        10:14:53
          1621 Euclid Avenue, 19th Floor
6         Cleveland, OH  44115
          216.621.1113.(fax) 261.621.6165
7
          CYNTHIA A. RICKETTS, ESQ.
8         DLA Piper US, L.L.P.
          2415 East Camelback Road, Suite 700
9         Phoenix, AZ  85016
          480.606.5112/(fax) 480.606.5512
10                                                        10:14:53
     For the Defendants:
11        ALAN H. BLANKENHEIMER, ESQ.
          LAURA UNDERWOOD-MUSCHAMP, ESQ.
12        CHRISTOPHER K. EPPICH, ESQ.
          Heller Ehrmann, L.L.P.
13        4350 La Jolla Village Drive, 7th Floor
          San Diego, CA  92122-1246
14        858.450.8400/(fax) 858.450.8499

15                                                        10:14:53

16

17

18

19

20

21

22

23

24

25

                        United States District Court

| | | |
|---|---|---|
| 1 | **P R O C E E D I N G** | 10:14:53 |
| 2 | (Court was called to order by the courtroom deputy.) | |
| 3 | THE COURT:  Please be seated. | |
| 4 | COURTROOM DEPUTY:  This is CV-06-2182, *Integrated* | |
| 5 | *Technologies v. Applied Precision*, on for markman hearing. | 10:14:58 |
| 6 | Counsel, please announce. | |
| 7 | MR. CAMPBELL:  Your Honor, I am Jay Campbell from | |
| 8 | Renner Otto for the plaintiff. | |
| 9 | THE COURT:  Thank you. | |
| 10 | MR. BLANKENHEIMER:  Good morning, Your Honor.  Alan | 10:15:10 |
| 11 | Blankenheimer from Heller Ehrman for the defendants and with me | |
| 12 | are Ms. Underwood-Muschamp and Mr. Eppich. | |
| 13 | THE COURT:  And who now?  I can't hear you. | |
| 14 | MR. BLANKENHEIMER:  The Applied Precision defendants. | |
| 15 | THE COURT:  Thank you. | 10:15:27 |
| 16 | All right.  And I have received one motion and that | |
| 17 | is to file documents under seal and I have granted that motion. | |
| 18 | And, Mr. Campbell, are you ready to proceed? | |
| 19 | MR. CAMPBELL:  Yes, I am, Your Honor. | |
| 20 | THE COURT:  All right.  Please call your first | 10:15:40 |
| 21 | witness. | |
| 22 | Or would you prefer to do an opening statement? | |
| 23 | MR. CAMPBELL:  Your Honor, what the parties had | |
| 24 | intended to do is do a short opening statement and then call a | |
| 25 | few witnesses after that to define the technology a little bit. | 10:15:53 |

1    THE COURT:  That's fine.  That will be helpful.        10:15:56

2    MR. CAMPBELL:  Your Honor, I want to talk about ITC's

3    invention, which is going to be the focus of this hearing.

4    ITC invented something that revolutionized the

5    industry back in the early '90s, something which rendered all    10:16:08

6    other technology obsolete and rendered the technology, in fact,

7    that the defendant corporation has its patent on completely

8    obsolete.

9    ITC is a company in Tempe, Arizona.  It started with

10   the two gentlemen I have in the back here.  Mr. Rod Schwartz     10:16:21

11   and his partner Gary Orman.  They formed a company as the two

12   of them to get into this market to look at what they could do

13   to see if they can improve upon the systems that were

14   available.  And now they have 70 employees in Tempe, Arizona,

15   building these machines.                                         10:16:38

16   Now, I want to take a step back and explain a little

17   bit about the technology because it's kind of three layers

18   deep.  The first thing I want to do is mention that this all

19   relates to integrated circuits.  Integrated circuits are the

20   things, the chips you find in the computers, you find in the     10:16:53

21   cell phone, you might even find a toaster or a refrigerator

22   anymore.

23   Would you like to dim the lights, Your Honor, a

24   slight bit or can you see?

25   THE COURT:  Well, you know, I can see it over here if    10:17:05

United States District Court

1   you don't mind me not looking at you.                          10:17:07

2           MR. CAMPBELL:  Either way is fine.  A few of the

3   images seem to wash out for some reason on the monitor.  So I

4   don't mind that as long as we can go back and forth a little

5   bit.                                                           10:17:18

6           THE COURT:  All right.  Let's dim the lights.

7           MR. CAMPBELL:  Your Honor, an integrated circuit is

8   also known as a chip.  What we see here is a chip.  A chip has

9   hundreds of thousands of tiny little transistors on it, little

10  tiny wires that run all between them.  They form the brains of  10:17:31

11  any computer.

12          Also on the chip are a number of bonding pads around

13  the outside which allows it to communicate with the outside

14  world.

15          Now, we don't make chips individually.  A chip is      10:17:42

16  very, very small.  It might be the size of a thumbnail or

17  smaller so they are made on a wafer and this wafer is a silicon

18  wafer, maybe the size of a dinner plate or a little bigger than

19  the pen.

20          Each of the squares you see on that wafer are the      10:17:58

21  integrated circuits.  Unfortunately, not all of the integrated

22  circuits work perfectly when they are made.  So before they are

23  turned into something much more valuable, like a complete

24  integrated circuit or toaster oven or a cell phone, we want to

25  make sure that they work; all right?                           10:18:14

1    To make sure that they work, what we do is we have a           10:18:17

2  machine which tests all of these bonding pads and communicates

3  with the integrated circuit, tests the circuit to make sure it

4  works as expected.  If it doesn't, you can get rid of it before

5  you invest all of this money to turning it into a more           10:18:31

6  expensive product.

7    So the next thing we have is a probe card.  What a

8  probe card does is test the integrated circuit.  Now, a probe

9  card has a number of these very, very small almost microscopic

10 probes in the middle.  They come down and touch those little     10:18:47

11 bonding pads we saw on the integrated circuit and then

12 communicate with it, talk to it back and forth, make sure that

13 it can test all of the circuits, make sure everything works.

14    These are the probes.  These are almost microscopic.

15 They are very, very, very small because you may have 10, 20, 50  10:19:05

16 of those talking to an individual integrated circuit.  These

17 little probes here have to make contact with those pads we saw,

18 electrical contact, so they can talk back and forth.

19    Now, the way this works, basically, is you have the

20 probe card sitting above a wafer and it comes down and contacts  10:19:24

21 it.  Each of these probe cards has these little tiny probes.

22 So what it does is it contacts all of the little pads there and

23 communicates with it.

24    Unfortunately, if a probe card is not working

25 perfectly, you're not going to get a good test on the           10:19:44

United States District Court

1  integrated circuit and you might throw one away that actually     10:19:46

2  works.

3        Here's an example of a probe card that might not work

4  well because you have one of the probe pins not aligned.  The

5  probe pin is not touching the integrated circuit, not touching   10:19:57

6  the pad so it can't communicate back and forth.

7        So what we then need is some way to test the probe

8  card to make sure it works.  That's really where the technology

9  comes in.  And that is a probe card inspection system and that

10 is what this case is really about, is ITC's invention of a       10:20:15

11 revolutionary probe card inspection system which uses machine

12 vision instead of conduction which is what everything did prior

13 to that.

14       Now, a probe card will fit into the top of the

15 machine there where you see that kind of small circle is.  Then  10:20:30

16 the machine has a computer which will analyze the images.  So

17 it has to be able to take first images, because it's machine

18 vision, an image of the probe card.

19       So it has a viewing system.  The viewing system is

20 merely like a camera.  We call a CCD camera, a charge couple     10:20:51

21 device.  And what that does is allow the system to be able to

22 see each of the probe tips through that little window.  A

23 window is nothing more than a window like you would have in a

24 house or a car, merely a transparent structure with some kind

25 of border around it, not meant to be anything special.  This is  10:21:11

CV-06-02182-PHX-ROS, January 23, 2008

1   very simple technology ultimately.                                  10:21:15

2          Now, the way this works is the probe card would be

3   inserted here, flipped over to come down and meet the area

4   where we have our window and, actually, the camera underneath

5   it.  As you can see in the back, there's a very slight           10:21:34

6   misaligned pin.  The purpose of this is to be able to find what

7   pins are misaligned and what pins are correctly aligned.

8          The way this is done is we have our viewing system,

9   we have our camera.  It looks at the pins but all it does is

10  create a digital image.  Once we have that image, we need to be  10:21:56

11  able to identify what little points in those digital images are

12  actually probe tips.  And we do that through something called a

13  positioning means.  All a positioning means is nice lawyerly

14  language for something which finds these probe tips and here's

15  how it works:                                                     10:22:15

16         The system will just go through, create an image and

17  then use something called blob analysis or image analysis,

18  which are terms that engineers know, algorithms that they know,

19  to find each of these points.  Unfortunately, here several of

20  those points are unaligned for our demonstrative purpose so you  10:22:32

21  can see how this works.  But that's all the positioning means

22  does is it runs a small algorithm, which has been known for

23  years, to find out where these little tips are based on little

24  blobs it that might see in the image.

25         Once we have all of our images, once we know where we     10:22:51

United States District Court

1   found those probe tips, we need to know if they are properly          10:22:54

2   aligned, because that's the invention.  We want to know whether

3   we have to realign them or if the probe card is good; right?

4         So what we do is a vendor usually, the vendor that

5   makes the probe card, will provide ITC with a pattern, a             10:23:08

6   mathematical pattern basically but no different than a pattern.

7   And that pattern is over here on the right.  That is how they

8   want the pins to be aligned.

9         So what it does is it mathematically moves.

10  Mathematically moves is just an engineering word for moving the      10:23:23

11  image on the right over the image on the left to see how well

12  they fit to get the best fit.

13        So what it basically does, Your Honor, is it looks at

14  the all of those images on the left, takes the image on the

15  right and tries to overlay it to see if they match.  And if          10:23:42

16  they match well, nothing needs to be done.  But sometimes they

17  don't match and that is where this best fit algorithm comes in

18  which is the last step of the mathematically moving.

19        You can mathematically move those two images in a

20  variety of different ways.  If my left hand here are my probe        10:23:59

21  tips and my right is the image that I want, I can overlay these

22  many different ways but I want to find the best fit.  I want to

23  find the fit where as many probe tips match as possible but

24  maybe one doesn't.  That's called a best fit algorithm, another

25  algorithm which is known to people of ordinary skill in the          10:24:20

United States District Court

1    art.                                                                    10:24:22

2            All it does is it identifies which pin necessarily is

3    out of line.  In other words, the result, the result of the

4    mathematically moving and running the best-fit analysis tells

5    you these are the probe tips which are misaligned.                      10:24:35

6            And that, Your Honor, is the invention.  Very simple

7    technology.  But ITC was the first person, the first company --

8    these gentlemen here -- to do that back in the early '90s.  And

9    because of that, they got two patents from the Patent Office,

10   one patent on this broad technology and another patent on              10:24:55

11   something called scrub analysis which we'll get to in a couple

12   of minutes.

13           So the patent examiner examined all of these

14   applications and found that they are much different than

15   anything ever that came before, much different than conductive         10:25:13

16   systems, which they rendered obsolete, like API's previous

17   system, and for that reason, conveyed a patent.

18           Now, I want to talk a little more specifically about

19   some of the claim terms since this is a claim construction

20   hearing.  I recognize that the parties have filed six briefs,          10:25:28

21   so you have probably been through a lot of this before and I

22   don't want to belabor many of the points.  I just want to hit

23   the high points, the points we figure are post important.

24           In the '394 patent, there are basically two terms we

25   find most important.  One is window.  The other is the computer        10:25:42

United States District Court

1  means with software means.  Well, the computer means with                10:25:46

2  software means is broken up into two parts.  In fact, it says

3  "comprising" which means, in patent legalese, including.

4          So the computer means is defined by these two things,

5  that positioning means we talked about which finds the probe             10:26:01

6  tips, and the means for mathematically moving using a best fit

7  which identifies those which are misaligned.  And that's really

8  all I think we need to get into in this patent for the most

9  part.

10          Now, I want to talk about first about what a window            10:26:15

11  is.  Well, according to the fed circuit, terms are usually

12  given their ordinary meaning.  Phillips decided that.  Claim

13  terms are given their ordinary meaning unless there's some

14  reason that you have to give them a different meaning.

15          In other words, does the patent say window normally          10:26:32

16  means this but herein we define it to be something different,

17  like we mean window to be anything which is blue.  Our patent

18  doesn't do that.  The ITC patent doesn't do that.  It uses

19  window in its very liberal, conventional sense.  There's no

20  reason to depart from that.                                             10:26:51

21          We all came into the courtroom knowing what a window

22  is and that shouldn't be any different.  It's a transparent

23  area bordered by a nontransparent area.  In a house, it's the

24  window and the glass pane and the frame.  Nothing is different

25  than that.                                                              10:27:04

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1        API wants you to say that it's something different,        10:27:06

2   something much more complex, that you need an additional

3   element.  It's a window plus a stage.  But if that were the

4   truth, we would have said window and stage or movable window or

5   something different than that.  But very clearly, claim one of   10:27:17

6   the '394 patent doesn't say anything about a movable state,

7   doesn't mention stage.

8        It says:  A viewing system for providing a digital

9   image in a window with a flat surface.  It says nothing about a

10  stage, says nothing about movement and for that reason          10:27:38

11  shouldn't be conveyed any more narrowly than that.

12       We're entitled to the broadest reasonable

13  construction supported by the patent and there's no reason to

14  differentiate from that.  There's no reason to try to read in

15  additional limitations.                                         10:27:54

16       We would submit that any additional limitation is

17  motivated not by the patent not by the disclosure but merely

18  from API trying to avoid infringement.

19       Now, the next term I want to talk about is the

20  computer means with software means.  Again, computer means with 10:28:07

21  software means is defined in the patent by its two parts.

22  Claim one says a computer means with software means to

23  determine and analyze the position of each probe.  Said

24  computer means with software means comprising, in other words

25  including, two different parts.                                  10:28:26

United States District Court

1    The positioning means, which we talked about, which          10:28:28

2  are the algorithms which find the probe tips and the means for

3  mathematically moving, which is just making sure that we know

4  which probe tips are misaligned, nothing more than that.

5    Now, API wants us to go beyond claim construction.          10:28:43

6  They want you to rule that the claims are invalid even though

7  the Patent Office examined these twice, examined each of the

8  means-plus-function clauses and somehow, according to API,

9  managed to get them all wrong.

10    This is a patent examiner who issued over a thousand        10:29:02

11 patents before he issued this patent, a very qualified

12 examiner, a very qualified organization.  They are the experts

13 at this.  They examined it and found perfectly adequate support

14 and we're going to get into that support.

15    But before we get there, API must prove invalidity,        10:29:15

16 of course, by clear and convincing evidence because there's

17 always that presumption that a patent is valid.  There is

18 always the presumption that the Patent Office did its job

19 right, as we'll see this examiner did.  He wasn't some rogue

20 examiner just trying to grant any application that came across   10:29:34

21 his desk.  If you go through the patent prosecution history,

22 it's very considered.  He looked at each issue, he looked at

23 each claim and determined that they are well-supported by the

24 specification.  And for that reason, the claims are valid and

25 entitled to this clear and convincing evidence.                 10:29:51

United States District Court

1    You don't see that anywhere in their briefs.  They                    10:29:54

2  will try to skip over that to make this seem like a threshold

3  image or threshold analysis of claim construction.  It's not.

4  It's a wholly separate issue of whether the patents ensued are

5  valid or not.                                                           10:30:06

6        Now, the only proof that API can submit that they

7  think the patents are invalid is they say that there is not

8  adequate support in the specification.  They submit the

9  affidavit from one gentleman, Dr. Paul Wright, a very esteemed

10 professor at I believe Berkeley, but not an expert in this, not         10:30:24

11 an expert in claim construction.  In fact, not even a person of

12 ordinary skill in the art in probe analyzers.

13       While very skilled, the gentleman had never seen a

14 probe card tester before his deposition, never seen one, never

15 used one, didn't know anybody from either of the companies,             10:30:42

16 didn't attend trade shows.  All he does is specify that

17 according to a definition he was given of an algorithm, he

18 didn't find that algorithm.  But the fed circuit uses a much

19 different definition.

20       The correct standard for an algorithm.  These are                 10:31:03

21 means plus function clauses so since they recite computer

22 means, they are necessarily limited by the structure given in

23 the specification.

24       In other words, it's not any computer.  It's not a PC

25 we see over here or Apple that is running this.  It's a                 10:31:16

CV-06-02182-PHX-ROS, January 23, 2008

1   computer which is configured to operate in accordance with the        10:31:20
2   claims.  The claims say the positioning means finds the probe
3   tips, so we need to look at the specification to find where
4   that is.

5           But all we need to do, all ITC needs to do is tell a         10:31:34
6   person of ordinary skill in the art -- not me as a lawyer, not
7   somebody else, but a person of ordinary skill in the art enough
8   to make it understandable.  It's not meant to be read by
9   lawyers.  It's meant to be read by another person of ordinary
10  skill in the art.                                                      10:31:50

11          So they have their own language.  They have their own
12  terms.  They have their own shorthand much like lawyers have
13  shorthands for different things.  We have our own language.
14  They have their own language.

15          We will see that all they need to do is communicate         10:32:04
16  in that language, that it's not a very difficult standard.
17  It's not a high bar.  All you need to do is disclose something,
18  something that a person of ordinary skill in the art will
19  understand what the claims mean because that's the test.  They
20  want to be able to look at the claims and be put on notice as       10:32:21
21  to what you can do and what you can't do.

22          And we'll go through the claims of ITC's patents and
23  you can very clearly see that a person of ordinary skill in the
24  art would know what they can do and what they can't do because
25  then they would infringe the patent.                                  10:32:35

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1       Now, what is an algorithm?  District courts, the        10:32:39
2  Finisair case, which is cited by the defendant, says algorithm
3  doesn't mean a formula.  It doesn't mean math.  It doesn't mean
4  code.  All it means is that you need to communicate between two
5  persons of ordinary skill in the art to convey what the         10:32:56
6  invention was.

7       In fact, the fed circuit has reviewed most recently a
8  number of cases to kind of define how that disclosure goes.
9  The *Allvoice v. Nuance Communications* case was very recent in
10 2007.  The federal circuit says just the reference to Windows   10:33:11
11 software, just the reference, no math, no code, no version
12 number just the reference to the Windows operating software was
13 enough to describe sufficient structure.

14      The *Atmel* case is a seminal by the fed circuit a
15 number of years ago which said what you need to define          10:33:31
16 structure.  They said that the mere title of a paper on a
17 MOSFET, which is another electrical device, the mere title of
18 that paper was enough that a person of ordinary skill in the
19 art knew generally what it was that the plaintiff was trying to
20 claim.  That was more than sufficient structure.                10:33:48

21      In the Intel case recently, they said a reference to
22 generic core logic -- in other words, you don't even have to
23 define which particular core logic.  You don't need to define
24 which particular algorithm.  All you need to do is define the
25 generic algorithm.  And, therefore, they didn't say that you    10:34:07

United States District Court

 1    even had to have exact circuitry, exact code, nothing like                    10:34:10
 2    that.

 3          In re Dossell is another federal circuit case.  They
 4    said that reference to known algorithms, even without
 5    specifying the exact algorithm, is enough if a person of                    10:34:21
 6    ordinary skill in the art would look at that definition of
 7    known algorithm, that description, and know what he could do
 8    and what he can't do.

 9          All right.  So it's not a very difficult bar and it's
10    a bar that the patents, without question, meet because there's              10:34:35
11    much, much more disclosure than any of these fed circuit cases
12    which held that there was adequate disclosure.

13          Now, getting back to the real terms we want to talk
14    about, the positioning means.  We defined the positioning means
15    as a computer programmed or running software such as image                  10:34:53
16    analysis software or blob analysis software.

17          Now, we don't pull that definition just out of the
18    air.  It's a means-plus-function clause.  So we look at the
19    patent.  What does the patent describe is the corresponding
20    structure, the corresponding algorithm?                                     10:35:08

21          Well, this is the '394 patent.  And it says
22    specifically in it says after each image is captured which was
23    done using the camera through the window, it's analyzed using
24    image analysis techniques to determine the position of the
25    centroid of each probe tip.  What it means is to determine the              10:35:26

1    center of each probe tip in that image.                          10:35:30

2            A person of ordinary skill in the art would

3    understand that from that what it is that ITC is conveying.

4    But ITC actually went far beyond that and they gave us specific

5    example, not just the generic algorithm which the federal       10:35:42

6    circuit found to be allowable but a specifical algorithm that

7    you can use which is called blob analysis.

8            And we're going to hear testimony that people in the

9    art readily understood what blob analysis was.  It's a wide

10   variety of programs which do one specific function and that is  10:36:00

11   identifying a blob in an image.  Very simply that.  The blob is

12   the probe tip and it finds it.

13           Now, ITC in implementing it did many other things.

14   They found ways to optimize it, to make it specifically work

15   well for a probe tip, but they didn't rewrite blob analysis.    10:36:21

16   They didn't invent blob analysis.

17           This isn't a patent on here's a new way of doing blob

18   analysis.  So all they did is need to convey to a person of

19   ordinary skill in the art this is what I'm claiming.  You can't

20   do this.  And it says blob analysis software running on a       10:36:38

21   computer -- that's a computer plus software -- to control the

22   image capture to determine the position of the image of the

23   probe tip, exactly what the claim says, exactly what they are

24   conveying to a person of ordinary skill in the art.

25           So now again, the test, the test isn't whether          10:36:57

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1   there's an algorithm disclosed, meaning software.  You need to       10:37:00

2   disclose by name an algorithm that a person of ordinary skill

3   in the art will understand it.  But you don't need to have

4   code.  You don't need to have software.  You don't need to have

5   math.                                                                10:37:12

6           All you need to do, according to the fed circuit, is

7   convey to a person of ordinary skill in the art enough that

8   they will understand what is being disclosed.

9           Now, I asked Dr. Wright if he understood what blob

10  analysis was.                                                        10:37:27

11          (Whereupon, an excerpt from a videotaped deposition

12  of Dr. Wright was played.)

13          MR. CAMPBELL:  In fact, I asked Dr. Wright, API's

14  expert, a little more.  Would a person of ordinary skill in the

15  art truly understand what it meant?                                  10:38:18

16          (Whereupon, an excerpt from a videotaped deposition

17  of Dr. Wright was played.)

18          MR. CAMPBELL:  And according to the fed circuit,

19  that's all we need, that a person of ordinary skill in the art

20  would understand it.                                                 10:39:25

21          But we didn't just ask Dr. Wright.  API deposed a

22  person of ordinary skill in the art, a person who actually did

23  some of the blob analysis software that is referred to in ITC's

24  patents.  His name is Joseph Oberzeir.  I asked him or my

25  partner asked him if he would understand what blob analysis         10:39:44

United States District Court

1    was.                                                                    10:39:48

2              (Whereupon, an excerpt from a videotaped deposition

3    of Mr. Oberzeir was played.)

4              MR. CAMPBELL:  Now, Mr. Oberzeir clearly testified

5    that he understood what the term meant.  But we have more          10:40:32

6    evidence.  We have API communicating in its own patents to

7    person of ordinary skill in the art so we can see what it

8    believed adequate disclosure was.

9              In API's '79 patent they claim blob analysis and they

10   refer to it as blob analysis even less disclosure than ITC has.    10:40:52

11   In fact, they say the mathematical centroid of this

12   distribution, which is of the probe tips, can readily be

13   determined by a technique that is well-known to those of

14   ordinary skill in the art as blob analysis.  It is implementing

15   software on a personal computer.                                   10:41:12

16             That's how API communicated to others of ordinary

17   skill in the art.  That's how ITC communicated to others of

18   ordinary skill in the art.  There's no question that the

19   standard, according to the fed circuit, is met that a person

20   looking at blob analysis, looking at the claim, looking at the    10:41:27

21   function would understand what he can and what he cannot do.

22             Now, the other thing I said we would talk about is

23   identifying, based on best fit, which is part of the

24   mathematically moving step again.

25             While we identify -- identifying based on best fit is   10:41:46

1   a computer programmed to run software for a best-fit analysis.   10:41:50

2   I went back a couple minutes ago and told you that if I have on

3   my left hand what the positioning mean found, the positioning

4   means found, which is all of these probe tips, and I want to

5   see whether they are properly aligned, I overlay another array   10:42:05

6   of properly lined tips and see if they fit.

7           But just mathematically moving doesn't tell me

8   anything.  It just moves these around until it finds the best

9   way, the best fit so that maybe only one probe tip needs to be

10  realigned.  That's called best-fit analysis.   10:42:25

11          And as a result of running that best-fit analysis,

12  you get the best fit.  You get an identification of the probe

13  tip which is misaligned.  That's all it is.  And it's running

14  best-fit analysis.

15          Now, the patent -- I'm not making this up again.  The   10:42:41

16  patent says how you do this.  It says this is done by a

17  computer using matrix techniques -- that's the mathematically

18  moving -- which mathematically moves the array of measured X,Y

19  probe positions -- X,Y is just an engineer's way of conveying

20  where things, they are coordinates are -- around to match as   10:43:01

21  closely as possible -- in other words, the best fit -- the pad

22  locations for best fit.

23          So clearly we see that the patent discloses what that

24  term is.  In other words, how do you do it, how do you

25  identify?  You do it based on a best-fit analysis.  So then the   10:43:19

United States District Court

1   question is, is that an adequate disclosure?  Does that                    10:43:24

2   identify to a person of ordinary skill in the art what they can

3   and cannot do?

4          So, again, I asked Dr. Wright, ITC's expert, if a

5   person of ordinary skill in the art would understand what that           10:43:34

6   term "best fit" meant.

7          (Whereupon, an excerpt from a videotaped deposition

8   of Dr. Wright was played.)

9          MR. CAMPBELL:  Again, we didn't just ask Dr. Wright.

10  We asked another person of ordinary skill in the art, Joseph             10:44:24

11  Oberzeir, the developer of the Volant special purpose computer,

12  which is referenced in ITC's patents, if he believed that a

13  person of ordinary skill in the art would understand what that

14  term meant enough that he would know what he could do and could

15  not do in reading a claim.                                               10:44:38

16         (Whereupon, an excerpt from a videotaped deposition

17  of Mr. Oberzeir was played.)

18         MR. CAMPBELL:  Again, it's just putting your fingers

19  together.  One is the set of images, the other is array and you

20  best fit them as much or as closely os possible.  There might            10:45:31

21  be a thousand or 10,000 different ways that a computer

22  programmer can implement a best-fit algorithm.

23         If you get 100 programmers, they are going to write

24  something slightly different but it's all that same generic

25  algorithm, that same special algorithm which allows you to               10:45:47

1    determine to move that array around and find the best fit.          10:45:50

2            Now, API also, when they refer to how their device

3    works, they communicate in a certain way and that certain way

4    is a person of ordinary skill in the art.  And they understand

5    what best fit is.  And they understand that they don't have to   10:46:06

6    further define it.  They can say best fit and the person, for

7    example, their customer who is reading this, will know exactly

8    what they mean.  They don't have to have the software.  They

9    don't have to have the math.  All they need to do is

10   communicate to their engineer, to their customer, "This is what  10:46:25

11   we do."

12           And, in fact, they do it almost exactly as stated in

13   the claim.  Probe alignment is determined by mathematically

14   positioning, mathematically moving, that measured array over

15   the referenced array for a best fit.  And the result of that is  10:46:39

16   which probe is not aligned.  So best fit identifies necessarily

17   what probe is unaligned.

18           Now, if you look at the invention, if you look at the

19   claim, you can see all of the elements very clearly.  There's

20   only a few.  It's a viewing system.  Well, a person of ordinary  10:47:05

21   skill in the art knows what a viewing system is and he looks at

22   his device and says, "Well, I could put a viewing system

23   therein as long as I don't have all of the other elements.

24   Well, if I build a viewing system with a window, then I have to

25   see if the computer works the same way.  Otherwise, I want to    10:47:21

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1    be sure I don't infringe;" right?                              10:47:23

2          Well, all the person then has to do is look at what

3    that computer is.  How does it work?  Does it have a

4    positioning means using blob analysis?  If it does, he knows

5    what blob analysis is.  He goes further in the claim and says,  10:47:35

6    "Well, I better make sure if I'm not going to infringe, that I

7    don't do the last step," which is means for mathematically

8    moving to determine the best fit and to identify those probes

9    based on a best fit.

10         Well, since he knows what a probe tip is, since he        10:47:53

11   knows what a window is, he knows what a camera is, he knows

12   what blob analysis is, he knows what best fit is, he can look

13   at that claim and very clearly understand, according to the fed

14   circuit, "This is what I can do."

15         That's the whole purpose of this test, is to identify     10:48:10

16   to a person of ordinary skill in the art what they can and

17   cannot do, what is claimed and what is not claimed.  And very,

18   very, very clearly the '394 patent tells a person that.

19         Well, how is it, then, how is it that API somehow

20   thinks and argues that the patent is still invalid despite the  10:48:28

21   fact that the examiner said it was invalid?  Well, they use an

22   inflated standard for algorithm.  They don't use what the fed

23   circuit said, which is just something which conveys to a person

24   of ordinary skill in the art some generic phrase which

25   identifies it.                                                  10:48:47

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1        I asked Dr. Wright, who was the one person who                          10:48:48

2    submitted a declaration saying that the claims were indefinite,

3    what he thought an algorithm was when he speculated in his

4    declaration and here's what he said.

5            (Whereupon, an excerpt from a videotaped deposition          10:49:09

6    of Dr. Wright was played.)

7            MR. CAMPBELL:  Now, a patent is not a blueprint on a

8    bomb or a blueprint on a missile.  It's something where you

9    convey to a person of ordinary skill in the art what I invented

10   and what I am claiming.  You don't have to have a blueprint.        10:49:34

11   Where in the fed circuit you don't have to have high-level

12   code.  You don't have to have low-level code.  You don't have

13   to have mathematics.  You don't need to have source code.  You

14   don't need to have flow charts.

15           All you need to do is adequately define structure           10:49:46

16   that renders the bounds of the claim understandable to a person

17   of ordinary skill in the art.  That doesn't mean that you need

18   to have source code or algorithms which is the standard that

19   Dr. Wright used.

20           So all we need to do is look at API's patent and see         10:50:05

21   is there some structure which corresponds to the means?  Is

22   there some structure that corresponds to the positioning means?

23   Yes, there is.  It's image analysis software or blob analysis

24   software.

25           Is there structure which corresponds to the best fit,       10:50:22

United States District Court

1   the mathematically moving for best fit?  Yes, there is.  You        10:50:26

2   look at the patent and you see several paragraphs devoted

3   solely to that.  So that a person of ordinary skill in the art

4   would know that.

5          Considering it's not a high bar and considering that       10:50:37

6   the defendants have a clear and convincing evidence standard,

7   without question, at least according to all of the cases from

8   the federal circuit, the patent clearly meets that, the '394

9   patent.

10         I said I'm going to talk about two patents.  The            10:50:55

11  other one that revolutionized the industry is a scrub mark

12  patent.  Now, what is a scrub mark?  It's not a term we would

13  normally discuss.

14         The best way I can describe it is I talked about a          10:51:09

15  pad, a contact pad, not a legal pad but a contact pad on an

16  integrated circuit and here's a probe.  Well, when this probe

17  comes down and touches, you need to make sure it touches with

18  adequate force because in electronics, if something just barely

19  touching, there's a lot of resistance, meaning it doesn't

20  communicate as efficiently as it can.                             10:51:29

21         So we want to make sure it communicates efficiently.

22  If this is the probe, what a probe card does and the way that

23  an integrated circuit is usually used is the tips actually are

24  compressed a little bit against that pad.  But I want to make

25  sure that that probe tip isn't going to damage the pad and I     10:51:50

CV-06-02182-PHX-ROS, January 23, 2008

1    want to make sure it's not going to go off the pad.  So all a        10:51:50

2    probe mark is I've got my pen and probe and when I compress

3    them together, a movement is made and creates a mark called a

4    scrub mark and that is what ITC's '894 patent is about.  It's

5    about using machine vision again very much the same way to          10:52:09

6    determine these probe marks that are created by a probe card.

7            Again, ITC was the first company ever to use vision

8    analysis in this way, to analyze and predict what kind of scrub

9    marks would be made by a probe tip.

10           And you see here in the little image we have on the          10:52:32

11   screen these are the pads.  This is the integrated circuit, the

12   chip we saw in the beginning, magnified very, very high.  That

13   is the contact and this is the mark, the scrub mark that is

14   left by the probe tip, the probe tip on that probe card when

15   somebody did the testing.                                           10:52:53

16           We want to make sure we're not going to damage a

17   circuit when we test it.  We want to make sure that we are

18   going to test it accurately, and that's what the '894 patent is

19   about.

20           Claim one of the '894 patent has a couple of terms in       10:53:05

21   it which you don't ordinarily see.  First force, second force,

22   and computer means again.  What is a first force?

23           Again, the purpose of the invention, the purpose of

24   the invention is to create two different images.  I want to see

25   my first image when my probe isn't quite touching or barely        10:53:22

1    touching but so that it hasn't deflected.  It hasn't moved            10:53:26

2    across the page yet.  It hasn't moved across the contact.

3          So that's my first image.  I want to be able to find

4    where that image is and then I want to compress these again,

5    create a scrub mark and see where the second image is.  That is    10:53:38

6    my scrub mark, where it starts and where it ends.

7          So my first force is the force that I create, which

8    can be a zero force, according to the patent.  And when I'm

9    taking an image of the pin in an undeflected state.  That's the

10   key, undeflected.  However you make it undeflected is up to the   10:53:58

11   designer, but you don't want to exert some force that is going

12   to cause it to be deflected substantially so you don't want it

13   to touch or you want it to just barely touch but the key is you

14   want it to be undeflected.  So the first force is just some

15   first force.  Within the context of claim, it defines what that  10:54:15

16   force is.  There's no reason to add additional meaning to that.

17         It defines a second force.  The second force is some

18   force different than the first force because it's the force

19   that makes the probe move along the pad, makes the probe move

20   along and create that scrub mark, nothing more than that,        10:54:33

21   nothing complex.

22         Now, what is a computer means?  Well, a computer

23   means is what actually figures out from those two images

24   whether I have a scrub and what the scrub looks like.

25         Now, we talked about the first patent when we have an     10:54:53

1    image and that image has a little blob in it which may                    10:54:55

2    correspond to a probe tip, we want to find out where it is in

3    the image.

4              Well, we use a computer using that equivalent image

5    analysis software like defined in the patent.  The              10:55:07

6    specifications of both patents are the same.  So everywhere

7    where I found a blob analysis, an image analysis in the first

8    patent you find it in the second patent.

9              And without question, it says you use blob analysis

10   to find both images and then what's left?  Math.  You subtract   10:55:24

11   one image from the other and you have the length.

12             The result of the blob analysis are two locations,

13   X,Y locations, so that defines where the scrub mark is, the

14   location of the scrub mark.

15             So the location necessarily falls out of the scrub     10:55:46

16   mark analysis and the length falls out of math, a simple

17   subtraction analysis.  Nothing more than that.  We're not

18   talking about algorithms which even you and I might not

19   understand.  We're talking about subtraction, nothing more.

20   Very, very simple algorithms.                                    10:56:04

21             Now, claim four in the '894 patent is also directed

22   to scrub.  Claim four is a bit different.  Claim one talks

23   about contact.  It talks about you have a first force which we

24   just talked about.  You have a first force in contact with the

25   window and then a second force in contact with the window.       10:56:39

1      By these two contact points I can define my scrub            10:56:44

2  mark, but it says contact.  It defines the invention in terms

3  of contact, two contact points at a beginning and an end.

4      Claim four is different.  And the Patent Office

5  allowed both of these.  And claim four noticeably does not say   10:56:58

6  contact anywhere.  ITC defined its invention without contact

7  because, again, the true invention is determining the length of

8  scrub based on an undeflected probe and a deflected probe.  It

9  doesn't matter whether there's contact.  That's one way to do

10  it.  That's the preferred way to do it.  But you can also do it  10:57:18

11  other ways as long as you can see that first probe and analyze

12  it and determine where it is in an undeflected state and then

13  look at it in a deflected state, that achieves the means of the

14  invention.  That achieves the purpose.

15      Now, there's a reason that claim four is different          10:57:36

16  than claim one.  Claim one defines contact.  Claim four does

17  not require contact.  It uses different terms and because it

18  uses different terms, they are implicitly meant to mean

19  different things.

20      Instead of having a first force defining contact and        10:57:53

21  a second force defining a different contact, claim four merely

22  defines a first and second defined overdrive.  Overdrives are

23  terms of ordinary skill in the art, terms that those people who

24  do this kind of work understand.  Overdrive just means how much

25  a stage, which is the thing that may have the window on it,      10:58:14

1    will move towards the probe tips and look at them.  The first        10:58:18

2    overdrive may be just below it.  The second overdrive is going

3    to create that scrub because it's going to cause some kind of

4    deflection.  All right?

5         Now, we would define the first overdrive, because we        10:58:30

6    looked at the patent and saw what it said, as a first position

7    in which a digital image of an undeflected or substantially

8    undeflected probe is captured because, again, scrub is from

9    where undeflection is to your final point of deflection.  So

10   the first overdrive is the point where it's not deflected.        10:58:49

11   Again, no reason to infer or to add in terms that aren't there

12   like contact.

13        The second overdrive is that second position where

14   the probe has been deflected.  It's the image you take at that

15   second point.  When my pen has moved all the way across the pad   10:59:07

16   so I now can see what my scrub mark is and that's all that is

17   meant by first and second overdrive.  Nothing more.  It doesn't

18   require contact.  There's a reason claim four doesn't require

19   contact which is what API wants to read into it.

20        Now, API tries to rely on the prosecution history to        10:59:26

21   say that it must have contact.  Well, you can use the

22   prosecution history to define terms.  According to fed circuit,

23   that's perfectly acceptable and you should do that.

24        But you can't use it to read terms into a claim which

25   aren't there.  Claim one says contact.  Claim four specifically   10:59:45

CV-06-02182-PHX-ROS, January 23, 2008

1   does not say contact.  And the reason it doesn't is it doesn't          10:59:50

2   require it.

3            The prosecution history refers generally, generally

4   to the invention in the claims as using contact at two points.

5   But that doesn't have to be how you use it.  And, in fact, the          11:00:02

6   prosecution history talks about claim four, which was initially

7   claim seven, and doesn't refer to contact at all.  Again, it

8   just refers to the first and second overdrive positions,

9   nothing more than that.

10           So when you construe the invention, when you construe          11:00:17

11  the claims, you need to look at what was the invention that

12  they were covering?  What was the thing that they were trying

13  to tell people of ordinary skill in the art you can't do?  And

14  that is using image analysis to take two images and then using

15  blob analysis to determine the locations of the undeflected          11:00:34

16  probe and the deflected probe, nothing more than that.  That is

17  the invention and they are entitled to the broadest breadth of

18  that.

19           Now, API tries to read in a bunch of additional

20  limitations to all of the claims and then says, for example,          11:00:50

21  they need correction or calibration means, things like that

22  that don't appear anywhere in the claims and then says, well,

23  the patent doesn't describe it so it must be invalid.  But you

24  only need to look at the terms actually set forth in the claims

25  and then find the support.                                            11:01:05

United States District Court

1    If you find support, you have a valid patent because          11:01:07

2  you've communicated to a person of ordinary skill in the art

3  all they need to know.

4    Now, we can go on to API's patent or I would much

5  prefer to call to the stand Mr. Schwartz who really can         11:01:21

6  describe the invention much better than I can.  I'm not a

7  person of ordinary skill in the art.  I'm not an expert but

8  Mr. Schwartz is and he can fill in the gaps which I was unable

9  to do.

10    Your Honor, may we do that at this time?                     11:01:34

11    THE COURT:  You may.

12                       RODNEY SCHWARTZ

13  called as a Witness herein by the Plaintiff, having been first

14  duly sworn and/or affirmed by the Courtroom Deputy, testified

15  as follows: correct                                            11:01:54

16    COURTROOM DEPUTY:  Thank you.  Please take our

17  witness stand.

18                   **DIRECT EXAMINATION**

19  BY MR. CAMPBELL:

20  Q.   Mr. Schwartz, I understand you are one of the principal   11:02:47

21  owners of ITC; right?

22  A.   Yes, I am.

23  Q.   Integrated Technology Corporation.  Can you tell me a

24  little bit about the formation of that company, just a quick

25  overview?                                                      11:02:59

United States District Court

RODNEY SCHWARTZ - Direct

1   A.   Your Honor, my partner and I -- my partner is Gary                    11:03:12

2   Ormen -- started this company in 1975.  We were employees of

3   Bomar Instruments and Bomar actually went Chapter 11 and one of

4   our customers at that time asked us to complete a project that

5   we had at Bomar which was a navigational commuter.                         11:03:32

6        We actually started the company, just the two of us,

7   to do that.  We proceeded from that point to test equipment for

8   integrated circuits into some OEM electronics.  We actually

9   built all of the electronics for a company called Universal Gym

10  Equipment.  And along the way we picked up a line of probe card   11:03:54

11  analyzers from a company called Probe Technology.

12       Probe Technology was a company who built probe cards,

13  and they had built a probe card analyzer but they were not

14  equipment people.  They built probe cards.  So they were not

15  skilled in that art.                                                       11:04:14

16       We actually purchased the product line from them in

17  California, brought it to Arizona, and we have developed from

18  that point our line of probe card analyzers.

19       Today we have somewhere between 65 and 70 people in

20  Arizona and three people in Taiwan.  We have a branch office               11:04:32

21  there.

22  Q.   Now, Mr. Schwartz, I tried to describe as best as I could

23  what a probe card tester is.  Can you fill us in a little more

24  about what that is?  How does that interface with the

25  integrated circuit?                                                        11:04:48

RODNEY SCHWARTZ - Direct

1  A.   Essentially, we're testing the tester.  The probe card is        11:04:49

2  the instrument that is used to connect these electrical signals

3  and instead of the stimulus and readings to the integrated

4  circuit chip.  If that's not done correctly.  If that probe

5  card is not correctly manufactured and correctly maintained,        11:05:10

6  the test might not be done properly.  We would throw away good

7  chips or, worse yet, maybe pass bad chips on to the assembly

8  process.

9       So, essentially, the probe card analyzer determines

10  that the probe card is acceptable to use in a production        11:05:37

11  environment and test the chips.  I hope that explains it, Your

12  Honor.

13  Q.   Now, Mr. Schwartz, before you came up with the invention

14  of the machine vision version of the system, how did systems

15  work before that?        11:05:57

16  A.   Let me try to explain this simply, Your Honor.

17       We can all use our eyes to see where something is

18  positioned.  This is not a quantitative measurement, though.

19  It's a qualitative measurement.  We think something is

20  positioned in the middle of a particular region because we can        11:06:18

21  see it.

22       I can see my hand and I can see my other hand and I

23  said, well, that's about in the middle.  Well, this is kind of

24  the way the industry maintained probe cards before.  They would

25  take a wafer which has the pads on it and a probe card,        11:06:38

RODNEY SCHWARTZ - Direct

1   position the probe card as well as they could over the wafer        11:06:44

2   and look at the probes and look at the pads, see if they were,

3   we think in our mind, close enough to being aligned.

4          API, at some point in this industry, came up with an

5   electrical method of finding the position of probes.  So until     11:07:07

6   we developed the machine vision method, there were no really

7   good methods of determining exactly where a probe was located.

8          What we did was apply machine vision and certain

9   best-fit algorithms and so on to the process of creating real

10  data, real live hard numbers on where the probes are located as    11:07:41

11  opposed to what the industry was doing before which was using

12  our eyes and our brain to position the probe card properly.

13  Q.   Mr. Schwartz, you talked about a conductive system, an

14  electrical system.  How did that work?

15  A.   I'm sorry.  Your Honor, I'll try to demonstrate this          11:08:06

16  graphically a little bit.

17         If I have a conductive strip and I have a probe, if I

18  bring a probe along and I will know when that touches an

19  electric -- makes an electrical contact to that strip.  So I

20  could come along and I could find the -- I believe this is        11:08:30

21  north-south direction by stepping along.  And as soon as the

22  probe contacted that strip, I would know its position in the

23  north-south direction.

24         I could then step it across a different electrical

25  strip and find its position in an east-west direction.            11:08:50

United States District Court

RODNEY SCHWARTZ - Direct

1          So using those two pieces of data, I could find the          11:08:56

2    position of the probe electrically.  I hope that's clear.

3    Q.   Now, that thing, that thing that you were trying to

4    simulate with your hand, that was called a checkplate at the

5    time?                                                              11:09:12

6    A.   Yes.

7    Q.   Now, did those systems use machine vision?

8    A.   Your Honor, there was no machine vision involved in this.

9    Q.   And who was the first to develop machine vision?

10   A.   I believe, Your Honor, we were absolutely the first to       11:09:26

11   develop machine vision as applied to a probe card analyzer.

12   Q.   So your probe card analyzer, as we showed pictures of it

13   and discussed it earlier, it has a window in it?

14   A.   That's correct.

15   Q.   And it has a camera system?                                   11:09:40

16   A.   Yes, it does.

17   Q.   And how do those two work together to see a probe?

18   A.   It's really very simple, Your Honor.  We're using a camera

19   system and some optics, essentially like a microscope or

20   telescope or whatever you want to think of it as and we're        11:10:01

21   looking through the window to see the probes.

22          The reason we're looking through the window is that

23   we want, in some cases, to position those probes against that

24   window and apply some force and watch the movement or find the

25   position of the probe under a certain amount of force or          11:10:22

United States District Court

RODNEY SCHWARTZ - Direct

1    deflection.                                                          11:10:27

2    Q.   Now, we talked about a computer and a computer means and

3    positioning means and these means-plus-function clauses, what

4    do those actually mean to you?  In other words, how does the

5    computer look at the images to an engineer?                          11:10:39

6    A.   Okay.  Your Honor, you heard the term "blob analysis."

7    Blob analysis is merely a specific type of image analysis which

8    is also described in the patent.

9         So positioning means or computer means, positioning

10   means is merely being able to determine in real terms, X, Y, or      11:11:01

11   east-west terms, the location of the probe or probe tip or tips

12   using these mathematical methods, these algorithms.

13   Q.   So once you find the probe tips, what do you do next?

14   A.   I'll use the same analogy, Your Honor.

15        If this is my best position for the probes.  This is           11:11:36

16   where I want them to be.  That matches the configuration of the

17   pads on the integrated circuit.  So my fingerprints would

18   represent the position where we want the probes to be.  And

19   then somewhere else in space -- doesn't have to be the same

20   place.  Somewhere else in space we capture the position of the      11:12:00

21   probes on the actual probe card.  We're actually going to take

22   those images and overlay them mathematically which is what we

23   call a best fit.

24        Now, if the probe card was perfect, all of the probes

25   would line up with all of the pad positions exactly.               11:12:21

United States District Court

RODNEY SCHWARTZ - Direct

1          Unfortunately, in nature, nothing is quite perfect.                    11:12:25

2    So one of the probes may be misaligned from the proper

3    position, the proper pad position or maybe two.  But the idea

4    of a best fit is to get the most or the best alignment we can

5    and then determine which probes do not meet our criteria so         11:12:52

6    they can then be repaired or moved to the proper position.

7    Q.    Mr. Schwartz, did you invent blob analysis?

8    A.    Your Honor I would like to say I did but, no, we did not

9    invent blob analysis.

10   Q.    How about best fit?                                                     11:13:12

11   A.    Again, Your Honor, we did not invent best fit.

12   Q.    Now, when you and this these other inventors were talking

13   about what were you going to do did you refer to those

14   algorithms by a particular name like best fit?

15   A.    Yes, we did.                                                            11:13:27

16   Q.    I mentioned that there were two patents and the other

17   patent was scrub which you mentioned a little bit.  What is

18   scrub?  Can you define that a little by better than I can?

19          You gave me an image yesterday I think when we were

20   talking -- with snow which I'm from Cleveland so snow works         11:13:44

21   well.  It may not work as well here.

22   A.    Okay.  The example I gave is the reason we want to make a

23   scratch or a mark, a scrub mark, on the integrated circuit pad

24   is that the top of the pad, top of the aluminum tends to

25   oxidize.  It doesn't make contact.  Aluminum is a conductor.       11:14:06

United States District Court

RODNEY SCHWARTZ - Direct

1    The oxide that grows on the top of it is not.  So we really          11:14:12

2    need to break through that.

3         It's very much like a crust of ice on the top of soft

4    snow.  We want to touch the snow so when the probe touches

5    down, we actually want to break through that crust and get down      11:14:26

6    to the snow, the aluminum.

7         So a scrub mark is an indication of how well we have

8    broken the crust of the snow or broken the crust of the

9    aluminum and gotten down to the place where we can make

10   contact.                                                            11:14:47

11        Now, in practical terms, we want to do just enough

12   and not too much because if we scrub too far, we might scrub

13   off the pad onto the rest of the integrated circuit and damage

14   it.  I hope that makes it clear for you.

15   Q.   We talked about two different images.  Why do you make two      11:15:10

16   different images?

17   A.   Essentially, you can think -- Your Honor, you can think of

18   the two different images as the start of the scrub mark and the

19   end of the scrub mark.  So we're very simply capturing two

20   different positions, start and end and mathematically               11:15:27

21   calculating the distance between them.

22   Q.   Do you need the probe tip to contact the pad in both of

23   those points to determine scrub?

24   A.   Actually, no, you don't, Your Honor.  You can pick any two

25   points, and I believe the patent clearly states at one force        11:15:46

United States District Court

RODNEY SCHWARTZ - Direct

1   and another force or at one overdrive and another overdrive so   11:15:53

2   those could be any points.  One of the points could be with the

3   probes hanging in space anytime before they contact the

4   integrated circuit.

5          The second position would be somewhere after it's   11:16:07

6   contacted the integrated circuit because until we contact the

7   surface with the probe, it doesn't move.  It's not going to

8   scrub in space.  It can't.  There's nothing forcing it to do

9   that.

10  Q.   And how do you find the probe in those two images?   11:16:25

11  A.   Again, Your Honor, we use the same method we use in the --

12  to find its position in '394 patent, blob analysis and

13  capturing the image using the machine vision.

14  Q.   Once you have the two images, how do you determine the

15  length?   11:16:52

16  A.   I believe it should be a very simple thing to understand,

17  Your Honor.  If I have two points in space, I can calculate the

18  distance between them.  There may be some trigonometry, simple

19  trigonometry involved in terms of the math, but it's really

20  very simple arithmetic calculation.   11:17:13

21  Q.   Now, Mr. Schwartz, you mentioned earlier conductive

22  system, a conductive system with a checkplate.

23         Now, since your invention of the machine vision, do

24  any of the manufacturers still make probe card testers that use

25  conductive systems for alignment?   11:17:29

United States District Court

RODNEY SCHWARTZ - Direct

1   A.   No.  The conductive system was a product from Applied                11:17:34

2   Precision, API, and they do not manufacture that system

3   anymore.  Nobody else does to the best of my knowledge.

4          MR. CAMPBELL:  Your Honor, I have no further

5   questions for Mr. Schwartz.                                               11:17:50

6          THE COURT:  Cross?

7          MR. BLANKENHEIMER:  Yes, Your Honor, I do.

8          Your Honor, may I approach the witness in the event

9   that we need to refer to Mr. Schwartz's deposition?

10         THE COURT:  Yes, of course.                                        11:18:21

11         MR. BLANKENHEIMER:  I thought it would be helpful.

12  Would Your Honor like a copy of that deposition as well?

13         THE COURT:  I believe I have one, don't I?

14         MR. BLANKENHEIMER:  I truly do not know but we have

15  an extra for you if that would help.                                      11:18:30

16         THE COURT:  Okay.  Okay.  And we will take a

17  12-minute break before this occurs so we can get everything set

18  up and also give my court reporter a break.

19         So we're in recess.

20         MR. BLANKENHEIMER:  Thank you, Your Honor.                         11:18:54

21         (Recess at 11:19; resumed at 11:35.)

22         THE COURT:  Please be seated.

23                        **CROSS EXAMINATION**

24  BY MR. BLANKENHEIMER:

25  Q.   Mr. Schwartz, you would agree that image analysis is a               11:35:13

United States District Court

RODNEY SCHWARTZ - Cross

 1  very general term, would you not?                                    11:35:16

 2  A.   Yes.   Image analysis by itself is a very general term.

 3  Q.   It defines an entire field?

 4  A.   It could.

 5  Q.   And the fact is it could even mean looking at a photograph    11:35:26

 6  and determining something; isn't that right?

 7  A.   In its broadest definition it could.

 8  Q.   And blob analysis is a type of image analysis; correct,

 9  sir?

10  A.   That's correct.                                               11:35:40

11  Q.   And blob analysis, the basis function of blob analysis in

12  1993 was to determine the difference between a digital image

13  and the background?

14  A.   I believe, Your Honor, I would like to restate that a

15  little bit.                                                        11:35:58

16         THE COURT:   Can you answer that yes or no?   And if

17  not, just tell him.

18         THE WITNESS:   I don't think that really is a complete

19  definition.

20  BY MR. BLANKENHEIMER:                                              11:36:11

21  Q.   All right, sir.   Would you turn to your deposition -- and

22  I'm looking now at the September 13 deposition.   And if you

23  will look, sir, at page 66.

24  A.   I have it.

25  Q.   All right, sir.   If you would look at page 66, line one.    11:36:33

United States District Court

RODNEY SCHWARTZ - Cross

1   I'm going to read to you from your deposition.  Were you                    11:36:41

2   deposed in Phoenix?  Is that right, sir?

3   A.   That's correct.

4   Q.   And there was a court reporter and you were under oath

5   when you were deposed?                                                      11:36:51

6   A.   That's correct.

7   Q.   And there was a court reporter taking down everything that

8   you said?

9   A.   That's correct.

10  Q.   And you had an opportunity to look at your deposition to            11:36:56

11  make any corrections that you might want to make?

12  A.   That is correct.

13  Q.   All right, sir.  Page 66, line one:

14       "QUESTION:  Is there something that software has to

15  do other than analyze an image for it to fall into the category        11:37:05

16  of blob analysis software?

17       "ANSWER:  Blob analysis software, the basic function

18  is to determine the difference between the image and the

19  background.  In other words, to identify the part of the video

20  capture that is of interest and this, in our case, is probe            11:37:24

21  tips."

22       Did I read that question and answer correctly sir?

23  A.   That is correct.

24  Q.   All right.  Now, after you separate, after blob analysis

25  separates the image from the background, you just get blobs;           11:37:37

RODNEY SCHWARTZ - Cross

1   right?                                                          11:37:42

2   A.   I'm sorry.  Would you repeat?

3   Q.   After blob analysis separates the image from the

4   background, the output is blobs; isn't that right?

5   A.   No, that's not strictly correct.                          11:37:54

6   Q.   It's the properties of the blobs in pixel coordinates?

7   A.   The properties, that would be closer to correct, yes.

8   Q.   And pixel coordinates are the -- are solely within the

9   digital image of the camera; isn't that right, sir?

10  A.   That's correct.                                           11:38:11

11  Q.   It doesn't necessarily correspond -- it doesn't tell you

12  any information about what's in the real word yet?

13  A.   If you mean -- I guess that's true.

14  Q.   All right, sir.

15          So you don't necessarily know from blob analysis       11:38:28

16  which blobs correspond to the probe tips; isn't that right,

17  sir?

18  A.   That would be in general, true.

19  Q.   All right, sir.  In fact, the reason is that blobs just

20  represent reflected light and so that what will show up in blob   11:38:48

21  analysis is anything that reflects light on the image; isn't

22  that right, sir?

23  A.   That's correct, in one implementation.

24  Q.   So you could have reflections of light from objects other

25  than the probe tip in an image; isn't that right, sir?         11:39:05

United States District Court

RODNEY SCHWARTZ - Cross

1   A.   That is correct.                                              11:39:09

2   Q.   And you could have multiple blobs because you have

3   multiple probe tips in the field of view even though you intend

4   to look at only one; isn't that right, sir?

5   A.   If your intent is to look at only one.  You could have     11:39:23

6   multiple images.

7   Q.   I see.  And you could have blobs that represent noise in

8   the system?

9   A.   That's correct.

10  Q.   And you could have blobs that represent scratches on the   11:39:33

11  glass plate?

12  A.   That is possible.

13  Q.   And you could have blobs that represent deposits from the

14  bonding pad, aluminum oxide deposits on the probe tips?

15  A.   That is also possible.                                      11:39:47

16  Q.   And some blobs you see may represent probe tips but some

17  blobs you see may represent the shanks of probe tips; isn't

18  that right, sir?

19  A.   That is correct.

20  Q.   And multiple blobs may correspond to a single probe tip;   11:39:58

21  isn't that right?

22  A.   It would be possible for a probe tip to exhibit multiple

23  blobs.

24  Q.   All right, sir.  And there may be irregularities in the

25  probe tip that result in producing multiple blobs as a result   11:40:15

RODNEY SCHWARTZ - Cross

1    of blob analysis; right?                                        11:40:19

2    A.    That would be -- that would be the reason you would see

3    multiple blobs.

4    Q.    And you might also see multiple blobs if you had a split

5    probe; isn't that right?                                        11:40:31

6    A.    If you had a split probe, there would, essentially, be two

7    images.

8    Q.    All right.  And so a probe tip isn't always flat.  Isn't

9    that true?

10   A.    That's correct.                                           11:40:44

11   Q.    It may be domed?

12   A.    It may be.

13   Q.    And that could result in your seeing multiple blobs for a

14   single probe tip; isn't that right, sir?

15   A.    Was the question would a domed probe tip give --          11:41:00

16   Q.    The fact that a probe tip is domed might result in your

17   seeing multiple blobs representing a single probe tip.

18   A.    Actually, that would not be likely because a domed probe

19   tip would typically give a single small dot of light.

20   Q.    And a flat probe tip would as well?                       11:41:20

21   A.    A flat probe tip, if it's perfectly flat, would give a

22   single image.

23   Q.    But probe tips are not perfectly flat?

24   A.    That's true.

25   Q.    Now ITC, just so I understand this, had to add something  11:41:35

United States District Court

RODNEY SCHWARTZ - Cross

1   to existing blob analysis software so that it would recognize          11:41:40

2   the blobs that correspond to probe tips; isn't that right, sir?

3   A.    We did not actually add anything to blob analysis.  We

4   used the results of blob analysis.

5   Q.    All right, sir.  Would you turn to your deposition?  This        11:41:58

6   is the September 13 deposition as well.  And I want to direct

7   you to page 67 beginning at line 24.

8           "QUESTION:  And did ITC have to do anything -- add

9   anything to existing blob analysis software to allow it to

10  determine what part of an image was a probe tip?                       11:42:24

11          "ANSWER:  We had to essentially customize the

12  application to the point that we were looking for particular

13  blobs which constituted the probe tips, and we had to make sure

14  we had a good video image."

15          Did I read that question and answer correctly, sir?           11:42:40

16  A.    That is correct.

17  Q.    All right.

18          Now, you needed to develop software to recognize

19  blobs that corresponded to the probe tips -- you needed to

20  develop software to compare the blobs to the expected size and        11:42:58

21  shape of the probe tip; isn't that right?

22  A.    Your Honor, can I expand on that?

23  Q.    Let me rephrase the question.  Perhaps that will be clear.

24          The project here is to figure out which blobs

25  actually correspond to a probe tip; right?                            11:43:22

United States District Court

RODNEY SCHWARTZ - Cross

1    A.    That is correct.                                              11:43:25

2    Q.    And what you had to do at ITC, because, as we've already

3    established, multiple blobs may represent a single probe tip;

4    right?

5    A.    Right.                                                        11:43:33

6    Q.    And you may have a single probe tip and extraneous blobs

7    that don't represent the probe tip but represent something

8    else; right?

9    A.    That's correct.

10   Q.    And so what you had to do was develop software to figure    11:43:46

11   out which blobs corresponded to the probe tips?

12   A.    We had to set conditions which is software.

13   Q.    And one of the ways you did this was by comparing the

14   blobs to the size and shape of the probe tip; isn't that right?

15   A.    That would be one criteria.                                  11:44:07

16   Q.    And to the expected contours of the probe tip?

17   A.    That could be a second criteria.

18   Q.    And to the expected location of the probe tip?

19   A.    That would be a third criteria.

20   Q.    All right, sir.  And the software that made those           11:44:22

21   comparisons and those decisions, that's not part of blob

22   analysis; right?

23   A.    That is not strictly a part of the blob analysis but it's

24   using the results of blob analysis.

25   Q.    It's using the output of blob analysis but it's doing       11:44:39

RODNEY SCHWARTZ - Cross

1   something else; right?                                          11:44:42

2   A.   Strictly speaking, yes.

3   Q.   All right, sir.

4            And you don't claim that one of ordinary skill in the

5   art -- you don't claim that that software was well-known to one   11:44:56

6   of ordinary skill in the art in 1993, do you?

7   A.   On the contrary, I believe it would be.

8   Q.   You believe that would be well-known to a person of

9   ordinary skill in the art to develop software to separate the

10  probes from the blobs?                                          11:45:15

11  A.   Not necessarily probes but it was well-known that you

12  could establish criteria within the blob analysis program.  In

13  fact, this is typically a part of most blob analysis programs

14  where you can establish I'm really only looking for blobs of a

15  certain size or a certain shape or whatever.  And this was       11:45:35

16  well-known as part of the blob analysis.

17  Q.   And you don't believe there was anything new and

18  innovative about that?

19  A.   The use of blob analysis was not -- I mean, standard use

20  of blob analysis, we did not invent that.                       11:45:54

21  Q.   I understand, sir.  My question was you've just been

22  describing software that you developed to decide which blobs

23  corresponded to the probe tip; right?

24  A.   There is some software, some criteria that we established,

25  yes.                                                            11:46:12

United States District Court

RODNEY SCHWARTZ - Cross

1   Q.   And you don't believe that software was new and innovative          11:46:13
2   to accomplish that function that you've just described?
3   A.   I guess I'm not qualified to answer that question because
4   I don't know exactly what you mean by new and innovative.   It
5   was part of the process to create the invention.                         11:46:35
6   Q.   I see.   So would you turn to your deposition of August 29,
7   sir and I want to direct to you page 169 and I want to begin at
8   line 12 of page 169:
9           "QUESTION:   Is the software that ITC developed, the
10  software portion that ITC developed in connection with                   11:47:06
11  determining the positions of the probes" --
12          Let me read that again.
13          "QUESTION:   Is the software that ITC developed, the
14  software portion that ITC developed in connection with
15  determining the positions of the probes, something that also             11:47:22
16  existed commercially or was it something that ITC had to
17  independently develop?
18          "ANSWER:   Yeah.   I believe I -- I made it clear that
19  we developed specific software for driving the stage the way we
20  wanted it to be driven.   We developed specific software for             11:47:41
21  analyzing the position of the probes, video, and so on.   You
22  could not buy this kind of thing off the shelf.   This didn't
23  exist.   This was new.   This was innovative."
24          Did I read that question and answer correctly, sir?
25  A.   That's correct.                                                     11:47:56

United States District Court

RODNEY SCHWARTZ - Cross

1  Q.   All right.  Now, among other things, ITC developed                    11:47:57

2  software for taking the outputs from blob analysis or image

3  analysis software to analyze the X,Y or real word positions of

4  the probes; isn't that right, sir?

5  A.   To analyze the X,Y position of the probes with respect to             11:48:34

6  each other, yes.

7  Q.   All right.

8           And blob analysis just gives you the positions of the

9  blobs in pixel coordinates; right?

10 A.   That's correct.                                                       11:48:54

11 Q.   It doesn't give you yet the positions of the probe tips?

12 A.   The positions of the blobs correspond to the position of

13 the probe tips.  They are the positions of the probe tips.

14 Q.   Okay.  Now, one of the functions required by claim one of

15 the '394 patent was to determine the positions of the probes in            11:49:15

16 the digital image relative to a known physical position.  Do

17 you remember, that sir?  If it would help, I can display the

18 patent of the patent.

19 A.   I'm sorry.  I can't see that.

20           THE COURT:  Usually -- this is a high-tech                       11:49:45

21 courtroom --

22           MR. BLANKENHEIMER:  Does that help?  Can you see

23 that, sir?

24           THE WITNESS:  I'm sorry, Your Honor.  My eyes are not

25 really that good.                                                          11:49:55

United States District Court

 1              MR. BLANKENHEIMER:  Do you have Plaintiff's          11:49:59

 2     Exhibit 1?

 3              THE WITNESS:  I'm sorry.

 4              MR. BLANKENHEIMER:  I wonder if I could approach the

 5     witness?                                                      11:50:06

 6              THE COURT:  We have Plaintiff's Exhibit 1.

 7              MR. BLANKENHEIMER:  Okay.  Good.  Okay.

 8              THE WITNESS:  Okay.

 9     BY MR. BLANKENHEIMER:

10     Q.   All right, sir.  Does this refresh your recollection that   11:50:28

11     claim one of the '394 patent requires determining the positions

12     of the probe in the digital image relative to a known physical

13     position; isn't that right?

14     A.   That is correct.

15     Q.   And the -- can we say that the known physical position is   11:50:44

16     in real world or X,Y coordinates?

17     A.   The known physical position is somewhere in space.

18              Your Honor, this could be a pixel on the CCD camera.

19     Q.   So, in your mind, there's no distinction between the

20     position of the probes in the digital image and the position of   11:51:14

21     the probes in a known physical position; is that what you're

22     saying, sir?

23     A.   I'm saying that the physical position could be anywhere.

24     It could be a physical position which corresponded to a

25     particular place on a camera but it wouldn't necessarily have   11:51:27

United States District Court

RODNEY SCHWARTZ - Cross

1  to.  It doesn't say that.                                    11:51:30

2  Q.   All right, sir.

3       ITC developed software to determine the positions of

4  the probes relative to each other, did it not, sir?

5  A.   That is correct.                                        11:51:42

6  Q.   And that's another of the functions required by the '394

7  patent?

8  A.   The positioning means -- one of the elements of the claim,

9  the positioning means to determine the position of each probe

10 in the digital image relative to a known physical position in   11:51:57

11 order to determine the location of the probes relative to each

12 other.  That's what we claim.

13 Q.   I understand, sir.

14      So to take the pixels -- blob analysis gives you

15 pixel coordinates; right?                                     11:52:16

16 A.   That's correct.

17 Q.   And real world or X,Y coordinates in physical space are

18 different than pixel coordinates, aren't they, sir?

19 A.   I'm sorry, Your Honor.  I'm an engineer.  I think of

20 things in maybe more engineering terms and pixel coordinates   11:52:37

21 and real-world coordinates as we think of them are directly

22 related in terms of position.  I'm not sure what the question

23 is.

24 Q.   ITC had to develop software to go from pixel coordinates

25 to real-world coordinates, did it not, sir?                   11:52:55

United States District Court

RODNEY SCHWARTZ - Cross

1   A.   This is a simple calculation, yes.                          11:52:59

2   Q.   The answer is yes.

3        Now, in fact, each of the elements of the claim that

4   we've just been talking about, that is determining the physical

5   positions of the probes and the digital image relative to a      11:53:14

6   known physical position, that requires going from pixel

7   coordinates to real word coordinates, does it not?

8   A.   Yes, it could.

9   Q.   And determining the positions of the probes relative to

10  each other, that requires that you have gone from pixel          11:53:30

11  coordinates to real-world coordinates, does it not, sir?

12  A.   I'm sorry.  It does not.

13  Q.   Okay.  And but it certainly requires that you have

14  identified the probe tips which -- strike that.

15       It certainly requires that you have identified which       11:53:46

16  blobs correspond to the probe tip, does it not?

17  A.   Yes, it would.

18  Q.   All right, sir.

19       Now, ITC bought a Volant image art and a package

20  associated with that, did it not?                               11:54:06

21  A.   That's correct.

22  Q.   Now, Mr. Oberzeir was the designer of the Volant card and

23  the associated software?

24  A.   To the best of my knowledge, that's true.

25  Q.   Now, he isn't one of the inventors named on either of the  11:54:16

United States District Court

RODNEY SCHWARTZ - Cross

1   ITC patents in this case, is he?                                    11:54:20

2   A.   No, he's not.

3   Q.   And you would agree that Mr. Oberzeir's work on the Volant

4   card and the associated software didn't contribute to the

5   design of the claimed invention?                                   11:54:28

6   A.   I'm sorry, Your Honor.  I'm not an attorney.

7            Mr. Oberzeir's contribution, if I could state it that

8   way, was that we bought an existing product from him.

9   Q.   All right, sir.  If you would turn to your deposition of

10  August 29 and I'm going to begin on page 25, line 13:              11:54:50

11           "QUESTION:  Did anyone other than yourself" --

12  A.   I'm sorry.  Excuse me.  We have a rather large stack of

13  documents.  Page --

14  Q.   Take your time.

15  A.   Page 29?                                                       11:55:15

16           THE COURT:  25.

17           THE WITNESS:  25, okay.

18           THE COURT:  Line 13 did you say?

19           MR. BLANKENHEIMER:  I'm going to begin at line 13.

20           THE WITNESS:  Okay.                                        11:55:24

21  BY MR. BLANKENHEIMER:

22  Q.   "QUESTION:  Did anyone other than yourself, Gary Rogers

23  and Glenn Wirick --

24           "ANSWER:  Wirick.

25           "QUESTION:  -- Wirick; sorry -- contribute to the         11:55:30

United States District Court

RODNEY SCHWARTZ - Cross

1  design of the PB2000?                                               11:55:33

2          "ANSWER:  If, by design, you mean the original

3  invention, no."

4          Did I read those questions and answers correctly,

5  sir?                                                                11:55:41

6  A.   Yes, sir.

7  Q.   Now, the software associated with the Volant card

8  performed some blob analysis; right?

9  A.   That was its purpose, yes.

10 Q.   But we can agree that blob analysis software does nothing   11:55:55

11 more than find the position, shape and characteristics of an

12 image in the camera field of view and present that as digital

13 information to a software programmer?

14 A.   That's correct.

15 Q.   Now, the image in the camera field of view that blob       11:56:14

16 analysis outputs is in pixel coordinates, is it not?

17 A.   That's correct.

18 Q.   Not real-world coordinates.  Do you agree, sir?

19 A.   To the extent that they may not be the same as real-world

20 coordinates but there is a direct correlation.                     11:56:37

21 Q.   All right, sir.

22          So -- and you would agree that all blob analysis does

23 is find an image versus the background in a video capture;

24 isn't that right?

25 A.   It finds the position and characteristics of images and    11:56:55

United States District Court

RODNEY SCHWARTZ - Cross

1   separates that image from the background.                          11:57:00

2   Q.   And you would agree that the commercially available blob

3   analysis software did not provide algorithms for determining

4   the position of probe tips in real-world coordinates?

5   A.   I guess, Your Honor, again, I'm an engineer.  I'm trying      11:57:26

6   to be specific here.

7            The blob analysis program provided us the means to

8   implement that function.  It did not do it all by itself.

9   Q.   You had to write additional software?

10  A.   We had to use the output of that blob analysis in a           11:57:45

11  specific way.

12  Q.   You had to write additional software?

13  A.   That -- the use of that digital image was software, yes.

14  Q.   All right, sir.  And you had to write additional software

15  to determine which blobs corresponded to the probe tips; right?    11:57:56

16  A.   We did that as an implementation of the product.

17           As far as the claim is concerned, that would not

18  necessarily be required because in the world of claims, we

19  could assume that all of the images were perfect.

20  Q.   All right, sir.                                               11:58:20

21           And you needed to develop additional software to

22  determine the position of the probes relative to each other,

23  did you not?

24  A.   The position of the probes with respect to each other is a

25  direct function of the positioning means, the blob software,       11:58:35

United States District Court

RODNEY SCHWARTZ - Cross

1   which captures the positions of the probes.  Once you know the        11:58:40

2   positions of the probes, you know their position with respect

3   to each other.

4   Q.   And you had to --

5   A.   It's a simple mathematical --                                    11:58:46

6   Q.   Excuse me.  I didn't mean to interrupt, sir.

7         You had to write additional software to do that;

8   right?

9   A.   If you mean did we write a piece of software that

10  subtracted one from the other, yes.                                   11:58:57

11  Q.   All right, sir.

12        Now, let's be clear on this because I don't want

13  there to be an ambiguity.  You believe that ITC had to develop

14  algorithms to analyze data to determine where the probe tips

15  were relative to each other?                                          11:59:21

16  A.   I'm sorry, Your Honor.  I don't believe I said that.

17  Q.   Well, sir, if you would -- do you deny that statement?  Do

18  you think --

19  A.   I do not deny it or accept it at this point.  I'm not

20  quite sure what you mean by that statement.                           11:59:37

21  Q.   Okay.  Could you turn to your deposition of August 29,

22  sir?  And if you'll look at page 160 at line 15:

23        "QUESTION:  Were there any other techniques that ITC

24  had to develop in connection with the video portion of the

25  automatic vision-based system?                                        12:00:06

RODNEY SCHWARTZ - Cross

1    "ANSWER:  We had to develop software techniques that                    12:00:09

2  would analyze the data in a form that we could use it to

3  determine the position of the probes relative to each other."

4          Did I read that question and answer correctly, sir?

5  A.   That's correct.                                                      12:00:24

6  Q.   All right.

7          And you believed that the performance of that

8  function was new and innovative; isn't that right, sir?

9  A.   I believe what was innovative was the entire invention

10  which is outlined in the claims.                                          12:00:43

11  Q.   I see.  But the software that we were just talking about,

12  you don't believe there was anything new and innovative about

13  that that analyzed the position of the probes relative to each

14  other?

15  A.   That is part of the whole.                                           12:00:56

16  Q.   And do you believe that part was new and innovative or

17  not, sir?

18          All right.  We'll move on.

19          I'm sorry.  If you have an answer, please give it.

20  A.   In terms of -- I'm sorry, Your Honor.  I'm not an                    12:01:14

21  attorney.  I don't speak in the same terms here.

22          Innovative, to an engineer, is something that new to

23  them at the time or hopefully new to the world.

24          In this case, no one had done this particular

25  function before.                                                         12:01:32

United States District Court

RODNEY SCHWARTZ - Cross

1   Q.   Now, the software available with the Volant card, that                    12:01:35
2   didn't give you the software for identifying, based on the best
3   fit, a minimum number of probes which needed to be adjusted?
4   A.   That's correct.  Best fit is a different algorithm than
5   what is contained in the Volant card.                                         12:01:54
6   Q.   And ITC had to develop software to identify, based on the
7   best fit, a minimum number of probes that needed to be
8   adjusted; isn't that right, sir?
9   A.   Actually, I believe the way we explained it before is
10  perhaps more correct.  We used -- the result of a best-fit         12:02:17
11  analysis essentially gives you the noncomplying probes.  That's
12  the purpose of a best-fit analysis.
13  Q.   Could you turn to your deposition of August 29, sir, at
14  page 163?  I am going to begin on line 20.
15  A.   Okay.                                                                     12:02:40
16  Q.   "QUESTION:  And did ITC also develop a technique to
17  identify, based on the best fit, a minimum number of probes
18  which need to be adjusted?
19         "ANSWER:  If you mean did we implement that in our
20  software, yes.                                                                 12:02:55
21         "QUESTION:  And was this a technique that ITC
22  developed to identify the minimum number of probes which need
23  to be adjusted?
24         "ANSWER:  I thought that's what we just said."
25         Did I read those questions and answers correctly?                      12:03:08

United States District Court

64

RODNEY SCHWARTZ - Cross

1    A.    Yes, you did.                                             12:03:11

2    Q.    All right.   Now, Mr. Schwartz, when you filed the '394

3    patent, you understood the claims, did you not?

4    A.    Yes, I did.

5    Q.    And you would agree, and I think you've testified earlier,   12:03:23

6    that claim one of the '394 patent requires determining the

7    positions of the probes relative to each other.

8    A.    That's correct.

9    Q.    And you understood that when you filed the patent --

10   A.    Yes, I did.                                             12:03:37

11   Q.    -- in 1993?

12   A.    Yes, I did.

13   Q.    And you understood what steps and software were required

14   to evaluate the relative positions of the probes?

15   A.    Yes.                                                    12:03:54

16   Q.    And what calculations were required to perform that

17   function, did you not?

18   A.    That's correct.

19   Q.    Now, Mr. Schwartz, before your depositions, you reviewed

20   the patents?                                                 12:04:02

21   A.    Yes, I did.

22   Q.    You reviewed them carefully because you knew they were

23   important in this case?

24   A.    That's correct.

25   Q.    And you went over them with your counsel, did you not?   12:04:10

United States District Court

RODNEY SCHWARTZ - Cross

1   A.    In some cases, yes.                                          12:04:15

2   Q.    And you had the '394 patent in front of you when your

3   deposition was taken, did you not?

4   A.    At various points -- there were three long days of

5   deposition.  At some point I had the patents in front of me.      12:04:31

6   Q.    Nobody ever denied you access to the patents sir?

7   A.    That's correct.

8   Q.    You could have asked for it at any point?

9   A.    Yes.

10  Q.    And after studying your patent, you couldn't say at your     12:04:40

11  deposition what calculations are involved in evaluating the

12  relative positions of the probes, could you?

13  A.    Your Honor, this invention or this implementation --

14        THE COURT:  Let me ask you, so that it's clear to me,

15  can you answer that yes or no?  If not, then tell                  12:05:02

16  Mr. Blankenheimer and he'll ask you another question.

17        Can you answer that one yes or no?

18        THE WITNESS:  No, I can't.

19  BY MR. BLANKENHEIMER:

20  Q.    All right, sir.  Would you turn to your deposition of        12:05:12

21  September 13?  I would like to begin on page 177 at line 11:

22        "QUESTION:  What calculations are involved in

23  evaluating the relative positions of the probes?

24        "ANSWER:  I'm sorry.  I don't recall at this time.

25        "QUESTION:  When you reviewed the patent and signed          12:05:40

United States District Court

RODNEY SCHWARTZ - Cross

1   the inventor's declaration, did you have an understanding of          12:05:43

2   what it meant to evaluate the relative positions?

3           "ANSWER:  I'm sure I did at the time, yes.

4           "QUESTION:  You no longer remember?

5           "ANSWER:  It's been nearly 20 years."                        12:05:55

6           Did I read those questions and answers correctly,

7   sir?

8   A.   That's correct.

9   Q.   And you couldn't remember those calculations.  You didn't

10  know what was required to evaluate the relative positions of        12:06:04

11  the probes because it's not disclosed in the patent, is it,

12  sir?

13  A.   I am sorry.  I can't answer that question either.

14  Q.   Thank you, sir.

15          MR. BLANKENHEIMER:  I have no further questions.            12:06:26

16          THE COURT:  Redirect?

17          MR. CAMPBELL:  Briefly, Your Honor.

18                    **REDIRECT EXAMINATION**

19  BY MR. CAMPBELL:

20  Q.   Now, you have Plaintiff's Exhibit 1 in front of you --          12:06:38

21  right?

22  A.   Yes.

23  Q.   -- which would be the '394 patent?

24  A.   That's correct.

25  Q.   And I want you to read the first line of claim one.             12:06:45

United States District Court

RODNEY SCHWARTZ - Redirect

1   A.   "An integrated circuit probe card inspection system for       12:06:56

2   probes in a probe array, comprising."

3   Q.   Comprising; right?   There were many other things that you

4   did, weren't there, in developing your machine?

5   A.   Your Honor, we're perhaps confusing the implementation of     12:07:14

6   a machine for commercial sale versus the requirements of the

7   patent here.

8        Yes, there were many other things.

9   Q.   One of the things you did to determine location of probes

10  was use blob analysis; right?                                      12:07:32

11  A.   That is correct.

12  Q.   That's comprised within one of the things you did is blob

13  analysis?

14  A.   That is correct.

15  Q.   You did other things; is that correct?                        12:07:41

16  A.   Yes, that's correct.

17  Q.   What other things did you do?

18  A.   We had to do many things, Your Honor.   We had to build a

19  physical operating system.

20       In the case of probe cards, perhaps we can't get all          12:07:56

21  of the probes in a field of view so we developed a movable

22  stage which would move the viewing system around to view all of

23  the probes.   We developed image patterns for the user to make

24  it easy for them to understand the data.

25       There were many, many things that went into this             12:08:22

RODNEY SCHWARTZ - Redirect

1    product as a product that were over and above the absolute            12:08:24

2    requirements of the patent.

3    Q.    Why didn't you claim all of those?

4    A.    Anything that we're claiming in the claim is what is our

5    invention.                                                            12:08:44

6            So, essentially, we're not claiming to invent

7    everything in the world.   We're claiming this particular thing

8    in claim one.

9    Q.    Now, going from, for example, pixel coordinates to

10   real-world coordinates, that's nothing more than moving from         12:09:01

11   one system to another.   Subtraction; right?

12           MR. BLANKENHEIMER:   Objection.   Leading.

13           THE COURT:   Sustained.

14   BY MR. CAMPBELL:

15   Q.    Mr. Schwartz, to go from pixel coordinates to real-world       12:09:12

16   coordinates, what would do you?   What would a person of

17   ordinary skill in the art understand?

18   A.    A person of ordinary skill in the art would easily

19   understand that each pixel has a known position in the image

20   and going from that positioning system to another coordinate         12:09:33

21   system, for example, is a simple matter of mathematics, simple

22   mathematics to calculate the position based on another

23   reference.

24   Q.    And, Mr. Schwartz, if you say in your patent that we

25   transform from one coordinate system to another, do you need to      12:09:54

RODNEY SCHWARTZ - Redirect

1    provide an algorithm all or does that by itself describe the          12:09:58

2    function?

3                    MR. BLANKENHEIMER:   Objection.   Leading.

4                    THE COURT:   Sustained.

5    BY MR. CAMPBELL:                                                      12:10:06

6    Q.   Sir, a person of ordinary skill in the art reading, for

7    example, even the claim, which says:   Positioning means to

8    determine the position of the probe in the digital image

9    relative to a known physical position to determine the location

10   of the probes relative to each other.                                 12:10:26

11        Does that describe the algorithm?

12   A.   Your Honor, I believe it describes it very well.   Anyone

13   of normal skill in the art would understand that a video image

14   is taken at a particular position.   If I take a picture with a

15   camera looking east and I told the viewer of that image that I        12:10:46

16   was standing at a particular place, this would easily translate

17   that image to a physical known location or another coordinate

18   system, the coordinate system being the real world.

19        That's certainly a skill anyone skilled in the art

20   would have.                                                           12:11:18

21                    MR. CAMPBELL:   No further questions, Your Honor.

22                    THE COURT:   Let me ask you one question.

23        If that's the case, then why did it take development

24   of software for that purpose?

25                    THE WITNESS:   Okay.   Very good question, Your Honor. 12:11:33

RODNEY SCHWARTZ - Redirect

1          Anything we do in a computer takes software so in          12:11:35
2    order to display a picture on this video screen or in order to
3    calculate the difference between two points which we could take
4    a measuring instrument or ruler or something and easily read it
5    off of the ruler, the computer system has to do that in ones          12:11:57
6    and zeros.  So anything we do in the computer requires software
7    regardless of how simple.
8          THE COURT:  Okay.  Thank you.
9          MR. CAMPBELL:  Your Honor, we don't have any
10   additional witnesses at this time.  Would you like us to go on          12:12:19
11   to the presentation of API's patents or do you think we should
12   split it up?
13         THE COURT:  I think we should split it up.
14         MR. CAMPBELL:  Okay.  Then we have to reserve some
15   time for a short closing to rebut anything that they might          12:12:31
16   bring up.
17         THE COURT:  Okay.
18         Thank you.  You may step down.  Just put that there.
19   We'll take care of it.
20         Let's take a 50-minute break for lunch.  We'll start          12:12:39
21   at 1 o'clock.
22         (Witness excused.)
23         (Recess at 12:13; resumed at 1:08.)
24         THE COURT:  Please be seated.
25         All right.  Mr. Blankenheimer?          01:09:36

RODNEY SCHWARTZ - Redirect

1      MR. BLANKENHEIMER:   Thank you, Your Honor.                    01:09:37

2      Your Honor, I represent, as I mentioned, Applied

3  Precision and with me are Ron Seubert who was previously CEO of

4  Applied Precision; John Strom, who was a lifetime fellow and

5  chief technologist of Applied Precision, now with Rudolph        01:09:59

6  Technologies.   You'll be meeting Mr. Strom in a bit.

7      Applied Precision is and has been, since the late

8  '80s, the leader in the field of probe card analysis.

9      As we will show you primarily on another day,

10 although we'll allude to it today, Applied began working on a    01:10:22

11 vision-based probe card analyzer in 1991, two years before they

12 applied for the patent, seven years before -- six years before

13 their patent issued.   They introduced that vision-based probe

14 card analyzer that performed alignment, that did all of the

15 functions, in 1993, produced it to the market.                   01:10:49

16     This case arises because the plaintiff, ITC, applied

17 for a patent on its particular implementation of a vision-based

18 probe card analyzer.   The patent, the '394, the first of their

19 patents, issued in 1997.

20     ITC chose, for reasons of its own, to frame many of          01:11:13

21 the key elements of the claims of both the '394 and the '894

22 patent in means-plus-function terms.

23     Now, I'm going to focus my remarks on the

24 means-plus-function elements.   Ms. Underwood-Muschamp, who is

25 sitting with me at counsel table, will then talk about some of   01:11:34

RODNEY SCHWARTZ - Redirect

1    the other aspects of the ITC patents and the API patent, the          01:11:38

2    Applied Precision patent at issue.

3            The claims of the patent.  Your Honor will have to

4    help me.  I am going to try with the lights on.  I was

5    joking --                                                             01:11:57

6            THE COURT:  We can put the lights down a little bit.

7            MR. BLANKENHEIMER:  We can put the lights down a

8    little bit.  I may have to, as I sometimes do in a restaurant,

9    have to ask for a flashlight to read the menu.  But let's put

10   the lights down a little bit.                                         01:12:09

11           THE COURT:  Okay.  Can you read?

12           MR. BLANKENHEIMER:  We'll find out, Your Honor.

13           So the claims of the patent, an invention is

14   described in the claims.  That's what an invention is, is the

15   claims of the patent.                                                 01:12:23

16           The purpose of the claims is to provide the world

17   with notice as to the metes and bounds of the claimed

18   invention, the patent.  Typically, those limitations, the

19   precise boundaries of that intellectual property, have to be

20   set forth entirely in the claim itself.                              01:12:45

21           Section 112, paragraph 6 of the Patent Act is a

22   limited exception to that rule.  It says that you can use a

23   generic placeholder in the claim itself such as "means" or

24   "device" or "mechanism" and if you -- but if you do that,

25   there's a price to be paid.  And the price to be paid is that        01:13:08

RODNEY SCHWARTZ - Redirect

1    you must then have -- since you're now taking a portion of          01:13:15

2    the -- you are now not being specific as to the boundaries in

3    the claim itself, that generic placeholder then has to be

4    specifically linked to something in the specification that

5    defines the metes and bounds of the structure that performs the    01:13:31

6    claimed function.  That's the law of 112, 6 in a nutshell.  And

7    as I'm sure Your Honor has read, it can be quite complex.

8           For example, in this case, and here is claim one of

9    the '394 patent, and the first means-plus-function element is

10   positioning means.  And you'll see it's positioning means to       01:13:57

11   determine the position of each probe in the digital image

12   relative to a known physical position.  That's part of the

13   function.  And the second part of the function is in order to

14   determine the location of the probes relative to each other.

15          So what we're going to look for is whether the              01:14:16

16   placeholder, the positioning means, has in the specification a

17   precise description of what the scope of that claim is going to

18   be.

19          The quid pro quo, as it's often said of

20   means-plus-function claiming is the precise and clear             01:14:37

21   disclosure of such structure and the linking of that structure

22   in the specification itself to the means element.

23          It isn't enough, as we'll see, for some person to

24   come along later and cobble together portions of the patent and

25   say, "This is what the structure is."  It has to be clearly        01:14:59

RODNEY SCHWARTZ - Redirect

1    disclosed in the specification, and it has to be clearly linked    01:15:01

2    in the specification to the function that's recited.  The

3    reason is simple.

4         As in all claims construction, the most important

5    thing is the intrinsic evidence, the evidence in the patent    01:15:14

6    itself in the prosecution because that's what's public.  When

7    somebody goes to look to see what can I do that's not protected

8    by a patent -- remember what a patent does is exclude the world

9    from doing what's in the claim.

10        And so in the very case that we're here for, the    01:15:34

11   markman case, the federal circuit and the Supreme Court have

12   said that the patents give notice of exactly what that

13   definition is in claims scope and in 112, 6 claiming, or

14   means-plus-function claiming, that has to come from the

15   disclosure of structure in the specification.  That is the quid    01:15:52

16   pro quo.  That's the price that must be paid.

17        Now, as Your Honor knows from our briefing, Your

18   Honor's task in this hearing is three-fold:

19        First, to identify with respect to each

20   means-plus-function element the complete function; second, to    01:16:14

21   determine whether the specification sets forth the complete

22   structure that is both necessary and sufficient to perform that

23   function and whether it's expressly linked to that function.

24        Third, if the court finds that there is such

25   structure disclosed, you must, in construing the claim, because    01:16:37

RODNEY SCHWARTZ - Redirect

1  that's what a markman hearing is, what the claims mean, what          01:16:41

2  are the limits, what are the metes and bounds of these claims?

3         So if Your Honor finds such as structure that is

4  clearly recited and disclosed and clearly linked to the

5  function, then you must include that as part of the claims          01:16:53

6  construction, identifying the metes and bounds of the claim.

7         But if you don't, if Your Honor does not find such a

8  structure, then you must either find the claim invalid as

9  indefinite or at least seek additional briefing, a motion for

10 summary judgment, as some of the cases have done on the issue          01:17:14

11 of invalidity for indefiniteness.  Indefiniteness means, quite

12 simply, not describing the metes and bounds of the claim so

13 somebody who doesn't have the benefit of an expert testimony,

14 who hasn't listened to Mr. Schwartz's testimony, or anybody

15 else, can look at the patent, the intrinsic evidence, and say,          01:17:34

16 "This is the boundary of what that claim is."

17        What must be avoided is allowing a patentee to misuse

18 the tactic of means-plus-function claiming by failing to

19 clearly identify and link a structure to each function.  And

20 the federal circuit has repeatedly admonished the practitioners          01:18:08

21 in the courts about that danger.

22        What cannot happen, what is not permitted is for

23 somebody to just claim a function because anybody can claim a

24 function and then, if there's not a precise definition of the

25 structure, they would be entitled to all structures that          01:18:25

United States District Court

RODNEY SCHWARTZ - Redirect

1   perform that function, including structures they never          01:18:30
2   invented, they never even dreamed of.  That is what is
3   happening here.  That's what's happening in this case, Your
4   Honor, as we'll show in a moment.

5        To avoid, to prevent that from happening, there are       01:18:48
6   three legal requirements to guide the court in performing this
7   claims construction task.

8        First, because each of the means elements in these
9   patents involve a computer running software, the corresponding
10  structure must be a precise algorithm.  That I think is        01:19:12
11  axiomatic although it's disputed in the briefing.  It truly is
12  axiomatic now in the law in the federal circuit and the progeny
13  of WMS Gaming.  Merely stating that something is software
14  clearly is not enough.  There has to be a disclosed algorithm.
15  And the Harris case, cited in our brief, makes it abundantly    01:19:42
16  clear.

17       Now, we have never argued that the only -- as you'll
18  hear from Professor Wright, Professor Wright never argued that
19  the only way to disclose an algorithm is by a mathematical
20  equation or by the source code itself.  An algorithm is        01:19:59
21  essentially a series of rules or instructions that tell you how
22  to solve a particular task and where you can understand each of
23  those instructions.  That's in the definitions that we've
24  supplied to the court that are of record.  I'm not quoting
25  precisely but those definitions from dictionaries in this field 01:20:22

United States District Court

RODNEY SCHWARTZ - Redirect

1  make clear.                                                          01:20:30

2        The real disagreement here is how precise that

3  algorithm has to be.  What ITC is doing is sort of waving its

4  hands and saying, "Well, it's all simple.  It's so simple, we

5  don't have to tell you what it is."  It's so simple that even       01:20:46

6  when Mr. Schwartz was asked, for example, to take one of those

7  elements that are in the claim that are the position of probes

8  relative to each other, he was asked in his deposition to

9  explain that, he couldn't do it.  It's not in the patent.  It

10  may be very simple but he couldn't do it.  The reason, by the      01:21:03

11  way, is that's not that simple.

12        In appreciating the danger to allow somebody to claim

13  using means but function by sort of taking an entire field or

14  an abstraction or a generic statement.  I mean, the whole

15  notion of means plus function is that the word "means" or        01:21:28

16  "mechanism" is generic and that what's required is more

17  definition of the structure in the specification.

18        The danger of failing to do that can be seen from a

19  simple example.  Imagine 15 years ago databases have been

20  around for years, means of searching databases have been around   01:21:48

21  for years.  And so ITC would probably say, well, search

22  algorithms are really well-known, well-known in the art.

23        So imagine someone who a few years ago, 15 years ago,

24  said -- had a claim computer means with software means, just

25  like in their proposed construction, for searching databases    01:22:06

United States District Court

RODNEY SCHWARTZ - Redirect

1    and displaying a list of relevant items and they disclosed in        01:22:11

2    the specification.  This is -- this relates to search

3    algorithms.  That would be enough for ITC.

4           But allowing such a patentee to claim in that manner

5    would allow them to exclude Google, Lexis-Nexis, all of the         01:22:28

6    means of searching databases, all search engines even though

7    they may use algorithms that were not even in the dreams of

8    that patentee.

9           And what's going on in this case, Your Honor, is that

10   is that ITC is trying to reap where they have not sown.  They       01:22:49

11   are trying to broaden their claims to encompass not just the

12   algorithms, the precise software they have written, they are

13   trying to exclude competition in the market for vision-based

14   systems from any algorithms far beyond those they have invented

15   or even dreamed of.                                                 01:23:10

16          No patentee should be permitted to expand the scope

17   of its claims beyond what it invented.

18          They use image analysis.  But as Mr. Schwartz

19   admitted, image analysis just defines the entire field.  Of

20   course the algorithms they have written are image analysis          01:23:28

21   algorithms.  Everything is image analysis.  It doesn't tell you

22   what the metes and bounds of their claim are.

23          So Your Honor must identify the precise algorithm

24   that correspond to these functions.  Second, the algorithm or

25   algorithms must be complete in the sense that they constitute,      01:23:51

RODNEY SCHWARTZ - Redirect

1    as I've said, the necessary and sufficient conditions for          01:23:53

2    performing the function.  They can't perform part of the

3    function.  They can't perform the function some of the time.

4    They can't be merely part of what is performing the function.

5    They have to be necessary and sufficient.                          01:24:06

6           Third, as I've said, the algorithm must be clearly

7    disclosed and linked entirely within the four corners to the

8    specification and that is important.  That is what the

9    intrinsic evidence is.  That is what somebody going to the

10   Patent Office, looking at the patent or bringing it up through     01:24:24

11   a search engine, that is what they need to know.  What does

12   this claim mean?  And the patent itself, the four corners of

13   the specification, has to tell you what the metes and bounds

14   are.  And if they don't, the patent is invalid.

15          Whether a skilled artisan, somebody of ordinary skill       01:24:51

16   in the art, would know how to implement the recited function is

17   irrelevant to whether or what structure was disclosed in the

18   patent.

19          Now, it's true that you have to look at the words of

20   the patent through the lens of a person of ordinary skill.         01:25:05

21   What those terms mean in the patent are the way a person of

22   ordinary skill would understand them.  But you cannot smuggle

23   into a specification material that isn't there simply because

24   it was known in the art.

25          And this is terribly important.  You particularly           01:25:22

United States District Court

RODNEY SCHWARTZ - Redirect

1  can't do that at the precise point of innovation, what they say      01:25:27
2  is new, because, once again, that now raises the danger that
3  they are essentially claiming the function or claiming all
4  solutions within the field of image analysis to perform that
5  function and that, the cases say, clearly is impermissible.      01:25:45

6         This is a somewhat pedantic point but I make it
7  anyway.  There's a basic difference.  They cite the *Atmel* case
8  and we'll come back to that.  The *Atmel* case is important
9  because one of the things it differentiates is between what's
10  called enablement and disclosure for purposes of 112, 6.  For      01:26:09
11  purposes of enablement, which we are not talking about today,
12  and that is -- it's a different section of the patent code.  We
13  may talk about it some day but not today.  The court's allow
14  you to read stuff into the patent, read material into the
15  patent that from what is known in the art.  As the *Atmel* case      01:26:27
16  makes clear, that is not true when what we're looking at is
17  whether the claim is indefinite under Section 112, 1 on a
18  means-plus-function claim under Section 112, 6.

19         The reason why you're allowed to incorporate material
20  for purposes of enablement, as the court there says, is for      01:26:56
21  purposes of explaining how to build something, which is what
22  enablement is, you don't want to have every patentee publish a
23  treatise and say you don't have to go into detailed
24  descriptions of how to build it.  But if, on the other hand,
25  the patentee chooses to use the device of means-plus-function      01:27:10

RODNEY SCHWARTZ - Redirect

1   claiming, that is their choice.  And if you do that, then you      01:27:14

2   must describe the precise structure.

3         The *Touchcom* case, which we cited to Your Honor, is

4   particularly instructive on this point.  There the court was

5   asked to construe the phrase "the display and input task          01:27:42

6   means," that's software, "for controlling the display and input

7   means."  A lot of patent language, a lot of means language but

8   that was the court's job there.

9         The patentee said of course -- the patentees always

10  say, "Well, there's enough in the specification," because there   01:28:01

11  are portions of the specification that refer to communications

12  between the task means and the input means.  The court rejected

13  that argument because it said that the algorithm cited by the

14  patentee falls short of explaining how the task means controls

15  the input means.  And so we don't know the metes and bounds of    01:28:22

16  the claim.  That's not a sufficient disclosure and it held the

17  claim invalid.

18        And, finally, the next-to-the-last bullet point on

19  the slide, the patentee said, "Well, the algorithm for

20  controlling the input means was supplied by the knowledge of      01:28:43

21  one skilled in the art," and it said, "Look, there's this

22  card" -- and this is going to sound very familiar.  There's

23  this card -- in that case it was called the Microtouch card,

24  like the Volant systems card here -- and it's a particular

25  brand of input device.  We mentioned it in the patent.  And       01:28:58

RODNEY SCHWARTZ - Redirect

1  that should tell somebody everything you need to know, so we've          01:29:04

2  disclosed enough.

3       Somebody skilled in the art could know that the

4  software to control the Microtouch could be downloaded from a

5  website that was known to people of skill in the art.  And they        01:29:20

6  could download that and they could get the entire code and so

7  you could get all of the algorithms.

8       The court held this was not sufficient because the

9  algorithms were not specifically disclosed and linked within

10  the four corners of the specification itself and it held the          01:29:38

11  patent invalid.

12       Now, here, Your Honor, the problem is that ITC

13  contends that terms like image analysis software -- their

14  claims construction is image analysis such as blob analysis

15  software, that's their structure.  That's no structure.  Image        01:30:00

16  analysis, as we've said, is the entire field.

17       ITC's own expert, Mr. Shaw, as we've noted in our

18  briefs, said that image analysis refers to all software that

19  analyzes images.  And Mr. Schwartz essentially confirmed that

20  on the stand.  That's not a limitation.  It's a tautology.  It        01:30:23

21  doesn't even describe the recited function, let alone solve the

22  problem of how to do it.

23       So ITC says, "Well, okay.  Maybe image analysis

24  software isn't enough" -- sometimes they say they think it is

25  enough.  Anyway, we have this blob analysis stuff.  So that           01:30:46

United States District Court

RODNEY SCHWARTZ - Redirect

1    certainly blob analysis is enough because that was well-known.          01:30:49

2    But the issue is are there boundaries?  And image analysis and

3    blob analysis are equally unbounded.

4         Mr. Oberzeir who designed the software for -- who

5    designed the Volant systems card and the software said image          01:31:10

6    analysis is unbounded.  Blob analysis is unbounded.  Doesn't

7    give you the metes and bounds of the claim.

8         But more fundamentally, Mr. Schwartz concedes -- he

9    had to concede that blob analysis doesn't get them home.  What

10   he kept saying on the stand was, well, yeah.  We used -- how          01:31:38

11   did you do this?  How did you look at the probes from pixel

12   coordinates and get to real-world coordinates?  How did you

13   determine how the probes were related to each other in space?

14   How did you determine the position of scrub marks?  How did you

15   do all of that?                                                       01:31:58

16        And he said, "Well, we used the outputs of blob

17   analysis," and that they did.  And then they wrote something

18   else.  So blob analysis, as Mr. Schwartz admitted on cross

19   examination, doesn't perform the functions, can't perform the

20   functions that are recited in the claims.  It doesn't get them        01:32:18

21   home.

22        Now, Mr. Schwartz made that clear in his deposition.

23   The Volant card -- this is what blob analysis does and this is

24   the limits of blob analysis.  All it does is finds the

25   position, shape, and characteristics of the blobs.  Number one,       01:32:41

RODNEY SCHWARTZ - Redirect

1   doesn't tell you which ones are probe tips.  Mr. Schwartz     01:32:48

2   admitted that on the stand.  You have to write new software to

3   do that.  Well, that's simple, they say.  It's not.

4          You have to take the pixel coordinates, where you get

5   from the camera image, the digitized image, to a position in     01:33:01

6   the real world.  How do you do that?  Well, it's simple, they

7   say, but it's not.

8          Image analysis -- excuse me, blob analysis does

9   nothing more than what Mr. Schwartz said.

10         We have other software, he said, which took that     01:33:19

11  information, analyzed it, and produced the results that are

12  needed to make the probe analyzer useful.

13         Now, Mr. Schwartz, of course, said all of this was

14  simple but when he was asked in deposition to tell us

15  calculations, the means of comparing pros relative to each     01:33:46

16  other, he couldn't do it because it's not in the patent.  And

17  he essentially conceded that on cross-examination.

18         Now the *DE Technologies vs. Dell*, which we've all

19  cited to Your Honor, illustrates the point.  If all structure

20  isn't disclosed and linked, the claim will be too broad in     01:34:15

21  scope and, hence, invalid.  It's the impermissible claiming of

22  the function.

23         In that case, in the context of a patent pertaining

24  to international computer-to-computer sales, the court held

25  that the specification and figures described many of the     01:34:30

United States District Court

1  relevant process in the patent but they failed to set forth the          01:34:32

2  precise algorithm integrating those processes and, accordingly,

3  the patent was invalid for obviousness -- excuse me, for

4  indefiniteness.

5          As in *Touchcom* and *DE Technologies*, here ITC simply          01:34:46

6  doesn't disclose and link the specific algorithms.  Therefore,

7  it's literally impossible to define the necessary and

8  sufficient set of conditions for performing those recited

9  functions.

10         It's impossible to do what the court's decisions say          01:35:03

11  you have to do which is allow the claims to speak for

12  themselves, the intrinsic evidence of the claims supported by

13  the specification, if it is supported, to define the

14  boundaries.

15         Now, Your Honor's task is to find these things.  Your          01:35:23

16  Honor's task is to find Waldo.  But if Your Honor has trouble

17  doing that -- and I would submit that what ITC has offered is

18  of no assistance in that.  They have simply said image

19  analysis.  That's the whole field.  Blob analysis, that doesn't

20  perform the functions.                                              01:35:40

21         If your Honor has trouble finding the algorithms that

22  completely perform the recited functions, that's a pretty good

23  indication that ITC hasn't met its statutory responsibilities

24  under Section 112, 6.

25         ITC wants to trade in vague terms like image analysis          01:36:00

RODNEY SCHWARTZ - Redirect

1   and blob analysis and to smuggle in the illusion of content by      01:36:04

2   referring to what one of ordinary skill would understand by

3   those terms.

4           As you listen to the evidence, Your Honor, I want you

5   to keep in mind two inconsistencies that viciate ITC's position   01:36:14

6   and ultimately expose it.   The first inconsistency is between

7   disclosure and validity.

8           You see, on one hand, ITC wants you to believe that

9   persons of ordinary skill would already know all of these

10  algorithms, all of this software that they wrote.   All of these  01:36:35

11  things that perform the recited function, just from the terms

12  "image analysis" and "blob analysis."

13          On the other hand, ITC has to prove that they

14  invented something new.   And you saw Mr. Schwartz struggling on

15  the horns of that dilemma.   He wanted to tell you that           01:36:53

16  everything was simple and obvious but he couldn't quite bring

17  himself to do that because if he did, he would give away the

18  patent.   It would be invalid as obvious.

19          If there's the next phase of the case, ITC will be

20  singing a different tune and the very algorithms that they are    01:37:10

21  not disclosing today, that is what they are going to point to

22  as evidence of what they did that was really new.

23          The second inconsistency -- by the way, that

24  inconsistency is dramatically reflected in the testimony of

25  ITC's expert, Mr. Shaw, who I think is not here today.   ITC I    01:37:46

RODNEY SCHWARTZ - Redirect

1  think didn't bring him.                                    01:37:53

2          When Mr. Shaw, having read the patents, was asked to

3  explain, what he said was -- and this is quoted in our brief,

4  that his deposition, pages 78 to fine, "Mr. Shaw said that he

5  wouldn't know the software disclosed in the ITC patent well   01:38:16

6  enough to tell what it would do.  I only know the end result.

7          But Your Honor, that's exactly what the federal

8  circuit said is impermissible.  That's claiming a function.  It

9  doesn't tell you how to get there.

10         Now, the second inconsistency -- the first          01:38:36

11  inconsistency is between saying, oh, it's all simple.  It's a

12  person of ordinary skill would know it.  But trying to preserve

13  something nonobvious that would merit a patent, the second

14  inconsistency is between ITC's arguments that the patents

15  disclosed sufficient structure and their unwillingness to     01:38:59

16  include in their proposed claims construction that structure.

17         We saw a slide that had to do with -- it had to do

18  with taking the pixel coordinates and converting them into

19  real-world coordinates and it used some additional information.

20  It was in the specification and Mr. Campbell, ITC's counsel,   01:39:18

21  showed it.  But that doesn't appear anywhere in the proposed

22  claims construction.  If you need something to achieve the

23  result, it has to be there.

24         Their proposed constructions omit any reference to

25  these specifics and refer only to vague and unbounded terms    01:39:36

RODNEY SCHWARTZ - Redirect

1  like image analysis.  Why?  So that on another day when we come  01:39:41

2  to the issue -- if we come to the issue of infringement, they

3  can say, "Oh, you did a different algorithm but that's still

4  image analysis.  That's still covered by our patent."

5          One other more general point, and that is that the  01:40:01

6  cases -- there were some very interesting things in

7  Mr. Campbell's presentation and if you'll forgive me while I go

8  back to counsel table for a second.

9          I won't spend too long on this because I want to get

10  to an understanding of the real technology here, not the waving  01:40:40

11  a hand and, oh, it's simple, but what really has to be done to

12  achieve the functions here.  But I do want to mention a couple

13  of things.

14          In terms of the case law you saw ITC's counsel

15  averted to a number cases:  The *Allvoice* case, the *Atmel* case,  01:41:05

16  *Intel v. VIA*, *Biomedino*.  They cite *Biomedino*, you saw in one

17  slide, for the proposition that the bar for identifying

18  structure is low.  What they neglected to tell you was that in

19  *Biomedino* the court invalidated the patent as indefinite.

20          The question in that case was whether recitation that  01:41:28

21  function can be performed by known methods and known equipment

22  was sufficient where there was record evidence that the patent

23  and the testimony of the -- of experts confirmed that it could

24  be done by known methods and known equipment.

25          The answer in the *Biomedino* case, which they cite,  01:41:45

RODNEY SCHWARTZ - Redirect

1  was a resounding no.                                                    01:41:48

2        In the *Atmel* case -- in the *Atmel* case and

3  *Allvoice* -- we'll deal with them separately.  In the *Atmel*

4  case, the case held, as they represented -- in that case, the

5  mere title of a scholarly paper in the industry relating to     01:42:07

6  nMOS devices was sufficient to satisfy the structure in that

7  case.

8        What they neglected to tell you was that in *Atmel* the

9  court emphasized that that testimony from an expert that it was

10 sufficient was completely unrebutted.                           01:42:23

11       And in the *Allvoice* case they say, oh, well, that

12 case supports our point because it says that reference -- kind

13 of a general algorithm, a general Windows software was enough.

14       In fact, as Your Honor can see from the case itself,

15 there were detailed flow charts in that case, figures 8A and 4  01:42:55

16 in the patent, far beyond what saying that ITC has offered

17 here.  If you look at the figures in the patent, by the way,

18 the '394 or the '894 patent, you won't find any software,

19 nothing, with one exception.  And I'll get to that exception in

20 a moment and that is just a black box, as we'll see.            01:43:20

21       They also neglected to tell you that in *Allvoice* as

22 well, once again, there was statement from an expert that was

23 unrebutted that that structure was sufficient.

24       Now, at this point, Your Honor, I'd like the court to

25 have a better idea of what it really takes beyond the           01:43:44

United States District Court

RODNEY SCHWARTZ - Redirect

1   hand-waving that it's simple to perform the required functions.    01:43:47

2   And with Your Honor's permission, Applied Precision would like

3   to call Mr. John Strom.

4                               JOHN STROM

5   called as a Witness herein by the Defendants, having been first   01:44:40

6   duly sworn and/or affirmed by the Courtroom Deputy, testified

7   as follows:

8               COURTROOM DEPUTY:  Please take our witness stand.

9                         **DIRECT EXAMINATION**

10  BY MR. BLANKENHEIMER:                                             01:44:50

11  Q.   Mr. Strom, would you introduce yourself to the court,

12  please.

13  A.   My name is John Strom.  I currently work at Rudolph

14  Technologies.  I used to work at Applied Precision.

15  Q.   And how long did you work at Applied Precision, sir?         01:45:01

16  A.   About 18 and a half years starting in 1989.

17  Q.   What did you do at Applied Precision?

18  A.   My main task was to write software that programmed probe

19  card analyzers.  I wrote software that would -- for probe card

20  analyzers.                                                        01:45:26

21  Q.   I think we heard what a probe card is and what a probe

22  card analyzer does.

23

24        MR. BLANKENHEIMER:  If Your Honor has any questions

25  on that point -- I won't cover it.                                01:45:34

United States District Court

JOHN STROM - Direct

1  Q.  You heard from ITC a reference to a vision-based probe          01:45:35

2  card analyzer.  Do you recall that?

3  A.  Yes.

4  Q.  Now, when did Applied Precision begin working on a

5  vision-based probe card analyzer?                                   01:45:51

6  A.  That was in 1991.

7  Q.  Did you start work on the design of the vision-based probe

8  card analyzer?

9  A.  The initial, when we started working on it, was more of a

10 hardware concept so I wasn't involved directly in 1991.             01:46:01

11         Once we started developing software, I started

12 working more directly on the project.

13 Q.  And when did you begin working on that?

14 A.  That was 1992.

15 Q.  Sir, can you tell me when did Applied Precision deliver a        01:46:13

16 probe card analyzer using vision for alignment?

17 A.  We delivered our first machine in 1993.

18 Q.  Okay.  Thank you.

19         Would you summarize your educational background for

20 the court, sir?                                                     01:46:28

21 A.  I have a B.S. degree in computer science from North Dakota

22 State University.

23 Q.  All right, sir.

24         Now, I would like to direct your attention.  Can you

25 see this slide?                                                     01:46:39

United States District Court

JOHN STROM - Direct

1    MR. BLANKENHEIMER:  I wonder if we could dim the          01:46:41

2  lights again.

3    MR. TUCKER:  Objection.  Leading, Your Honor.  He's

4  putting his testimony in front of the witness.

5    THE COURT:  I'm sorry?                                    01:46:50

6    MR. TUCKER:  Objection.  Leading, Your Honor.  He's

7  putting the testimony right in front of him.

8    THE COURT:  Well, is this testimony or is this an

9  exhibit that was used in his deposition?

10    MR. TUCKER:  It was not in his deposition.  The first    01:46:57

11  I saw this was last night.

12    MR. BLANKENHEIMER:  This was not used in his

13  deposition, Your Honor.  We've submitted these -- I should say

14  it has been stipulated and that all exhibits are admissible

15  between the parties.  We delivered these exhibits to opposing  01:47:10

16  counsel yesterday when we agreed to exchange exhibits.

17    And these are exhibits that are designed simply to

18  assist Mr. Strom as he will tell you.  He asked for exhibits to

19  be prepared to help him explain what he's about to explain.

20    THE COURT:  Well, did he prepare this exhibit?          01:47:34

21    MR. BLANKENHEIMER:  He assisted in preparing them,

22  Your Honor.

23    THE COURT:  Overruled.

24  BY MR. BLANKENHEIMER:

25  Q.  Mr. Strom, can you tell me what --                     01:47:40

United States District Court

JOHN STROM - Direct

1          MR. BLANKENHEIMER:  Maybe we could dim the lights          01:47:44

2     again.

3     Q.   Mr. Strom, what is this slide, what does it represent?

4     A.   It was a slide we put together to help explain how an

5     imaging system measures a probe tip.                            01:47:58

6     Q.   And let's go, what is shown on the far left?

7     A.   The far left is an example of an image of a probe tip

8     taken from a CCD camera.

9     Q.   And is that the way a probe tip would normally appear on a

10    CCD camera?                                                     01:48:16

11    A.   That example is actually a color image at a high

12    magnification microscope so it's probably not a typical image

13    we get off a probe card analyzer, but it is a typical image of

14    a probe tip.

15    Q.   Now, the next block is called an image capture card.  Can  01:48:35

16    you explain what an image capture card is?

17    A.   Yes.  A simple CCD camera doesn't digitize it, give you an

18    image that the computer actually understand.  So you typically

19    will have this analog image coming off the CCD camera.  And the

20    image capture card will digitize that, turn that into a         01:48:56

21    grayscale image where pixels that are dark will be given a

22    value of zero and pixels that are very bright will be given a

23    value of 255.

24    Q.   And what happens next after the image capture card

25    digitizes the image and sends it on to the computer?  What      01:49:14

JOHN STROM - Direct

1    happens next?                                                      01:49:17

2    A.    What happens next in the process of measuring it or -- one

3    other step I wanted to go over here was the calibration part.

4    Sorry about that.

5    Q.    That's quite all right.  What is calibration and how does    01:49:32

6    it fit into this?

7    A.    When you actually capture that image, you have to know

8    very precisely where you're at when you measure that image.

9    Remember that these pads and these probes are very, very small

10   and so you have to have a very accurate machine.  It's very        01:49:47

11   essential that you have a stage that is very accurate and also

12   your camera, the position of your camera has to be known.

13          So we do a lot of calibrations prior to actually even

14   capturing the image to guarantee that we know where we're at

15   when we capture that image.                                        01:50:05

16   Q.    And what happens next after calibration?

17   A.    After you've calibrated the system, now you know where

18   you're at when you capture that image and so you have this

19   grayscale image.  And before you can actually do blob analysis,

20   you need to segment that gray image into a black and white        01:50:21

21   image.

22          And so what you do is what's called a thresholding

23   which is basically taking a certain value of that gray image

24   and anything that is above, like, let's say, a value of 150 of

25   brightness, you turn that all to white and everything below        01:50:35

United States District Court

JOHN STROM - Direct

1    that value you turn to black.  It's called segmentation.                    01:50:37

2    Q.   Does the next slide illustrate what you're saying?

3    A.   Yes.  This is an example of a rough example of an output

4    of a CCD camera where each one of those squares is a pixel

5    where it would have a gray -- like a grayscale image, where it   01:50:53

6    would have a value from zero to 255, a very simple camera.

7              What you do is you want to take a threshold where the

8    objects of interest are the bright objects and you want to

9    identify those.  You try to pick a threshold to segment that

10   image.                                                          01:51:12

11   Q.   So do I understand that you set a threshold to determine

12   which of those squares, some of which are gray, will appear as

13   white and which will appear as black?

14   A.   Correct.  You write an algorithm that basically determines

15   what threshold you pick to threshold the image to turn certain  01:51:26

16   pixels white and certain pixels black.

17   Q.   And in the manner that is shown in this slide?

18   A.   Yes.  That's an example of an output after you threshold

19   an image and turn into a black-and-white image.

20   Q.   Okay.  Now, does anything that we've talked about so far   01:51:43

21   tell you where the probe tip is?

22   A.   No.  I just had have a black and white image right now.

23   Q.   What happens after the image is thresholded?

24   A.   After the image is thresholded and you get a

25   black-and-white image, then you basically pass it off to a blob  01:52:05

United States District Court

JOHN STROM - Direct

1    analysis software package that will come back and give you                    01:52:09

2    properties of the blobs.  And blobs are essentially pixels that

3    are connected.  A blob analysis looks for groups of pixels that

4    are connected together.  In this example, the pixels would be

5    the white pixels.                                                             01:52:21

6            So it would look at those groups and say, hey, I got

7    nine groups of pixels and here's a locations and pixels

8    coordinates and pixel dimensions.

9    Q.   There's been a lot of discussion about pixel coordinates

10   versus real-world coordinates.  Can you explain to the court                  01:52:40

11   how those differ?

12   A.   When you're -- the image capture board and the blob

13   analysis really only knows about the CCD cameras, the array of

14   pixels that you have.  It doesn't know anything about real

15   world is converting a pixel -- pixel number two, whatever, to a               01:52:52

16   certain size and position.

17           And when you are dealing with an image, you only are

18   bounded by what you're looking at in that image.  You only know

19   if that blob is pixel number 72 in the Y dimension and pixel 72

20   in the X dimension.  And that's all the information you have at                01:53:13

21   this point.

22   Q.   So what is the output from blob analysis?

23   A.   The output of blob analysis is, typically, you'll come

24   back with N number of blobs.  I found five blobs and they have

25   certain properties.  So I'll come back and say I have a blob at                01:53:26

JOHN STROM - Direct

1   position X and Y and pixel coordinates like 22.5 and 32.6 or          01:53:31

2   something like that.

3   Q.    And are those pixel coordinates just within the image, the

4   digital image?

5   A.    That's just within the digital image.                          01:53:41

6   Q.    So that doesn't tell you where they are in the real world;

7   is that right?

8   A.    You still do not know where they are in the real world.

9   Q.    And does the output of blob analysis tell you anything

10  about what the probe tip is within that image?                        01:53:54

11  A.    No.   It just describes the blobs that it found.

12  Q.    So do you know which blobs are associated with the probe

13  tip?

14  A.    Not at this point.

15  Q.    And you could have -- is it true that you could have           01:54:05

16  multiple blobs corresponding to a single probe tip?

17            MR. TUCKER:   Objection.   He's leading.

18            THE COURT:   Sustained.

19            MR. BLANKENHEIMER:   All right.

20  BY MR. BLANKENHEIMER:                                                  01:54:17

21  Q.    Can you explain to the court why a blob analysis does not

22  necessarily tell you, as you've testified, about the probe tip

23  properties?

24  A.    Blob analysis, when you get the output of blobs, now you

25  need to associate which blobs really give you some information        01:54:30

JOHN STROM - Direct

1   about the probe tip that you're trying to measure.                    01:54:34

2          So you need to do some -- you have to take the

3   expected location of where the probe is at, the expected size

4   and do some type of algorithm to come up with which blobs are

5   associated.  And sometimes none of the blobs might be          01:54:47

6   associated with the probe.  The probe might not be there.  It

7   might be not found.

8   Q.   All right, sir.

9          When did you first use blob analysis?

10  A.   I first used blob analysis probably '92, '93.  I can't     01:55:00

11  remember exactly when I started using it.

12  Q.   And what did blob analysis do, then?

13  A.   What did it do then?  It basically -- same basic thing,

14  just the connectivity of groupings of probes and give you

15  properties of those groupings, of those blobs.                 01:55:25

16  Q.   So does -- what does a blob analysis picture look like?

17  A.   Well, there's not a -- there's a black-and-white picture

18  that you send to it.  Blob analysis is an output of properties

19  on the blob analysis.  It's not like a picture, that you give

20  an input, black-and-white image into blob analysis and out     01:55:45

21  comes properties of the blobs.  It's not really a picture.

22  Q.   So did you develop blob analysis software?

23  A.   No, I did not.

24  Q.   You purchased it off the shelf?

25  A.   Yes.  We purchased from it third parties and used that     01:56:00

United States District Court

JOHN STROM - Direct

1   software.                                                                     01:56:04

2   Q.   Once blob analysis is completed, what will you know about

3   the probe tip?

4   A.   You still don't know anything about the probe tip.  You

5   still have to go through more steps.                                          01:56:15

6   Q.   By the way, in 1993, were you familiar with the Volant

7   systems image capture card?

8   A.   No, I was not.

9   Q.   Did you later become familiar with the Volant image

10  systems capture card and its associated software?                            01:56:40

11  A.   Yes, I have.

12  Q.   And when did you do that?

13  A.   Just a couple of weeks ago.

14  Q.   It was in connection with this case?

15  A.   Yes, it was.                                                             01:56:48

16  Q.   Now, have you studied the Volant software in and of

17  itself?

18  A.   Not the software directly.  I've read through the three

19  manuals that I read through.

20  Q.   And do the Volant manuals tell you how to identify a probe   01:57:07

21  tip?

22  A.   No, they do not.

23  Q.   Now, after blob analysis, what's the next step?  What do

24  you need to do to achieve a useful function for your probe card

25  analyzer?                                                                     01:57:26

JOHN STROM - Direct

1    A.   The next step that you need to do is basically I have          01:57:27

2    these blobs in pixel coordinates.  Now I have to go and apply

3    those calibrations that I have done before.  So I have a

4    calibration for the stage, a calibration for the image and now

5    I have to convert that pixel coordinates into real-world          01:57:43

6    coordinates so I know where all of the blobs are in real world.

7    Q.   You mentioned earlier in your testimony calibration of the

8    camera.  Is that involved as well?

9    A.   Yes.  You also have to know -- the cameras usually have an

10   objective with some magnification.  And so if you look at a       01:57:56

11   camera, there's a pixel inside there.  And it's a very small

12   camera with a little CCD on it and it has a certain physical

13   size.

14        But when you actually take the image, you're going

15   through some magnification and so that size of that pixel is      01:58:09

16   not a real-world size.  It's magnified by some magnification

17   and that's not exact either.  Again, remember, we're talking

18   about really small dimensions.  So we actually calibrate the

19   exact size of that pixel so we can get a very precise

20   measurement of that probe tip so we can hit those pads.          01:58:30

21        So we calibrate the camera along with the stage so we

22   can get a very precise measurement.  And then you have to apply

23   those calibrations at this point.

24   Q.   Now, how do you determine -- by the way, is the process

25   that you just described about going from pixel coordinates to    01:58:47

JOHN STROM - Direct

1   real-world coordinates, is that blob analysis?                    01:58:50

2   A.    No, it is not.

3   Q.    Does it require the output of blob analysis?

4   A.    I'm sorry.  I didn't understand the question.

5   Q.    Does it require the output of blob analysis?              01:59:00

6   A.    The transformation of coordinate systems?

7   Q.    Yes.

8   A.    You can take any position.  It doesn't have to be a blob

9   position.  You could transfer it from pixel coordinates to real

10  world.  But in this case we're taking the blob properties and   01:59:14

11  transferring them into real world.

12  Q.    Now, how do you determine -- how do you determine what

13  blobs correspond to the probe tip?

14  A.    That's a fairly extensive algorithm.  We look at the

15  expected position of the probe versus the properties of the     01:59:37

16  blobs that we found and do some scoring type of stuff.  There's

17  multiple different algorithms that we write here, but we look

18  at combining two blobs because sometimes a probe tip is made up

19  of multiple blobs.  You have to combine it into one.  Sometimes

20  it can be all of these little tiny blobs.  Sometimes you have    01:59:56

21  two different blobs that are different.  You have to say, well,

22  which one am I associating with it?  Am I trying to measure

23  this one or this one?  And there's all kinds of noise in the

24  background.

25          The position of the probe is not always where you       02:00:06

United States District Court

JOHN STROM - Direct

1   expect.  It could be slightly off so there's all kinds of                    02:00:09

2   algorithms that you have to sift through all of this

3   information and say, "Okay.  What is my real probe tip?  What

4   is that thing?"

5           It's actually a fairly complex problem.  You're eye         02:00:19

6   does it amazingly well.  You can look at the image and go,

7   "That's it."  But to write an algorithm to do that is extremely

8   difficult.

9   Q.   Now, you had mentioned that Applied Precision -- by the

10  way, before we get to that, is the next slide -- what does the      02:00:35

11  next slide illustrate?

12  A.   This is an example of how the blob analysis, when it goes

13  and looks at a black-and-white image, it outputs and says, "Hey

14  here are the blobs that I found."

15          So for this example here, I found nine objects and         02:00:54

16  comes back and will give you information on those nine objects.

17  And so those blobs and now you have to figure out from that

18  information where is the probe tip.

19  Q.   Now, you mentioned -- and you mentioned that Applied

20  Precision has certain software that it's written to perform       02:01:11

21  that task and you described a little bit as involving a scoring

22  system?

23  A.   Yes.  Yes.  That's one of the criteria we do for finding

24  which blobs to apply to the probe.

25  Q.   Are there other ways of performing that?                     02:01:27

United States District Court

JOHN STROM - Direct

1   A.   Yeah.  There's infinite number of ways you could probably          02:01:29

2   solve that problem besides the way we do it right now.

3   Q.   Now, you've read the '394 patent in this case?

4   A.   Yes, I have.

5   Q.   I wonder if -- I believe that's Exhibit 1.                         02:01:51

6        MR. BLANKENHEIMER:  I wonder -- is that in front of

7   you at the moment?

8        THE WITNESS:  No, it's not.

9        MR. BLANKENHEIMER:  I wonder if I could prevail upon

10  you to hand the witness a copy of I believe it's P 1.                   02:02:02

11       THE WITNESS:  Thank you.

12  BY MR. BLANKENHEIMER:

13  Q.   Now, by the way, before we get to P 1, does this slide,

14  does the slide them now showing you reflect -- can you --

15  describe that.                                                          02:02:30

16       Can you explain what this slide represents?

17  A.   Yes.  That's an example of kind of an output after you do

18  the analysis of saying okay.  Here's my expected probe tip and

19  I've looked at it, combining some blobs and looked at the

20  properties and done some scoring and I finally made a decision         02:02:44

21  this is what the probe tip properties is.  Here's where the

22  probe tip is, the size and shape of it.

23  Q.   Is that blob analysis?

24  A.   No, it is not.

25  Q.   Okay.  Now, if we could turn to PX 1 or I guess it's              02:02:57

United States District Court

JOHN STROM - Direct

1  Exhibit 1 which is the '394 patent.  You'll recall that the                    02:03:04

2  '394 patent claims the function of determining the position of

3  probes relative to each other?

4  A.    Yes.

5  Q.    Does blob analysis do that?                                              02:03:14

6  A.    No, it does not.

7  Q.    And you recall that the '394 patent also claims a means of

8  determining the minimum number of pins to adjust based on the

9  best fit?

10  A.    Yes, I do recall that.                                                  02:03:32

11  Q.    And what is a best-fit analysis?

12  A.    Best-fit analysis is typically something that is an

13  optimization routine.  Maybe you're trying to minimize or

14  maximize some type of parameter.  You're trying to best some

15  kind of parameter.                                                           02:03:51

16  Q.    Would a best fit typically involve determining a minimum

17  number of pins to adjust?

18  A.    Not typically, no.

19  Q.    Are there other ways of doing a best-fit analysis?

20  A.    Yes.  Best fit is general mathematical term that --                    02:04:06

21  there's tons of different best fits, yes.

22  Q.    By the way, do you know how to determine the minimum

23  number of pins to adjust?

24  A.    As I sit here today I can't give you an algorithm that

25  would guarantee that output.                                                 02:04:28

JOHN STROM - Direct

1   Q.   Do you see anything in the ITC patent that would help you        02:04:32

2   write such an algorithm?

3   A.   Not that I recall.  No, I don't recall anything in there.

4   Q.   Now --

5        MR. BLANKENHEIMER:  Forgive me but if we could hand        02:04:46

6   the witness I believe it's PX -- P, 3,which is the '894 patent?

7        I beg your pardon, Your Honor.  It's P2 is the '894

8   patent.  As long as he has the '894 patent.

9        THE WITNESS:  No.

10       THE COURT:  What I have is P2 is the '894.        02:05:42

11  BY MR. BLANKENHEIMER:

12  Q.   By the way, before we get to the '894 patent, I have one

13  other question.  Are you familiar with the term "matrix

14  techniques"?

15  A.   Yes, I am.        02:06:08

16  Q.   Do matrix techniques allow you to determine the minimum

17  number of pins to adjust?

18  A.   No, it does not.

19  Q.   If you look at the '894 patent and claim one you will

20  recall that the '894 patent claims a means of determining the        02:06:27

21  location of scrub marks?

22  A.   Can you repeat that?  I'm sorry.

23  Q.   Yes.  If you'll look at claim one of the '894 patent.

24  A.   Yeah.

25  Q.   Do you recall that the '894 patent claims a means of        02:06:40

United States District Court

JOHN STROM - Direct

1    determining the location of scrub marks?                         02:06:42

2    A.   Yes, I do.

3    Q.   Does blob analysis do that?

4    A.   No.   It does not.

5    Q.   What algorithms are required to do that?                    02:06:50

6    A.   You would still have to have the algorithm to identify the

7    probes from the blobs.  You would have to also have all of the

8    calibrations to get a precise measurement would be two

9    essential items that you would need.

10   Q.   Thank you, Mr. Strom.                                       02:07:09

11            MR. BLANKENHEIMER:  I have no further questions.

12            THE WITNESS:  Thank you.

13            THE COURT:  Cross?

14            You want the light turned on?

15            MR. TUCKER:  Yes, please.                               02:07:17

16                    **CROSS EXAMINATION**

17   BY MR. TUCKER:

18   Q.   Mr. Strom, you've worked at API for quite a while; right?

19   A.   I did, yes.

20   Q.   Okay.  I'm sorry.  Now you work for Rudolph?               02:07:41

21   A.   Yes.

22   Q.   Okay.  And do you consider yourself one of skill in the

23   art of probe card analyzers?

24   A.   Yes, I do.

25   Q.   Okay.  And when you were at API, you worked on API's first  02:07:51

JOHN STROM - Cross

1   machine vision probe card inspection system; correct?                    02:08:02

2   A.   Yes, I did.

3   Q.   And is it not true that Integrated Technologies' first

4   machine vision inspection system came out before API's first

5   machine vision probe card inspection system?                             02:08:15

6   A.   I would actually have to look at documents.  I can't

7   recall, actually.  But if you show me some documents, it would

8   give me a better recall on that.  I believe it did, though.

9   Q.   Okay.  So you believe Integrated Technologies' machine

10  came out first?                                                          02:08:34

11  A.   I believe so but without the hard documents in front of

12  me, I don't have the hard dates.

13  Q.   Now, you understand, as a person of skill in the art, that

14  blob analysis, it's an image analysis algorithm; right?

15  A.   Yes, it is.                                                         02:08:53

16  Q.   Okay.  And also as one that is skilled in the art, you

17  understand that best fit is an algorithm; right?

18  A.   Yes, it's an algorithm.

19  Q.   And there's a number of things that you've mentioned here,

20  this calibration thresholding and -- I took some notes here,        02:09:07

21  control software, those sorts of things.

22         As one that is skilled in the art, are you familiar

23  with a patent that API owns, it's patent 6,710,798?  It's a

24  Hershel.  It's called methods and apparatus for determining the

25  relative positions of probe tips on a printed circuit board         02:09:40

United States District Court

JOHN STROM - Cross

1   probe card.                                                              02:09:43

2   A.   I'm probably familiar with it but I would have to refresh

3   my memory by looking at it.

4           MR. TUCKER:  It's Exhibit 6.  Could we get it in

5   front of the witness, please.                                           02:09:53

6           THE WITNESS:  Yes, I'm familiar with this patent.

7   Not intimately but I'm aware of it.

8           MR. TUCKER:  Okay.  Good.

9   BY MR. TUCKER:

10  Q.   Now, could you turn to column nine of that patent?  I              02:10:22

11  believe it's -- well --

12  A.   Yes.

13  Q.   This is a patent for determining positions of probe tips;

14  right?

15  A.   I'm not really sure actually.  I mean, it is relative to a         02:10:42

16  grid, yes, it is, yes.

17  Q.   So you're determining positions of probe tips relative to

18  some grid; right?

19  A.   Yes.  That's what -- as I recall, yes.

20  Q.   And this patent in column nine, if you go down to about            02:10:54

21  line 25, it says:  The mathematical centroid, 112 of this

22  distribution, can be readily determined by a technique that is

23  well-known to those of ordinary skill in the art as blob

24  analysis and is preferably implemented in software in the

25  personal computer.  Do you see that passage?                            02:11:13

United States District Court

JOHN STROM - Cross

1    A.    Yes, I do.                                                    02:11:15

2    Q.    Okay.  Now, when API got its patent on a method and

3    apparatus for determining the relative positions of probe tips

4    on a printed circuit board probe card, API felt it was

5    sufficient to just mention blob analysis; right?              02:11:30

6    A.    Well, it says here the mathematical centroid of this

7    distribution.  I'm not sure what they are referring to when

8    they say "distribution" there.  So if that means blobs, does it

9    mean -- I'm not sure what that refers to.

10   Q.    Does this patent mention anything about calibration     02:11:47

11   threshold?

12   A.    The calibration -- what's nice about this calibration is,

13   actually, the fiducials are the calibration.  So each image you

14   can calibrate the size of the image by the size of the

15   fiducials.  That's what the essential thing is.  You don't need  02:12:08

16   the separate step that you do here.  It's actually done within

17   the image because the fiducials are of a known position.

18   Q.    What about control software, does this patent talk about

19   control software?

20   A.    I don't know.                                           02:12:25

21   Q.    Do you want to take a look.

22   A.    It would take me a while to read through this.  I'm not

23   that familiar with this.  If you can point me to something in

24   here.

25   Q.    Would you expect that if this invention was patentable,  02:12:36

United States District Court

JOHN STROM - Cross

1  that it would include a reference to control software?        02:12:38

2  A.   I'm not an expert on patent theory so I don't know if it

3  should have it or not.   I don't know.

4  Q.   As one of skill in the art, would you be able to make the

5  invention of the '798 patent if it doesn't talk to you about   02:12:54

6  control software?

7  A.   Again, I don't know.   I haven't read through this whole

8  software and the exact details of this patent so I don't know.

9  Q.   So you don't know with API's patent on positioning but

10  with ITC's patent, you're pretty sure it's got to be there;    02:13:11

11  right?   Is that your testimony?

12  A.   I haven't studied this patent very thoroughly.   It may or

13  may not need control software.   So I've studied your patent

14  more thoroughly and know more of the details of that.

15         MR. TUCKER:   Could we get Exhibit 5 and 5A to the      02:13:42

16  witness, please.

17  BY MR. TUCKER:

18  Q.   Have you seen these exhibits before, Mr. Strom?

19  A.   Yes, I have.

20  Q.   Just for the record, 5 is the -- is it correct that it is  02:14:11

21  the reference file handbook for Precision Point's VX3 system?

22  A.   Yes, it is.

23  Q.   And the Precision Points VX3 system is a machine vision

24  probe card inspection system that API introduced in the late

25  nineties?                                                       02:14:33

JOHN STROM - Cross

1    A.   Yes, it is.                                                    02:14:34

2    Q.   Okay.  And what we've done to make it a little bit easier

3    on everyone is we have Exhibit 5A which is page 18 of the whole

4    reference manual.  Do you have 5A in front of you?

5    A.   No, I don't.                                                   02:14:56

6             MR. BLANKENHEIMER:  Your Honor, excuse me.  I'm going

7    to object.  I don't believe this exhibit has ever been provided

8    to us.

9             THE COURT:  Either one, 5 or 5A?

10            MR. BLANKENHEIMER:  I believe 5 has, 5A has not.          02:15:07

11            THE COURT:  Well, apparently, isn't 5A a part of 5?

12            MR. TUCKER:  The court requested for convenience that

13   we just pull that one page since it's the only page that we're

14   going to use.

15            MR. BLANKENHEIMER:  Do you have a copy of it?            02:15:19

16            THE COURT:  Or what page is it?

17            MR. TUCKER:  It's page 18 of Exhibit 5.

18            Do you have another copy, John?

19            MR. BLANKENHEIMER:  5A.

20            MR. TUCKER:  Are we okay?                                 02:15:42

21            MR. BLANKENHEIMER:  Yes.

22   BY MR. TUCKER:

23   Q.   Now, Mr. Strom, this reference manual API designed so that

24   its customers, people skilled in the art of probe card

25   analyzers, would understand and be able to operate your           02:15:51

JOHN STROM - Cross

1    machines; right?                                                    02:15:54

2    A.   Yes.

3    Q.   Okay.  And when API was teaching people of skill in the

4    art how to use their machines, do you see where it says:  Probe

5    alignment is determined by mathematically positioning the          02:16:04

6    measured array over the reference array for a best fit?  Do you

7    see that?

8    A.   Yes, I do.

9    Q.   Okay.  So API thought that sentence was sufficient to show

10   its customers and teach them what the best fit is; right?          02:16:16

11   A.   To communicate how the errors were determined for a

12   layman, for a user.  I didn't write the manual but try and

13   explain a little bit about how the process works.

14   Q.   So I think like Mr. Campbell, you heard him this morning

15   talking about how all of you engineers, you kind of have your      02:16:41

16   own language you're communicating in.  This is an example of

17   the language that you're communicating with each other?

18   A.   Yes.  Yes.

19   Q.   Okay.  You've looked at both the '394 and '894 patents,

20   Exhibit 1 and 2?                                                   02:17:20

21   A.   Yes, I have.

22   Q.   You spent a lot of time studying them; right?

23   A.   I probably should have spent more but I spent some time.

24   Q.   You spent some time.  As you sit here today as a person

25   skilled in the art, you understand what the terms used in those    02:17:34

United States District Court

JOHN STROM - Cross

1   patent mean; right?                                                    02:17:37

2   A.   I understand a lot of the patent.  A lot of legalese in

3   there that I don't understand; but, generally, I understand the

4   patents, yes.

5   Q.   So the technical language in those patents that engineers        02:17:44

6   use to communicate with each other, you understand what that

7   means; right?

8   A.   Some of the terms are engineering terms and I understand

9   what those terms mean typically, yes.

10  Q.   When was the first time you saw the '394 patent?                 02:18:10

11  A.   I don't recall but it wasn't that long ago.  Probably

12  maybe within the last five years.  I don't really recall,

13  though.  It wasn't that long ago.

14  Q.   You had seen it in some patent searching if I recall

15  correctly.                                                            02:18:25

16  A.   Yes.  Exactly.

17  Q.   Okay.  And when you first saw that patent you read it and,

18  as we've said, you understood it; right?

19  A.   I briefly went over it, just scanned it.

20  Q.   Okay.  But you understood what you read?                         02:18:42

21  A.   Well, I understood certain terms in the legalese stuff.

22  It's tough to follow but, yes, I generally try to understand

23  what I read.

24  Q.   So as we sit here today, is it now your testimony that you

25  don't understand the '394 patent?                                     02:18:58

United States District Court

JOHN STROM - Cross

1    A.    Oh, no.  I mean, there's certain legal terms.  I'm not an          02:19:01

2    expert in patent theory but I do understand the basic concept

3    of what the patent is about, yes.

4    Q.    Okay.  So you understand what Mr. Schwartz was trying to

5    communicate to people of skill in the art like yourself via          02:19:16

6    that patent?

7    A.    Yes.  I understood what he was talking about today, yes.

8    Q.    Okay.

9          MR. TUCKER:  No further questions.

10         THE COURT:  Redirect?                                          02:19:28

11         MR. BLANKENHEIMER:  Very briefly, Your Honor.

12                    **REDIRECT EXAMINATION**

13   BY MR. BLANKENHEIMER:

14   Q.    Mr. Strom, were you just shown Exhibit 5 which is the PRVX

15   manual -- P 5 which is the PRVX reference file handbook.  What        02:20:06

16   was the purpose of that document, do you know?

17   A.    To communicate to operators of machines how to run the

18   machine, how to operate it.

19   Q.    Was it to teach anyone how to build the machine?

20   A.    No.                                                            02:20:22

21   Q.    Was it to teach anyone how to implement a best-fit

22   algorithm?

23   A.    No, it was not.

24   Q.    Now, if we could turn back to Exhibit 6 which is the '798

25   patent.                                                             02:20:34

JOHN STROM - Redirect

1    A.    Okay.                                                              02:20:35

2    Q.    You were asked some questions about Exhibit 9 -- strike

3    that.

4             You were asked some questions pointing you to column

5    9 of Exhibit 6.                                                         02:20:52

6    A.    This is the '894 patent?

7    Q.    No.   I'm sorry.   I'm now on the '798 patent.   I believe

8    it's Exhibit P 6.

9    A.    Okay.   I gotcha.

10   Q.    And you were asked some questions about column 9 of             02:21:03

11   Exhibit P 6.

12             THE COURT:   Page 17.

13             THE WITNESS:   Okay.   Yes.

14   BY MR. BLANKENHEIMER:

15   Q.    By the way, you're not one of the inventors on the '798        02:21:18

16   patent?

17   A.    No, I'm not.

18   Q.    Can you tell me, starting at about line 30 on column 10,

19   can you tell me what's described in that patent?

20   A.    Give me a second to read it, okay?                             02:21:34

21   Q.    Let me just ask you.   Are they equations?

22   A.    Yes.   It's talking about, basically, the CCD array

23   orientation to the stage and correcting for that.   So it's

24   talking about converting -- it appears to be converting from

25   real world to -- from pixels to real world.                         02:22:09

United States District Court

JOHN STROM - Redirect

1  Q.   And are there equations shown in column 10?                    02:22:14

2  A.   Yes, there is.

3  Q.   What is the purpose of those equations?

4  A.   To give a little more detail exactly of how that

5  translation is being done.                                          02:22:24

6  Q.   To show you the algorithm?

7  A.   Yes.

8  Q.   Thank you, Mr. Strom.

9          THE COURT:  Are all of those equations, do they show

10 you how it's done?                                                  02:22:35

11         THE WITNESS:  It's showing basically the rotation of

12 the camera.  The camera is not necessarily aligned, squared up

13 with the stage itself.  It can be at a small rotation.  So if

14 you measure a probe that's off center, you actually have to

15 correct for that rotation of camera and it's done through a         02:22:53

16 tangent type of thing and scaling.  So they are talking

17 about -- so it's going through the equations of how you

18 actually determine that position.

19         MR. BLANKENHEIMER:  And all of these do that, all of

20 these three equations?                                              02:23:05

21         THE WITNESS:  Those three equations are talking about

22 converting from pixel coordinates to real-world coordinates.

23         MR. BLANKENHEIMER:  Thank you.

24         You may step down.

25         We're going to take a break now for about 15 minutes.       02:23:17

United States District Court

JOHN STROM - Redirect

1   20 minutes of three.                                          02:23:22

2          (Witness excused.)

3          (Recess at 2:24; resumed at 2:43.)

4          THE COURT:  Please be seated.

5          All right.  Mr. Blankenheimer?                         02:47:20

6          MR. BLANKENHEIMER:  Thank you, Your Honor.

7          What I'm going to do next is simply build on what

8   we've seen before.  It will be partly by way of summary but I

9   want to go through some slides.  And I know we are getting

10  short on time so I'm going to try to go through them very      02:47:39

11  quickly.  Obviously, if I skip something and the court has any

12  questions about it, I hope you will ask.

13         I wonder if we could just dim the lights a little

14  bit.

15         And I know you told me before that there's not such a   02:47:54

16  thing as just a bit here it's binary.  It's one or a zero.

17         I've also been asked to make clear on the record that

18  there is a stipulation that all of the exhibits -- among the

19  parties that all of the exhibits are to be deemed admissible.

20         THE COURT:  Okay.                                       02:48:07

21         MR. CAMPBELL:  Your Honor, I hate to interrupt but

22  the stipulation was that all of the submitted exhibits on

23  exhibit charts were the ones deemed admitted, not, for example,

24  these demonstratives.

25         THE COURT:  Okay.  Thank you.                           02:48:23

United States District Court

JOHN STROM - Redirect

1      MR. BLANKENHEIMER:  I want to talk about the '894      02:48:25

2   patent which we have not spoken too much about.  And the first

3   means element is a computerized means with software means.  The

4   functions are shown on this slide but I want to focus on the

5   second function for determining the location and length of the   02:48:43

6   scrub mark.

7      ITC's proposed construction was originally simply a

8   computer running software.  In its reply brief it changed its

9   construction and corresponding structure they now they claim is

10  the Volant image card and software.      02:49:01

11     But as we've seen, I think, from the testimony of

12  Mr. Strom, Mr. Schwartz, blob analysis software doesn't perform

13  this function and neither does the blob analysis software that

14  came with the Volant image capture card.

15     Without going through all of the stages, the image      02:49:23

16  capture card's function is limited to capturing the image and

17  digitizing it.  The blob analysis software is limited to

18  determining properties, as Mr. Schwartz explained, of the blob

19  and those are provided in pixel coordinates.

20     Additional software, which we'll see in a minute, is      02:49:48

21  called control software, does all of the hard work.  It

22  constitutes the algorithms to compute the absolute coordinates

23  of the blobs from the pixel coordinates to select the blobs

24  associated with the expected probe tip locations and sizes to

25  calculate probe tip properties and ultimately to determine the   02:50:09

JOHN STROM - Redirect

1    location of scrub marks.                                           02:50:12

2           That is where all of the work gets done and that is

3    not blob analysis.  Mr. Schwartz in his deposition made that

4    clear.  Blob analysis, he said, does nothing more than what he

5    explained in the first paragraph.  We had to write software.    02:50:25

6    It's that additional software that is at issue here.

7           Now, here is where in the patent they talk about what

8    Mr. Schwartz was talking about.  Here they call it the control

9    software is written to automatically perform the operation.

10   This describes simply the operation of going from pixel          02:50:45

11   coordinates to real-world coordinates.  And that is all of the

12   explanation that is given for control software.  What we have

13   is an empty box, a black box called control software but that

14   is where all of the magic happens.

15          At the very point of alleged innovation, all we get       02:51:04

16   is control software, no explanation of the algorithms

17   underneath it.  Not only that, but as to the even more

18   important and complex function of determining which blobs

19   constitute the probes, the software doesn't even say that the

20   control software does that.  It doesn't even describe where or   02:51:25

21   how that gets done.  There isn't even a name for it.

22          So at the very point of the hard stuff, there's no

23   explanation in the patent.  There's no detail.  There's no

24   structure.

25          What is the control software then?  It's undisclosed      02:51:41

United States District Court

JOHN STROM - Redirect

1    algorithms for performing these tasks.  That is the black box.    02:51:45

2    And you have to go from pixel coordinates to real-world

3    coordinates.  You have to find the probe and that isn't done.

4    And we saw that in connection with the '394 patent.

5            And then in addition, you need algorithms in the '894    02:52:03

6    patent for determining the location and length of a scrub mark

7    based on the calculated location of the probe tips.  Those

8    calculated locations have to be in real-world terms.  We

9    already saw that it took new software to get there.  We already

10   saw that it took new and undisclosed algorithms to identify the    02:52:24

11   probe tips from the blobs in the first place.  So there simply

12   isn't enough structure.

13           In the '894 there are two means elements and I will

14   go over them quickly.  Two elements under section 112,

15   paragraph 6 that don't use the term "means."  They use another    02:52:38

16   generic term, device, in the case of the slide that I am

17   showing now, a location-determining device.

18           And once again, as -- now, it is true, and I want to

19   be clear with the court, there is a presumption that if you use

20   the term "means" it's a Section 112, 6 claim.  And I think all    02:53:01

21   of the elements we've been talking about so far are conceded to

22   be section 112, 6.  I just see disputes that this is a section

23   112, 6 element because it doesn't use the term "means."

24           But we briefed this issue in our markman briefing.  I

25   think there has been no effective rebuttal to it.  There's no    02:53:20

JOHN STROM - Redirect

1   structure that's determined by location-determining device.                    02:53:24

2   Therefore, it has all of the -- it must be scrutinized under

3   Section 112, 6 and it fails that scrutiny because there is no

4   disclosed structure.

5          The same is true with another element in the '894            02:53:37

6   patent and that is processing device.  There is no structure

7   inherent in the term "processing device."  All you get really

8   is that it performs a function, processing.  So, once again,

9   Section 112, paragraph 6 should apply.  We scrutinize it under

10  that section.  It fails that scrutiny because there is no          02:53:59

11  algorithm that's disclosed for performing the function of a

12  processing device.

13         Now, I want to go back by way of review to the '394

14  patent.  The first means element, and there's no dispute as to

15  this element being under 112, 6 is the positioning means to       02:54:19

16  determine the position of each probe in the digital image

17  relative to a known physical position -- that's going from

18  pixel coordinates to real-world coordinates -- and to determine

19  the location of the probes relative to each other.

20         That is yet another algorithm and one that              02:54:37

21  Mr. Schwartz couldn't remember in his deposition, couldn't find

22  in the patent because it isn't disclosed.  That, too, fails

23  scrutiny under Section 112, 6.  And, again, we can go through

24  the steps that Mr. Strom went through.  The camera performs a

25  limited function.  The image capture card performs a limited      02:55:02

United States District Court

JOHN STROM - Redirect

1   function.  There has to be software to calibrate the camera,     02:55:06

2   which is not talked about in the patent in this stage, and to

3   perform thresholding.  All of this is within the box, by the

4   way, that you'll see, the dotted box, which is software of the

5   probe card analyzer.  That's what we're talking about here.     02:55:24

6          Now, it is disclosed as blob analysis software but as

7   we've seen, that's an unbounded software.  That doesn't provide

8   the metes and bounds of the claim.  It doesn't bound the claim.

9          And the more important point is that it doesn't

10  perform the key functions which are listed here.  It doesn't --  02:55:43

11  blob analysis does, as Mr. Schwartz said, nothing more than

12  that.  It doesn't perform the -- and I think there should be no

13  dispute on this.  It doesn't perform, cannot perform the

14  functions of computing the real-world coordinates of the

15  probes, of locating the probes, of selecting them from the     02:56:02

16  blobs.

17         Mr. Schwartz said, "Well, we'll use the output of

18  blob analysis to do that," and of course that's true.  But we

19  had to write new software.  It's that software that performs

20  the magic and it's that software that is not disclosed.     02:56:15

21         Now, the second part of the -- of this positioning

22  means element is the function -- the second part of the

23  function is determining the location of the probes relative to

24  each other.  That's one step further removed.  You have to have

25  already done all of the things we've talked about and in     02:56:35

United States District Court

1   addition, you have to have software for analyzing -- for          02:56:38

2   determining the location of the probes relative to each other.

3        Those are within the black box of ITC control

4   software, what the patent calls control software, but as to

5   which no specificity is given.  And control software isn't even   02:57:01

6   linked to this function even if it were more detailed.

7        It simply is a second black box consisting of

8   undisclosed algorithms to build on the previous undisclosed

9   algorithms to compute the location of the probes relative to

10  each other.                                                       02:57:25

11       Blob analysis stops before the pixel image is

12  converted to real-world coordinates, before the probe tips are

13  identified from the blobs.

14       Now, the last element that I'm going to talk about in

15  the '394 patent, this is very interesting.  You'll recall what    02:57:45

16  seems like quite a long time ago, this morning around 10

17  o'clock, Mr. Campbell got up and he showed you a blowup I

18  believe -- no, I believe it was a slide and it said -- it took

19  this element, this means from mathematically moving the

20  positions of the probes and the function that we're talking       02:58:10

21  about here is for identifying, based on the best fit, a minimum

22  number of probes which need to be adjusted but he didn't list

23  that function.

24       We've heard nothing from ITC abut the algorithm

25  required to determine a minimum number of probes to be            02:58:27

JOHN STROM - Redirect

1  adjusted.  That is not trivial either.  Mr. Strom is a pretty        02:58:29

2  smart guy, said he didn't know how to do it and he testified

3  that he didn't -- he got no clue from the ITC patents about how

4  to do this.

5          So there's a reason why ITC didn't even list this          02:58:47

6  function on their slide, talking about the means for

7  mathematically moving.  They have no good answer to this and

8  it's not trivial, Your Honor.

9          As we cited in our briefs, this very limitation was

10  an important part of their getting the patent.  They            02:59:08

11  distinguished a prior art reference, a reference -- the

12  reference in the prosecution history was to Sato, a particular

13  patent, and they said, "We're different from Sato because we

14  have means for identifying, based on the best fit, a minimum

15  number of probes to be adjusted."                               02:59:27

16          It was significant in the prosecution history.  It's

17  part of why they got the patent.  But it's never explained.

18  It's the algorithms to perform that function remain wholly

19  undisclosed.

20          ITC's corresponding structure, a computer programmed    02:59:44

21  with and/or running software for best-fit analysis doesn't get

22  you there.  Mr. Strom said best fit was something completely

23  different.  Mr. Strom knew how to do best fit.  He didn't know

24  how to identify the minimum number of probes to be adjusted

25  based on a best fit.  That is a separate algorithm and one that  03:00:06

JOHN STROM - Redirect

1    is entirely undisclosed.                                          03:00:10

2          And the patent itself makes clear that these are

3    separate functions.  It talks about a best-fit analysis and

4    then it says it is then determined which probes are properly

5    aligned and which probe -- and those probes that are selected    03:00:35

6    for further analysis and adjustment.

7          So over and above all of the functions we've been

8    talking about, this key function of identifying the minimum

9    number of pins to be adjusted, that function is not disclosed.

10         The structure must be an algorithm that uses the           03:00:55

11   results of the best fit to identify a minimum number of pins.

12   And that is not disclosed.

13         And, once again, I don't want to go through all of

14   the -- our basic chart.  We've included in the materials and

15   Your Honor can see it.                                           03:01:13

16         But the algorithm for performing this function as

17   well is undisclosed.

18         And, finally, let me say -- I alluded earlier to

19   definitions of an algorithm that we had provided to the court.

20   This is one of them and although I paraphrased it earlier, it's  03:01:31

21   important.  An algorithm must be specified exactly.  It's a

22   sequence of instructions that tell how to solve a particular

23   problem.  On that test ITC's patents have failed.

24         With that, Your Honor, with the court's permission, I

25   would like to turn the podium over to Ms. Muschamp.              03:01:52

United States District Court

1      THE COURT:  Thank you.                                    03:01:57

2      MS. UNDERWOOD-MUSCHAMP:  Your Honor, I would like to

3  start by calling Dr. Wright to the standard.  And to clarify

4  things, I think we were asked which exhibits will be used.  It

5  will just be Exhibit 1.                                      03:02:11

6                  PAUL WRIGHT, Ph.D.

7  called as a Witness herein by the Defendants, having been first

8  duly sworn and/or affirmed by the Courtroom Deputy, testified

9  as follows:

10     COURTROOM DEPUTY:  Thank you.  Please take our           03:02:37

11  witness stand.

12                  **DIRECT EXAMINATION**

13  BY MS. UNDERWOOD-MUSCHAMP:

14  Q.   Dr. Wright, would you please introduce yourself to the

15  court?                                                       03:03:01

16  A.   My name is Paul Wright and I am a professor of mechanical

17  engineering at University of California, Berkeley.

18  Q.   Would you please describe for us the core technologies in

19  which you have specialized?

20  A.   My degrees, my background are in manufacturing, in       03:03:16

21  automation and in metrology.  And then when I came to the

22  United States in 1979 I was one of the four founders of the

23  Robotics Institute at Carnegie Mellon University.  And we began

24  to use automation systems, robots, computer vision, and sensors

25  to do automated manufacturing and metrology for companies like  03:03:42

PAUL WRIGHT, Ph.D - Direct

1   Westinghouse and Intel.                                           03:03:48

2   Q.   What is metrology?

3   A.   Metrology is a fairly specialized field of engineering

4   concerned with measurement techniques and gauging.

5   Q.   Have you offered any publications in the core technologies   03:04:05

6   that you have just described?

7   A.   Yes.  I have four textbooks in this area and over 200

8   publications, academic publications, and some patents in these

9   areas.

10  Q.   Would you please summarize your educational background?      03:04:18

11  A.   My degrees, my fundamental degrees, are in industrial

12  metallurgy from the University of Birmingham in England.

13  Q.   And what is industrial metallurgy?

14  A.   The industrial part especially focuses on industrial

15  processing, like we're seeing here, and the metallurgical part   03:04:34

16  focuses on metals, on semiconductors, and on applications to

17  electronics manufacturing such as the aluminum oxide and

18  aluminum bonding pads that we're seeing in the chips that we

19  saw much earlier today.

20  Q.   And, Dr. Wright, you've been retained as an expert by the    03:04:55

21  defendants in this case; correct?

22  A.   Correct.

23  Q.   And have you reviewed the patents at issue?

24  A.   I have.

25  Q.   Generally, what is your understanding of the patents at      03:05:06

PAUL WRIGHT, Ph.D - Direct

1  issue?                                                          03:05:06

2  A.   They relate to the design of the probe card analyzers that

3  we saw in the morning slides.

4  Q.   And how does your background relate to this area of

5  technology?                                                     03:05:17

6  A.   My background, as I said, is in manufacturing and in

7  robotics and in computer vision.  So many of the machines that

8  my students and I have designed and controlled and prototyped

9  have all been involved in the robotic stage that we see in

10  these patents, the computer vision system that we see in these  03:05:36

11  patents.

12       Between 1979 and way into -- well, currently now but

13  especially through the mid-1990s I used computer vision for

14  blob analysis, a big project to measure turbine blades and

15  other materials.  We still use it to measure Intel chips.       03:05:56

16       We have a probe tester in our laboratory.  It's an

17  HP auto glass tester that my students and I use when we've made

18  chips.  And we use the probe cards that you saw to test our

19  chips to make sure that they are functioning correctly.

20  Q.   What is your understanding of a person of ordinary skill    03:06:18

21  in the art for the patents at issue?

22  A.   I think one has to say that this is a hybrid engineer or

23  hybrid computer scientist.  It's unlikely that somebody with a

24  bachelor's degree from a leading university would know some of

25  the subtleties that we're seeing today.                         03:06:37

United States District Court

PAUL WRIGHT, Ph.D - Direct

1    So one would definitely have to have a degree in                    03:06:40

2   mechanical engineering, industrial engineering, computer

3   science.  But then, most typically, one would have had to do a

4   master's degree, a year or two specialized degree in metrology

5   or computer vision in order to really understand the subtleties      03:06:54

6   that are involves in the blob analysis, in the various aspects

7   that come after the blob analysis.

8        That person would have had to do some robotics to

9   understand the X, Y, Z coordination that we've talked about.

10  And failing having a master's degree, they would have had to         03:07:13

11  have done several years of experience in this general field of

12  integrated circuit manufacturing or probe card manufacturing or

13  probe card analysis manufacturing.

14  Q.  Do you consider yourself to have at least the level of

15  skill of a person of ordinary skill in the art?                      03:07:34

16  A.  My skills are beyond, with due respect, that because

17  during that long period, say, at Carnegie Mellon we used these

18  computer vision techniques to do that kind of inspection work.

19       MS. UNDERWOOD-MUSCHAMP:  Your Honor, at this point I

20  would offer Dr. Wright as an expert in this case.                    03:07:49

21       THE COURT:  No objection?

22       He is an expert.

23       MS. UNDERWOOD-MUSCHAMP:  Okay.

24  BY MS. UNDERWOOD-MUSCHAMP:

25  Q.  Dr. Wright, we've heard a lot of talk today about                03:07:58

PAUL WRIGHT, Ph.D - Direct

1  algorithms.  Can you tell us what your understanding of an          03:08:03
2  algorithm is?
3  A.   If we may dim the lights slightly.  This dictionary of
4  computer and Internet terms by Barron's is in my own
5  laboratory.  It's a standard reference book.  The wording is        03:08:18
6  really pretty important.  In bold face there in the first
7  bullet, it says, "An algorithm must be specified exactly, so
8  that there can be no doubt about what to do next, and it must
9  have a finite number of steps."

10       And then in the second paragraph in the bold face it          03:08:43
11 really stresses, "A," general, "set of instructions is not an
12 algorithm if it does not have a definite stopping place, or if
13 the instructions are too vague to be followed clearly."

14       So this dictionary is one that I really stress with
15 my students and my colleagues.  This is what an algorithm is.       03:09:00

16       When I look at an academic paper for review, which is
17 part of my main business, or if I look at a patent, one of the
18 first things I look for is some kind of flowchart which
19 generally has rectangular boxes in it which tells you the
20 things to do and often has diamond-shaped boxes in it that sort     03:09:21
21 of tell you yes/no situations.

22       And towards the bottom end of that flowchart, having
23 gone through a looping process, it will ask you a question:
24 Have you done the best fit according to some minimum error, yes
25 or no?  And you, as the engineer, specify what that yes-or-no       03:09:41

PAUL WRIGHT, Ph.D - Direct

1  answer is.                                                    03:09:44

2        If the answer is yes, then you terminate the

3  algorithm and you've done your job.  If the answer is no, you

4  go around looping the -- you go looping around the boxes again

5  and run the software one more time.                           03:09:55

6        So that key element in that second paragraph about

7  having a definite stopping place and about being clear are

8  things that are very important to a computer scientist who is

9  writing an algorithm.  It's a really very specific art and a

10 very specific term of art.                                    03:10:15

11 Q.   Did you review the ITC patents, those being the '394 and

12 the '894 patents, to look for algorithms?

13 A.   Yes.  Yes, I did.

14 Q.   And what types of things were you looking for when you

15 reviewed those patents to see if algorithms were present?     03:10:29

16 A.   I was looking for these -- they are usually at the

17 beginning of a patent with the mechanical engineering designs

18 of the equipment which you can see in these patents, and then

19 most often there's a flowchart with these boxes that I was

20 talking about.  And I was looking for those.  It's an easy way 03:10:46

21 of digging into a patent when you first start.  There's no

22 boxes.  There's no flowchart there.

23        Now, failing a flowchart, the next thing you look at

24 is for some mathematical equations that would tell you about

25 the trigonometry of the robotics setup or would show you an   03:11:02

PAUL WRIGHT, Ph.D - Direct

1    image of a camera being calibrated.                                03:11:07

2              And for this hearing, I glanced back at some of the

3    papers that I remember wrote with my Ph.D. students Morris

4    Goldstein and David Bourne in that general period of the late

5    1980s and early 1990s, and I'm very pleased to see that in the     03:11:20

6    appendices of the papers we have these diagrams of our

7    apparatus and we have some mathematical equations that tell us

8    how we did the calculations and ran through these error

9    analyses.

10             And then in some cases, a person would go on with a      03:11:37

11   lot of detail in mathematics.  In some rare cases, people would

12   put some of the code, the high-level code, in the paper.  That

13   is less common than the codes usually relegated to the appendix

14   of a Ph.D. thesis.

15             But those are the kind of things that I was looking      03:11:54

16   for when you first asked me to look at the patents.

17   Q.   And, Dr. Wright, you were present in the courtroom when

18   there was a video clip played of some testimony you gave about

19   algorithms; correct?

20   A.   Yes, I was.                                                   03:12:07

21   Q.   And do you recall that testimony identified things like

22   flowcharts, equations, high-level code and low-level code?

23   A.   I recall my testimony, yes.

24   Q.   And those were things you were looking for?

25   A.   Those were the kinds of things I was looking for, yes.       03:12:20

PAUL WRIGHT, Ph.D - Direct

1  Q.    Now, do all of those things have to be present for an          03:12:23
2  algorithm to be disclosed?
3  A.    Absolutely not.  It's most common today to put that box
4  diagram in that I was talking about or instead of high-level
5  mathematical equations.  Otherwise, it becomes far to -- you        03:12:37
6  are caught up in the details in both the patent and in an
7  academic paper.  You just get bogged down in the details.
8            So you wouldn't be expecting all of those things but
9  you definitely would be expecting some of them.  Otherwise, you
10 wouldn't know, based on the Barron's Dictionary of Computer and     03:12:53
11 Internet Terms, you wouldn't know where to start.
12 Q.    I want to turn your intention attention specifically to
13 the ITC patents.  Do you have a general understanding of the
14 algorithms that are required in probe card analyzers?
15 A.    Yes, I do.                                                    03:13:14
16 Q.    And have you created any materials to help you explain the
17 things that are needed for a probe card analyzer?
18 A.    Yes.  Actually, in my first exposure to this in the spring
19 and summer of this year, I provided the lawyers with kind of a
20 checklist of what they should be looking for and the kind of        03:13:28
21 work -- that is described in the kind of work that I did back
22 in the late 1980s and the 1990s.  So I believe I created a
23 slide for you.
24 Q.    Is this the slide that you helped create?
25 A.    This is my slide of the algorithms that I used myself in      03:13:45

United States District Court

PAUL WRIGHT, Ph.D - Direct

1   the computer vision work that I did between -- especially          03:13:52

2   between 1985 and 1995 with Morris Goldstein and David Bourne.

3   This was work that we did for the Westinghouse Corporation back

4   there at the Robotics Institute at Carnegie Mellon University

5   in Pittsburgh.                                                     03:14:05

6           So numbers one and two there, they are about the

7   general setup for any robotic system where you have to make

8   sure that everything is working smoothly and the X, Y, Z

9   direction.

10          And then you have this camera calibration and of          03:14:22

11  course what you are trying to do there is take images and then

12  relate them to the real-world coordinates.

13          The next, number three, is more of a physical thing

14  where you're electronically taking the image, capturing it on

15  an image capture card.  Here as we sit in the year 2008, we are   03:14:43

16  doing this every day when we take our out our handy-dandy

17  camera now, which is all digital, and we capture an image of

18  our recent holiday party on a card.

19          But then going forward in computer vision, you have

20  to do these important things of image thresholding because       03:15:03

21  you're taking black and white images, as we saw very nicely in

22  these previous slides, and you have to figure out what exactly

23  you're saying.

24          Then I'm sure Your Honor and others are getting a

25  little tired of what blob analysis is.  I can go into that if     03:15:19

PAUL WRIGHT, Ph.D - Direct

1   you would like me to, but I think we've probably beaten that          03:15:23

2   horse close to death today.

3         And then six and seven are much more to do with

4   relating the blobs, especially that last step is the really

5   complex mathematical aspect of understanding what the blobs          03:15:35

6   are, relating them to probe tip locations and sizes, and then,

7   finally, calculating the probe tip property.

8         So I group these things in calibration numbers one

9   and two.  Three, four and five are to do with the imaging in

10  the camera.  And six and seven are the kind of magic that Alan       03:15:53

11  was just describing in his summary.

12  Q.  And we have described blob analysis quite a bit so we'll

13  skip over that unless you need to refer to it.  I would like

14  you to focus specifically on what comes after the blob

15  analysis, your steps six and seven.                                  03:16:10

16        Can you explain for us the algorithms required to

17  perform -- to compute absolute coordinates of blobs from pixel

18  coordinates?

19  A.  Yes.  This goes back to -- by the way, I should say all of

20  these algorithms are kind of layering on top of each other.  As      03:16:27

21  Mr. Strom said, even though you may have something in pixel

22  coordinates which you can see on a camera, you still don't

23  quite know where it is in the room.

24        So, actually, I could take the photograph of you

25  standing there with a digital camera but if it's a close-up and      03:16:43

United States District Court

PAUL WRIGHT, Ph.D - Direct

1    somebody asked me, "Where is Laura in relationship to the          03:16:49

2    door?" and I can't see where the door is, that doesn't tell me

3    where she's really standing in the courtroom.

4            So it's all to do with a very tight image that you

5    captured in pixel coordinates on a camera and then saying where   03:17:01

6    is that in relationship to my robotic system and all of my

7    probe tips?

8    Q.   And were any algorithms in the ITC patents that discussed

9    how to compute the absolute coordinates from the pixel

10   coordinates?                                                       03:17:17

11   A.   I looked for that at your request and I could not find any

12   algorithms in the two patents.

13   Q.   The last step you have on this slide, the last item in the

14   list says, "Algorithms to associate blobs with expected probe

15   tip locations and sizes and to calculate the probe tip            03:17:30

16   properties."  Can you explain what that entails?

17   A.   We've heard parts of that today.  There are parts of that

18   that really are extremely subtle.  As we heard from both of the

19   speakers, both on the ITC side and the API side when they were

20   being examined, that even though you see a blob, you're not       03:17:53

21   sure if it's a probe tip.

22           First of all, we've heard that there are scratches

23   and other haze on the glass that the probe tips are touching

24   on.  And since this is being lit very strongly, there could be

25   reflections that might also show up as blobs.                     03:18:12

United States District Court

PAUL WRIGHT, Ph.D - Direct

1    Secondly, we heard that the real functioning of those    03:18:15
2    probe tips is to sort of grind on the integrated circuit
3    bonding pads so some aluminum oxide from the bonding pads or
4    little tiny lumps of aluminum are going to be attached to the
5    probe tips and they, too, are going to be stuck on the plate.    03:18:34
6    Some of the blobs you see are going to be not probe tips at
7    all.  They are going to be random pieces of aluminum or
8    aluminum oxide.

9    Thirdly -- I'm just taking my pen out of my pocket --
10   the happy scenario would be you're looking end-on of my pen.    03:18:48
11   But as we saw in one of Mr. Campbell's slides, there's a very
12   good chance that the probe tip is bent out like this
13   (Indicating).  So when you try and look at a bent object like
14   that (Indicating), you could be looking at the color of my pen.
15   You could be looking all the way down the shank of my pen.  So    03:19:05
16   you don't even know you're looking at the tip of a probe tip.
17   You might be looking at a very elliptical shape as you look all
18   the way down the probe tip.

19   So this word associating the blobs with expected
20   probe tip locations, even the first part of that, making sure    03:19:19
21   that you have blobs that are the real probe tips, is very, very
22   difficult indeed and requires a lot of thresholding algorithms
23   and connectivity algorithms that we've heard little bit about
24   and spoken about.

25   Then, finally, on top of everything else, you need to    03:19:35

PAUL WRIGHT, Ph.D - Direct

1    figure out -- even if you have the right blobs that you found          03:19:38

2    in the camera, you still need to associate them with this huge

3    array of probe tips.   In modern probe card analyzers there are

4    as many as 70,000 probe tips that you're looking at.   This is a

5    huge undertaking to see where all of these little bent fingers        03:19:55

6    are.

7            The opposing counsel was holding up five fingers.

8    But imagine how difficult it is to try to match up 70,000 of

9    these or a large number of these anyway.

10           So this last step has all of the subtleties involved         03:20:10

11   of figuring out exactly are they probe tips or are they random

12   pieces of gunk or am I looking at the side of the probe tips or

13   are they spectral reflections of the image.   And then, finally,

14   doing that calculation to make sure that we're getting all of

15   the probe tips matched up with where the expected values are.        03:20:27

16   That's a very challenging set of algorithms are needed for

17   that.

18   Q.   Those algorithms that you've just discussed to perform

19   this last item on the list, are those disclosed in the ITC

20   patents?                                                             03:20:43

21   A.   They most certainly are not.

22   Q.   In 1993 were there commercially available software

23   packages to perform this last function on your list?

24   A.   No, there weren't.   The systems that I was using, the

25   automatic -- I used a system called an automatic system, which      03:20:54

PAUL WRIGHT, Ph.D - Direct

1  is slightly different than what we saw here.  And, actually, I          03:20:57

2  did glance through the testimony of Mr. Oberzeir who was the

3  very clever guy that wrote the Volant system manual; and he

4  also confirmed that that -- your numbers six and seven are

5  there are not commercially available.                                   03:21:14

6  Q.   I would like you to look at Exhibit 1 which I hope you

7  have in front of you.  It's the '394 patent.

8  A.   Yes, I do have that.  Yes, thank you.

9  Q.   And specifically if you'll look at column 14 and I'm going

10 to focus on lines 32 through 35.  And that particular passage        03:21:33

11 states, "The control software for the computer 200 is written

12 to automatically perform the required operations to determine

13 X, Y, and Z locations of all of the probe tips 90 based on the

14 blob analysis software."

15       What does the term "control software" convey to a              03:21:59

16 person of ordinary skill in the art?

17 A.   Control software really is no different to the word

18 "software."  It's the most generic high-level description of

19 programs running on a computer.

20 Q.   Does the reference to control software disclose the            03:22:19

21 algorithms that are necessary to determine the position of a

22 probe tip in a digital image?

23 A.   No, it doesn't.  This is just three lines of wording that

24 is just an incredibly high-level function description that has

25 no algorithms or no methodology, no mathematical equations.          03:22:37

United States District Court

PAUL WRIGHT, Ph.D - Direct

1   It's just a supergeneric description of what is going on.    03:22:41

2   Q.   Now, Dr. Wright, you're also aware that the Volant image

3   system is referenced in the patent; is that right?

4   A.   Yes.   That's higher up on column 14 in the first few lines

5   from three onward.    03:23:01

6   Q.   And in 1993 what functions would a person of ordinary

7   skill who was reading through the '394 patent understand this

8   image capture card to perform?

9   A.   The image capture card?   Okay.   That would -- a person of

10  ordinary skill in the art would understand that there's some    03:23:22

11  kind of printed circuit board plugged into the back plane of a

12  computer and the image from the camera, from this digital

13  camera, is being stored in memory locations on the computer

14  chip, on the image capture card.

15  Q.   And in 1993 would image capture -- or did image capture    03:23:40

16  cards typically come with software to analyze the images once

17  they were already in the computer?

18  A.   Absolutely not.   Actually, they don't today.   We all went

19  out for Christmas and probably bought our friends a camera, a

20  digital camera, and that has an image capture card in it but it    03:24:00

21  doesn't tell you -- as Mr. Strom said, we're intelligent human

22  beings.   We can look at the image and recognize our family, but

23  there's no analysis done on how tall Uncle Joe is or -- it

24  doesn't tell you anything.   It's just a picture that a human

25  being looks at.    03:24:23

United States District Court

PAUL WRIGHT, Ph.D - Direct

1    Q.    Do you know if there was software that was provided with        03:24:25
2    the Volant image system capture card?
3    A.    Your Honor, since this process began, I was deposed and
4    then I was invited since my deposition to acquire the Volant
5    systems manual.  As I did that, I could see there were             03:24:41
6    functions in there related to the blob analysis.
7    Q.    So did you have to look outside of the patent in order to
8    learn about the software that was provided with the Volant
9    image system capture card?
10   A.    Yes, really.  I can say with great conviction that only       03:24:56
11   column 14 for about four or five lines here gives you any idea
12   of what was done by this patent.  It mentions the Volant system
13   model 2510.  It says it runs on a computer and it mentions blob
14   analysis and that's really all you have to go on.
15   Q.    Having looked at the software that goes with the Volant        03:25:23
16   image capture card, does that perform either your item six or
17   seven of the slide of the algorithms that are necessary?
18   A.    Absolutely not.  Actually, it's relatively -- it gives you
19   many options on how to do number five because at that time,
20   doing blob analysis and actually even thresholding -- they were    03:25:43
21   difficult to do with that generation of computing.
22   Q.    Does reading the Volant system manual in combination with
23   ITC's patents tell a person of ordinary skill in the art how to
24   determine the positions of probe tips in a digital image?
25   A.    Absolutely not.  Those items six and seven, you can't         03:26:04

United States District Court

PAUL WRIGHT, Ph.D - Direct

1   figure that out from either one or the two of them together.                03:26:08
2   You can't figure out what to do.
3   Q.   If you will look at the slide that I've just put up, is
4   this another slide that you helped create?
5   A.   It is indeed.                                                          03:26:21
6   Q.   And the first major bullet point there says, "Positioning
7   means...to determine the location of the probes relative to
8   each other."
9        Can you please describe for us the algorithms that
10   are required to determine the location of probes relative to   03:26:32
11   each other?
12   A.   That will be a series of error calculations.  So one has
13   to imagine this big layout, sort of a two-dimensional layout of
14   these needle-like probes and they are all going to be slightly
15   bent out of their ideal position.                              03:26:56
16        The way I was explaining it to somebody the other day
17   is you can sort of imagine a crossword puzzle grid in your head
18   and in the ideal situation, all of the probe tips are going to
19   hit the middle of the squares but they are all going to be
20   slightly bent.                                                 03:27:12
21        So you're going to have to calculate both the X and
22   the Y errors from where the probe tips should have landed to
23   where they are in the squares and then you're going to have to
24   run through a statistical algorithm to try and minimize that.
25        First of all, in doing so, you have to try to            03:27:32

United States District Court

PAUL WRIGHT, Ph.D - Direct

1    determine where the probes are being moved inside the little          03:27:34

2    square boxes and then calculate where they are relative to each

3    other.

4    Q.   Do the ITC patents disclose the algorithms that are

5    required to determine the location of the probes relative to          03:27:44

6    each other?

7    A.   No, they do not.

8    Q.   The second major bullet point on the slide is, "Means

9    for...identifying based on the best fit a minimum number of

10   probes which need to be adjusted."                                    03:27:58

11          Now, were you present in the courtroom when ITC's

12   counsel associated this function with a best fit?

13   A.   Yes, I was.

14   Q.   And do you agree that a best-fit algorithm would identify

15   the minimum number of probes that you need to adjust?                 03:28:12

16   A.   I do not.

17   Q.   And why not?

18   A.   Well, a best-fit algorithm is a standard mathematical

19   technique.  It has a number of ways in which you can execute

20   it.                                                                   03:28:29

21          What has to be clear about the fact that best fit,

22   Your Honor, is a very general term.  We're most familiar with

23   it in plotting a linear line through data sets.  Here we're

24   talking about movements in both the X and Y plane.

25          Having done that best-fit analysis, then the engineer         03:28:49

PAUL WRIGHT, Ph.D - Direct

1   would have to decide in the algorithm how many of the probes     03:28:53

2   considerably are out of their position and so that the engineer

3   has to specify in the algorithm where the algorithm would

4   terminate once it would run.

5          So that figuring out that minimum number of probes to     03:29:10

6   be adjusted is a little bit difficult for me to understand what

7   it means in the patent.

8          But I think I could do it by my graduate students.

9   They were working at it for a long time.  But then we would

10  write our own special algorithm to decide from our point of     03:29:27

11  view what is the minimization function in the algorithm to

12  allow us to tweak just a minimum number.

13  Q.   Are you familiar with any best-fit algorithms that

14  determine the minimum number of probes that need to be

15  adjusted?                                                        03:29:43

16  A.   I have not seen any -- I'm not familiar with any, no.

17  Q.   Do the ITC patents disclose an algorithm for determining

18  the minimum number of probes that need to be adjusted?

19  A.   Absolutely they don't.  They really don't.

20  Q.   Looking at this next slide, is this another slide you       03:30:00

21  helped create?

22  A.   Yes, it is.

23  Q.   And the first major bullet point in this size says, "A

24  computerized means with software means...for determining the

25  location and length of the scrub mark based on said positions."  03:30:10

United States District Court

PAUL WRIGHT, Ph.D - Direct

1    Can you please describe the algorithms that are                    03:30:14

2    required to determine the location and length of scrub marks?

3    A.   The first really crucial point to emphasize is that all of

4    the algorithms I showed in that first slide, you've got to do

5    all of that before you can do anything else.                       03:30:30

6          But then once you've done that, it is the case that

7    you're going to have a beginning X,Y location of a scrubbing

8    action and a finishing X,Y location of a scrubbing action.

9    It's also necessary to specify the angle against some known

10   reference direction, an angle theta here.   Any angles, I beg      03:30:50

11   your pardon.

12         So another algorithm is going to need to be run.   It

13   needs to involve statistics, too, because we have many probe

14   points that we're trying to analyze.

15         And so you need mathematics that calculates that            03:31:08

16   length and calculates that angle and applies statistics to the

17   results to make sure that it's a good result.

18   Q.   Do the '394 and '894 patents disclose algorithms for

19   determining the location and length of a scrub mark?

20   A.   They do not.                                                  03:31:32

21   Q.   The second bullet is, "A processing device

22   which...predicts the location of a scrub mark that would be

23   made by the probe tip on an integrated circuit bonding pad."

24         Can you predict the algorithm that would be made on a

25   bonding pad?                                                       03:31:47

United States District Court

PAUL WRIGHT, Ph.D - Direct

1   A.   These two things, as I read through them, more or less          03:31:48

2   come out to be the same thing.  It's first big bullet up there

3   you might say is moving the probe tips on the glass plates in

4   order to see where that scrub mark is, the length of it and its

5   angle, and then later on the probe tip is going to go over and    03:32:07

6   make the same measurement on the bonding pad of an integrated

7   circuit.

8           So this is basically the same thing and you are just

9   going to apply the algorithms that you used in the first bullet

10  to the second bullet.                                             03:32:23

11  Q.   And are you aware of any commercially available algorithms

12  to analyze scrub marks that would be made?

13  A.   No, especially in 1993.

14          MS. UNDERWOOD-MUSCHAMP:  I have no further questions

15  for Dr. Wright.                                                   03:32:37

16          THE COURT:  Cross?

17          MR. CAMPBELL:  I have some questions.

18          THE COURT:  Mr. Campbell, would you like us to turn

19  on the lights?

20          MR. CAMPBELL:  Yes.  I would prefer that if you don't     03:32:51

21  mind, Your Honor.

22                    **CROSS EXAMINATION**

23  BY MR. CAMPBELL:

24  Q.   Dr. Wright, you talked about -- your testimony, you looked

25  for algorithms throughout the ITC patents; right?                03:32:58

PAUL WRIGHT, Ph.D - Cross

1    A.    I did.                                                        03:33:02

2    Q.    And you gave the basis for what those algorithms are;

3    right?  In fact, you relied upon a dictionary definition;

4    right?

5    A.    Yes.                                                          03:33:10

6    Q.    And I have that dictionary definition here.  It comes from

7    Barron's Sixth Edition 1998 of the Dictionary of Computer and

8    Internet Terms at 12; right?

9    A.    Yes.

10   Q.    And you tell me that's the definition you used; right?       03:33:21

11   A.    Well, in addition to that, as I mentioned to the court,

12   that I was looking for flowcharts, mathematics and possibly

13   code.

14   Q.    Okay.

15   A.    So I was looking for two things.                             03:33:40

16   Q.    All right.  So in order to determine whether there was an

17   algorithm, first you applied this definition, right, the

18   definition we saw in the Dictionary of Computer and Internet

19   Terms, and then you added to that you looked for -- what was

20   it?                                                                03:33:55

21   A.    Flowcharts, mathematics, and possibly code.

22   Q.    And possibly code.  And you didn't find those things;

23   right?

24   A.    I did not find any of those later things.

25   Q.    And based on that, you determined that ITC's patents did     03:34:05

United States District Court

PAUL WRIGHT, Ph.D - Cross

1  not disclose the required algorithms; correct?                    03:34:08

2  A.   Yes.

3  Q.   All right.

4        Dr. Wright, did you look at any, for example, law to

5  determine how the -- do you know what the fed circuit is?  U.S.   03:34:18

6  Court of Appeals for the Federal Circuit?

7  A.   Well, I'm getting on thin ice here.  I'm not a trained

8  lawyer.

9  Q.   I understand that.  It seemed to me like a lot of the

10 things that you talked about were legal conclusions so I want    03:34:32

11 to find out what you know about the law about what an algorithm

12 is according to the courts.

13       Do you know what the U.S. Court of Appeals for the

14 Federal Circuit is?

15 A.   I have a very general understanding, yes.                    03:34:43

16 Q.   What is it?

17 A.   It developed some of those slides that were shown earlier.

18 Q.   It's the court that determines, for example, patent law;

19 right?  It interprets the patent laws; correct?

20 A.   I presume so.                                                 03:35:03

21 Q.   Did you look at any of the fed circuits decisions to see

22 what an algorithm is?

23 A.   I did not.

24 Q.   Okay.

25       So in your conclusion today, for the last half-hour        03:35:10

United States District Court

PAUL WRIGHT, Ph.D - Cross

1    and in your declaration, when you were opining on whether the          03:35:13
2    required algorithm was disclosed in ITC's patents, you did not
3    use the law according to the fed circuit.  You used the
4    dictionary definition of Computer and Internet Terms and
5    whether there was high-level code, low-level code, math and            03:35:35
6    flowcharts?
7    A.    Yes.
8    Q.    Okay.  So if that's not the law, your conclusions would be
9    incorrect?
10   A.    My conclusions were reached being an engineer, as if I was       03:35:47
11   reviewing an academic paper and working on these machines with
12   my students to find an algorithm.
13   Q.    Exactly.  And you referred to Ph.D. dissertations or
14   theses; right?
15   A.    Right.                                                           03:36:07
16   Q.    And you looked to determine whether a patent met all of
17   the requirements you would look for in a Ph.D. thesis; right?
18   A.    No.  Actually, with due respect, I said an academic paper
19   or a patent.  I did say that.
20   Q.    You have to back up a minute.  You agree you're not an           03:36:21
21   expert in patent law; right?
22   A.    I did say that.
23   Q.    And you have no idea what the federal circuit has said the
24   requirement is for an algorithm; right?
25   A.    With due respect, I have some idea.                              03:36:34

United States District Court

PAUL WRIGHT, Ph.D - Cross

1  Q.   And you don't review patents for a living; right?          03:36:37

2  A.   I have to be a little gray on that area because I do look

3  at patents and I have patents and I have patents in play right

4  now of my own in different fields.

5          So it's not a straight yes-or-no answer to that.        03:36:54

6  Q.   But you wouldn't consider yourself a person even of

7  ordinary skill in trying to interpret patents because you don't

8  know the fed circuit law; right?

9  A.   I find that a convoluted question.  Are you saying I'm not

10 a lawyer?  Is that what you're saying?                           03:37:11

11 Q.   I'm not just saying you're not a lawyer.  We can all agree

12 you're not a lawyer even though you opined, as I understood, as

13 to what an algorithm is means according to the law; right?

14 We'll agree you're not a lawyer.

15         But you will agree also that you don't even have the     03:37:25

16 skills that a lawyer would have.  In other words, you haven't

17 reviewed all of the fed circuit opinions.  You haven't tried to

18 distill from those opinions what the requirements of an

19 algorithm are, have you?

20 A.   I will agree with you on that point.                        03:37:45

21 Q.   All right.

22         Now, one of the things we talked about is that a

23 patent is looked at through the eyes of a person of ordinary

24 skill in the art; right?

25 A.   Yes.                                                        03:37:59

United States District Court

PAUL WRIGHT, Ph.D - Cross

1   Q.   And you agree you're not a person of ordinary skill in the          03:38:00
2   art?

3   A.   With due respect, I am beyond a person of ordinary skill
4   in the art.

5   Q.   Okay.  You define a person of ordinary skill in the art to          03:38:06
6   have, for example, I think you said a master's degree from a
7   reputable college; right?

8   A.   I said this was a hybrid area and it's likely that you
9   would have to have additional training as you just
10  characterized it.                                                        03:38:23

11  Q.   You said these are smart people; right?

12  A.   Yes.

13  Q.   They have master's degrees.  They have a couple of years
14  of experience working for maybe a probe card testing machine
15  company.  I believe that is the definition --                            03:38:33

16  A.   Yes, I did say that, yes.

17  Q.   Those people would have a general understanding of the
18  type of algorithms that are used in that industry; right?

19  A.   I think I would disagree with you on that point since this
20  is taking place in a period -- in the period around 1990.                03:38:51

21  Q.   Okay.

22  A.   And, in fact, it's clear to me from reading Mr. Oberzeir's
23  deposition, the man that wrote the Volant systems manual, that
24  people were going -- companies were going to people like him
25  because they didn't understand how to do blob analysis and so            03:39:12

United States District Court

PAUL WRIGHT, Ph.D - Cross

1   forth back at that time.                                          03:39:14

2   Q.   I want you to think back to your deposition and think back

3   to -- you were here in the courtroom earlier; right?

4   A.   I was.

5   Q.   And we played a few deposition clips, right, the video?     03:39:25

6   A.   Yes.

7   Q.   And you agreed with me when we asked that a person of

8   ordinary skill in the art in 1993 knew what best fit was;

9   right?  They knew that algorithm.

10  A.   With due respect, you took me out of the context.  In that  03:39:43

11  deposition you asked me if a person would know what a best fit

12  is.  And so in most undergraduate engineering or mathematics

13  courses, a best fit -- I'll tell the court, if you hold up your

14  hands and you have a Y axis and an X axis, there could be some

15  random data points here.  This could apply to anything,          03:40:04

16  agriculture through zoology.  You have data points and you're

17  going to draw a best line.

18          So most undergraduates would know that a best fit is

19  the best line through a set of data points.  And they do

20  something called regression analysis on it.  But this is a       03:40:21

21  different situation where X and Y movements are being executed.

22          It's that crossword puzzle thing I was talking to you

23  about before, Your Honor, and to do that best fit is

24  substantially more complex than doing a linear best fit through

25  a series of data points.                                         03:40:40

United States District Court

PAUL WRIGHT, Ph.D - Cross

1          So my clip, with due respect, was taken out of                    03:40:41

2   context.

3   Q.   All right.  And did I also take you out of context when I

4   showed your clip about blob analysis and the fact that not only

5   engineers but engineers in this art would understand what blob     03:40:52

6   analysis was?

7   A.   I think we've heard today that image analysis and blob

8   analysis are extraordinarily high-level terms.  A blob is a

9   blob and I think people understand what a blob might look like.

10  It looks like an ink blot.  But going beyond that to do the        03:41:12

11  thresholding that we've heard about and the segmentation that

12  we've heard about and then the connectivity that we've heard

13  about, those are very subtle algorithms that have to be run.

14  Q.   I'm sorry.  I only got part of that.  Connectivity was

15  one; right?                                                        03:41:30

16  A.   Connectivity -- well --

17  Q.   Segmentation; right?

18  A.   Yes, m'hum.  I said thresholding, segmentation, and

19  connectivity.

20  Q.   Alrighty.                                                     03:41:41

21          Does the patent -- you have Exhibit 1 there and you

22  have claim one.  And it says -- for example, let's go to the

23  blob part:  Position means to determine the position of each

24  probe in the digital image.  Does that say anything about --

25  what is it -- connectivity, segmentation, or thresholding?        03:42:03

PAUL WRIGHT, Ph.D - Cross

1    A.    It does not.                                                          03:42:08

2    Q.    But those are all things that a person of ordinary skill

3    in the art, like I believe we heard Mr. Strom testify about,

4    would apply in the context of the overall system; right?

5          In other words, you understand that a patent doesn't      03:42:24

6    need to enable or -- or I mean doesn't need to teach every

7    single thing there is to do to build, for example, ITC's

8    machine; right?

9    A.    Ask me that question again.  It kind of got a little long

10   and I missed it.  I lost focus on it as we went through.         03:42:39

11   Q.    Did you hear or were you listening to the opening argument

12   given by my opposing counsel?

13   A.    Yes, I was.

14   Q.    And he differentiated between a disclosure requirement;

15   right?  You heard that, and an enablement?  Did you recall        03:42:54

16   that?

17   A.    Yes, but I -- I am a little vague, of course.

18   Q.    I understand.  What is the difference, according to the

19   patent laws, between enablement and having enough disclosure to

20   meet the requirements for 35 USC, Section 112, paragraph 6?       03:43:12

21   A.    I am now in legal territory and so I'm not able to answer

22   that question with accuracy.

23   Q.    Okay.  Well, one of the things I heard you talk about a

24   few minutes ago is that a person couldn't make this or couldn't

25   do this based on the disclosure; right?  Make was the exact       03:43:30

PAUL WRIGHT, Ph.D - Cross

1    words you used.  Do you recall that?                          03:43:37

2    A.    Not quite.  Can you -- can we go back in the court and see

3    what I said?

4    Q.    I think that will be a little difficult.  What I want to

5    do is differentiate between those two things.                03:43:47

6           What were you looking for?  Were you looking for,

7    when you looked at the patent, whether it taught a person of

8    ordinary skill in the art how to build this device?

9    A.    I was looking for -- right from the beginning, as I said,

10   again, being an engineer, not a lawyer, I was looking for an  03:44:03

11   algorithmic basis for doing these steps.

12          Going back to my slide, if we may, the first ones,

13   topics one through seven, I was looking for those algorithms.

14   Q.    And what was the purpose for looking for all of those

15   algorithms?  It was to determine whether or not the patent    03:44:25

16   taught you how to do or how to build one of these machines?

17   A.    Yes.  Yes.

18   Q.    All right.  So it wasn't whether it disclosed what is in

19   the claims.  It's whether it taught you how to build a machine

20   that would do this; right?                                    03:44:40

21   A.    Well, I was expecting both, actually.  I mean, I was

22   expecting to see how to build the machine and what it said in

23   the claims.

24   Q.    Maybe I'm a little lost.  You were looking at the patent

25   to determine whether it would enable a person -- whether it   03:44:56

United States District Court

PAUL WRIGHT, Ph.D - Cross

1    would teach them how to build something like what's claimed?    03:44:58

2    A.    Yes, and to control this machine, yes.

3    Q.    And you referenced a slide with required algorithms and

4    you had seven different algorithms, one of which was perform

5    blob analysis; right?    03:45:12

6    A.    Yes.

7    Q.    And if the claim is construed as requiring blob analysis,

8    that is disclosed in the patent; correct?

9    A.    There's no algorithms for blob analysis.

10   Q.    Hold on.   The patent teaches a person of ordinary skill in    03:45:27

11   the art to use blob analysis.   You'll agree with me on that;

12   right?

13   A.    Is this column 14.   Which part of the patent especially?

14   Is this column 14, the first few lines here?

15   Q.    I believe -- is it the top of 14 that has the Volant    03:45:56

16   system.

17   A.    Yes.

18   Q.    Well, yes.   That teaches blob analysis to find probe tips;

19   right?

20   A.    No.   Actually, it just talks about the image of the probe    03:46:08

21   tips.   There's general language here in those five or six lines

22   there.   It says, "The computer 200 can be a personal computer.

23   Blob analysis software returning on the computer to control the

24   image capture is used to determine the position of the image of

25   the probe tip on the video field of view."    03:46:32

United States District Court

PAUL WRIGHT, Ph.D - Cross

1          And that is some of the language that was in some of      03:46:34

2   the slides that we saw here.

3   Q.    Right.   That's one of the seven algorithms that you came

4   up with; right?

5   A.    No, that's not an algorithm.                                03:46:42

6   Q.    Okay.   I'm sorry.   Under your definition, I agree it's not

7   an algorithm.

8          Putting aside whether the fed circuit would say

9   that's an algorithm or not, you agree that the patent teaches a

10  person of ordinary skill in the art to perform at least one      03:46:59

11  part of that step is to use blob analysis software running on a

12  computer to control the image capture -- oops, I'm sorry.   I

13  think I skipped it.

14         Blob analysis software running on a computer to

15  control the image capture 250 is used to determine the position  03:47:13

16  of the image of the probe tip; right?

17  A.    That's what it says here.

18  Q.    So if the claim is construed, if the positioning means

19  claim is construed as requiring blob analysis, that is

20  disclosed in the patent; right?   Putting aside whether that's   03:47:31

21  an algorithm or not, that's disclosed in the patent; right?

22  A.    I'm getting a little caught in the semantics; but if

23  you're saying that these words about blob analysis are

24  disclosed in the patent, obviously I agree that the words are

25  there, yes.                                                      03:47:49

United States District Court

PAUL WRIGHT, Ph.D - Cross

1    Q.    All right.  Now, you had I believe seven different          03:47:51

2    algorithms:  Stage calibration, camera calibration --

3    A.    Image thresholding and so forth.

4    Q.    Image thresholding, I think connectivity.  Did I miss any?

5    A.    That's not -- connectivity is not in there.  That's part   03:48:03

6    of blob analysis.

7    Q.    It's part of blob analysis?

8    A.    Yes.

9    Q.    You'll agree those aren't in the patent; right?

10   A.    They are not in the patent.                                03:48:12

11   Q.    And, in fact, those are ways that a person of ordinary

12   skill in the art would improve blob analysis, right, to make it

13   work in particular applications or to make sure that it was

14   efficient; correct?

15   A.    Ask me that again.  I got lost in the double negatives.     03:48:27

16   Q.    I'm sorry.  You had seven different algorithms, six of

17   which I believe you said don't appear in the patent, nor in the

18   claims; right?

19   A.    None of those algorithms appear.

20   Q.    In the claims or in the patent?                            03:48:41

21   A.    Yes.  As I see an algorithm, coming back to my box

22   diagrams and my need for mathematics and possibly code, none of

23   those things appear in the patent.

24   Q.    All right.  Because there's not code for them and there's

25   not --                                                           03:48:55

United States District Court

PAUL WRIGHT, Ph.D - Cross

1    A.    No.   There's no block diagrams even for them.                03:48:56

2    Q.    There's no block diagrams?

3    A.    That's the simplest way in which you could convey an

4    algorithm to a person of ordinary skill in the art.

5    Q.    Under the requirement you had for an algorithm, which was    03:49:06

6    Dictionary of Computer and Internet Terms, you applied those

7    terms, that definition, to determine whether or not those

8    things were there; right?

9    A.    As well as coming in semi blind to this process just

10   looking for some algorithms in the patent.                         03:49:20

11   Q.    Okay.   One more time.   When you were looking for an

12   algorithm, you looked for this definition of an algorithm plus

13   a little bit of code plus a flowchart and some math; right?

14   A.    Yeah.   I am repeating myself.   When I look at these

15   patents, I begin by looking for a flowchart.   And if there's no   03:49:38

16   flowchart -- like in my own papers, I'm looking for some

17   mathematics.   And failing that, I might be looking for some

18   code and I'm not seeing any of those structures I believe you

19   called them.

20          And then just to make it clear for the court, you          03:49:54

21   know, I went back to my standard textbooks that I have in my

22   lab for my students and myself to clarify more precisely in

23   words what an algorithm is other than just relying on my box

24   diagrams, mathematics, and code.

25   Q.    Now, you were engaged to give your expert opinion, right,    03:50:11

United States District Court

PAUL WRIGHT, Ph.D - Cross

1   as to whether or not the specific algorithms were disclosed in        03:50:15

2   the ITC patents; right?

3   A.   Yes.

4   Q.   That was your goal.  Did you ask?  Did you ask Heller

5   Ehrman's lawyers, "What is an algorithm according to the             03:50:24

6   federal circuit?"

7   A.   What is an algorithm according to the federal circuit, I

8   don't believe I asked them that, no.

9        MR. CAMPBELL:  No further questions.

10       THE COURT:  Redirect?                                           03:50:36

11       MS. UNDERWOOD-MUSCHAMP:  I'll be very brief, Your

12   Honor.

13                    **REDIRECT EXAMINATION**

14   BY MS. UNDERWOOD-MUSCHAMP:

15   Q.   Dr. Wright, if you'll look at claim one of the '394            03:50:52

16   patent, and specifically I think you were asked about the

17   limitation positioning means to determine the position of each

18   probe in the digital image relative to a known physical

19   position in order to determine the locations of the probes

20   relative to each other.  Do you see that?                           03:51:04

21   A.   This is the fourth subparagraph I believe; is that right?

22   Q.   Correct.

23   A.   Yes.

24   Q.   Did you find anything in the ITC patents that a person of

25   ordinary skill in the art would understand to be an algorithm      03:51:17

PAUL WRIGHT, Ph.D - Redirect

1    to perform the functions recited in that subparagraph?                    03:51:20

2    A.    Your Honor, I did not find such algorithms.

3            MS. UNDERWOOD-MUSCHAMP:  No further questions, Your

4    Honor.

5            THE COURT:  You may step down.                                    03:51:29

6            THE WITNESS:  Thank you, Your Honor.

7            (Witness excused.)

8            MS. UNDERWOOD-MUSCHAMP:  At this point, we were going

9    to turn to the nonmeans-plus-function claims which I think will

10   be substantially faster.                                                  03:51:38

11           MR. CAMPBELL:  Your Honor, I believe we had an

12   agreement that each side would have two hours to make --

13           THE COURT:  That is correct.  We've gone over that.

14           MS. UNDERWOOD-MUSCHAMP:  Would you like me to address

15   the nonmeans-plus-function claims?                                        03:51:59

16           THE COURT:  How long will it take?

17           MS. UNDERWOOD-MUSCHAMP:  You can tell me how much

18   time I have.  I can probably address it in less than ten

19   minutes and probably less than five for the Applied Precision

20   patents.                                                                  03:52:09

21           THE COURT:  All right.  Ten minutes total.

22           MS. UNDERWOOD-MUSCHAMP:  I would like to focus for

23   the nonmeans-plus-function limitations.  There's, essentially,

24   three main nonmeans-plus-function terms in each of the ITC

25   patents and the ITC patents.  I'm going to highlight two of     03:52:25

1    them.   The first is the force and overdrive limitations that        03:52:30

2    you've heard about.   The second one is the method of moving,

3    which you haven't heard anything about, but it is a claim that

4    requires construction due to its complexity.

5         In terms of the force and overdrive limitations, the         03:52:44

6    '894 patent refers to two contact positions for analyzing a

7    scrub mark.   It's important to recognize that a scrub mark is

8    not something new.   Rather, the prosecution history for the

9    '894 patent describes it as a normal result.   This is something

10   everybody knew about.   It's not something ITC learned about,        03:53:05

11   oh, there are scrub marks.   This was a well-known phenomenon

12   that people knew they had to deal with.

13        What ITC did is came up with their method of how they

14   were going to analyze those scrub marks and to look at them and

15   predict them.                                                        03:53:22

16        As shown here, the method they chose was to have two

17   contact positions.   The first contact position is shown in 6(a)

18   and the second contact position is shown in 6(b).

19        ITC initially disputed that contact was required for

20   the first force.   They since seemed to withdraw that being that    03:53:43

21   contact applies in each of the claims that recite a first

22   force.   So the claims themselves say you have to have contact

23   for your first force, this first position.   It's in the claim

24   language and they have essentially run away from their initial

25   contention that contact was not required.                           03:54:02

1    API's construction essentially recognizes that and        03:54:09

2  defines first force as a force between the probe tip and the

3  window or deflection surface.  That's a force that's created

4  when the probe tip contacts the window or the deflection

5  surface.                                                     03:54:24

6        If we look at the written description in addition to

7  the claims which if Your Honor wants to look at the leading

8  case on claim construction and what we really look at, it's

9  really the *Phillips vs. HWH* case which was decided en banc in

10  the 2005 by the federal circuit.                            03:54:44

11        We know that we look at the claims but we also have

12  to look at the written description.  And the written

13  description specifically says that this first contact or first

14  force as well as the first overdrive is an initial contact

15  position.                                                   03:54:57

16        And then the second force or the second overdrive

17  that we'll talk about is a second contact position created when

18  we raise the stage and create an additional heavier force.

19        So the written description specifically says that

20  first force, that first overdrive relates to an initial contact  03:55:13

21  position.

22        So we know from the claims that we need contact and

23  we know from the written description that we need contact for

24  this first force or this first position that we're talking

25  about.                                                      03:55:26

1    But the most critical element, Your Honor, is really    03:55:27

2    the prosecution history and that is the third piece of

3    intrinsic evidence which the *Phillips* decision tells us we have

4    to look at.

5    Mr. Campbell begrudgingly admitted that this court    03:55:39

6    can look to the prosecution history.  It's not just that the

7    court can look at the prosecution history.  This court must

8    look to the prosecution history.

9    In fact, when we look at the *Phillips* case, they cite

10   to *Vetronics*, an earlier in decision, for the proposition that    03:55:54

11   the purpose of consulting the prosecution history in construing

12   a claim is to exclude any interpretation that was disclaimed

13   during prosecution.

14   A patentee cannot tell the Patent Office their claim

15   means one thing in order to get the patent allowed and then    03:56:14

16   come to the court and say, no, it means something else in order

17   to try and find infringement.

18   That is the reason that the court not only can look

19   at the prosecution history but the federal circuit says we must

20   look at the prosecution history and construe the claims based    03:56:27

21   on the prosecution history.

22   You didn't see the prosecution history.  ITC didn't

23   put that on the screen because they didn't want to put that on

24   screen.  The prosecution history answers for us what first

25   force requires and what first defined overdrive requires.    03:56:43

United States District Court

1       And that is when we look at what is said in the          03:56:47

2   prosecution history, ITC said in the context of the specific

3   language of the claims, they each recite -- not just the claims

4   that say force.  Every claim that they have in the '894 patent,

5   they said, recite that the probe tip is driven at two different  03:57:04

6   forces or overdrives after contacting a window or deflection

7   surface.

8       Today they essentially conceded that claims one,

9   seven, and 16, okay, there's contact in the claim.  We can't

10  credibly say that this first force doesn't require a contact     03:57:23

11  position.

12      But they say, oh, claim four is different because it

13  says overdrive.  And overdrive is an entirely different

14  phenomenon.

15      Well, they told the Patent Office the exact opposite.   03:57:35

16  They said every claim, whether it said force or overdrive,

17  required a contact and the claims must be construed in

18  accordance with what ITC represented during the prosecution

19  history.  And it's also maybe true that overdrive isn't a term

20  that nontechnical people use in day-to-day conversation.         03:57:55

21      Before having this case, looking at this case, most

22  people in this courtroom probably never heard of an overdrive

23  but it is a term that has an ordinary meaning to people that

24  are involved in the art.

25      And one of the -- in this case, Mr. Schwartz who you     03:58:11

United States District Court

1  heard from today, one of the inventors, named inventors on the          03:58:20

2  patent and the principal of ITC, was asked:  What do you mean

3  when you say a first defined overdrive?  What does that mean?

4          And he confirmed that people would understand that

5  the first defined overdrive creates a force.  The force that's     03:58:31

6  created when those probe tips touch the window or deflection

7  surface.  That is what overdrive means.  It has a meaning to a

8  person of ordinary skill in the art.  It's a meaning that

9  requires contact between the probe tips and a window or a

10  deflection surface, the same thing as the first force in the      03:58:48

11  patents, and the same thing that ITC told the Patent Office was

12  required.

13          So each of the claims of the '894 patent, not just

14  the ones that say first force, but also claim four which

15  recites a first defined overdrive position requires contact      03:59:04

16  between the probe tips and the window or deflection surface.

17          I want to turn very briefly to claim 12, which you

18  haven't heard mentioned today, and this is a very long and

19  somewhat convoluted claim that talks about -- at least the

20  first four limitations of claim 12 talk about how this field of  03:59:25

21  view, this video microscope moves in order to find a probe, in

22  order to determine, get an orientation of where the probe card

23  is when it first starts up.

24          The first four of the seven limitations in claim 12

25  deal with how you're going to move this field of view.          03:59:44

United States District Court

1        We asked one of the named inventors of the patent,        03:59:49

2   what does the claim require?  What method of moving is recited

3   in claim 12?  And what he told us is he wouldn't even venture a

4   guess.  He had absolutely no idea what the claim language

5   required because it's written in legalese in strange terms, and   04:00:05

6   he wouldn't even venture to interpret the limitation for us.

7        The claims must recite -- we must know the metes and

8   bounds, as Mr. Blankenheimer said, and the court must construe

9   these claim limitations so we know whether a product practices

10  claim 12, whether they move in the manner that is claimed in    04:00:25

11  the patent.

12       Applied Precision has proposed a construction that

13  attempts to do so, that attempts to figure out what the metes

14  and bounds are, and that construction is that after a field of

15  view is first moved to the maximum position in a predetermined   04:00:42

16  direction, the field of view is then moved in the opposite

17  direction where the field of view must be capable of being

18  moved in both a positive and a negative perpendicular direction

19  for the predetermined direction.

20       Essentially, you must move in a serpentine pattern.        04:00:58

21  You first move in one direction.  If you don't find any probe

22  tips, you move up and down and in the opposite directions and

23  you continue moving in this alternating pattern until you find

24  a probe tip.

25       This is consistent with a written description which        04:01:13

United States District Court

1   is set forth in column 14, line 49 through 53, and it's also          04:01:14

2   consistent with ITC's representations to the Patent Office.

3           Very briefly, if you would like me to touch on the

4   Applied Precision patents, there's three terms or if you want

5   ITC to go first, I'm happy to relinquish the podium.                   04:01:33

6           THE COURT:  Let's have ITC.

7           MR. CAMPBELL:  Your Honor can we take a five-minute

8   break to change computers or however long you want?

9           THE COURT:  Sure.  Ten minutes.

10          (Recess at 4:02; resumed at 4:12.)                             04:02:09

11          THE COURT:  Please be seated.

12          Mr. Campbell?

13          MR. CAMPBELL:  Thank you, Your Honor.

14          Your Honor, I want to talk about API's patent but

15  I'll do it very briefly and, in fact, I think I'll talk about         04:13:23

16  one of the claims term and that is checkplate.  But I want to

17  do it in terms of what the invention is because as I said

18  earlier, and as Mrs. Muschamp said, according to the federal

19  circuit and *Phillips*, we have to look to the invention.  Look

20  to the invention and that's how you interpret the claim is to         04:13:34

21  reflect the invention.

22          Now, API's '374 patent says it's an object of the

23  present invention to provide automatic inspection of probe

24  point alignment, just like we talked about with ITC's patents,

25  probe point alignment, but this is the prior art system, the         04:13:50

1   obsolete system, the system that uses conductivity.                    04:13:54

2          What conductivity, just briefly, means is electrical

3   connection, that there's some kind of an electrical connection.

4          If you go through several parts of the patent, and

5   I'll just point out a few of them, it talks about the              04:14:10

6   checkplate and the checkplate is the thing that is used to

7   check alignment.

8          One embodiment of the checkplate can be used to check

9   the probe point alignment of the probe cards.  The checkpoint

10  50 is able to inspect the alignment of the probe point array.   04:14:26

11  And, in fact, when they describe what the invention is with

12  reference to the figures, what this is is the checkplate, this

13  little square.  And the square has this insulating squares.  In

14  other words, they don't conduct electricity.  I could stick my

15  tongue on those and I would be just fine.                           04:14:45

16         But this little, little strip in between, that is

17  electrically conductive.  So whenever this probe passes over

18  that little line there, it tells it, hey, I found a probe.  And

19  since you know where the system is, you know where that -- what

20  they call it like a chuck is, you know where the probe is.  And   04:15:03

21  you have to do it in the X direction and in the Y direction.

22  And by doing it in those two directions, you determine

23  alignment.  That's all the checkplate does.  That is the

24  invention, is using the checkplate with that conductivity

25  surface and that conductivity line and able to check alignment.   04:15:19

United States District Court

1     Checkplate, you can look in a dictionary and you're          04:15:26

2  not going to find a definition.  It's not a word like window.

3  It's not a word like many of the other things we talked about

4  where you can just look at a dictionary and know generally what

5  it is.  You have to look to the patent to define it because you    04:15:37

6  can't find the definition anywhere else.

7     Well, we know that the patent says that the invention

8  is using the checkplate to determine alignment by passing the

9  probe across this transition border.  So the definition we

10 propose, which is taken right from the patent, is a smooth,      04:15:54

11 rigid plate that checks alignment.  The rest of this stuff is

12 all well-supported, but the key is to get the invention into

13 the term.  Why are you using this?  What was the whole purpose

14 of having the patent?

15    Well, the whole purpose is having a checkplate which     04:16:10

16 determines alignment based upon conductivity; all right?  So

17 the key is a smooth, rigid plate that is used to check

18 alignment of probe points on a probe card.

19    API's definition is just a smooth, rigid plate.  So

20 according to them, you can just wholly disregard the patent.     04:16:29

21 You can disregard the invention.  To them it means nothing more

22 than the surface of a desk, because they don't even require it

23 be conductive.  Anything which is smooth to them is a

24 checkplate and, obviously, that is not the case.

25    Your Honor, that's all I really have to say about     04:16:46

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1   their patent.  I would like to save five or six minutes just to    04:16:48

2   tie everything up when we're done.  And that is all I have.

3          THE COURT:  Thank you.

4          MR. CAMPBELL:  Thank you.

5          MS. UNDERWOOD-MUSCHAMP:  Your Honor, my remarks will    04:17:43

6   be similarly brief.

7          First thing to note is the figures that you saw

8   Mr. Campbell put up are just two of the figures of the patent,

9   Figure 3 and Figure 4.  And there are absolutely some claims in

10  the patent that recite the use of these crossed conductivity    04:17:56

11  strips.  They haven't been asserted in this case.

12         What you didn't see today is figure 10 which shows a

13  conductive dot.  That's a conductive circle surrounded by an

14  insulative layer.  That conductive dot is also part of the

15  invention that is disclosed in the '374 patent and Figure 10    04:18:16

16  teaches that it's not limited to alignment.  It can also be

17  used for other purposes.

18         So what ITC is trying to do is limit it to an

19  embodiment that some of the claims cover but not all of the

20  claims, including claims 14.    04:18:31

21         I'm going to focus my presentation primarily on ITC's

22  comments in their opening brief on claim construction, but

23  first we need to do that, obviously, in the context of the

24  patents.

25         So the claim that has been asserted in this    04:18:48

United States District Court

1   litigation says a checkplate usable for inspecting integrated          04:18:50

2   circuit probe cards.  There's no mention of alignment.  You can

3   look all you want.  You won't see alignment there.  That is

4   something that ITC injected to come up with a noninfringement

5   position.  It's not part of the claim language.                        04:19:05

6           And, in fact, in ITC's opening claim construction

7   brief on page 14 they say, "As defined in the specification,

8   the checkplate is a plate 52 of rigid material such as steel

9   which is preferably conductive."  That's what ITC quotes.  And

10  they are right, that is what the patent teaches a checkplate            04:19:23

11  is.  It teaches that it's a plate of rigid material.  The

12  specification also goes on to teach that it should be smooth so

13  that it doesn't wear down the probe tips.

14          So the teaching of the specification is that a

15  checkplate is a smooth, rigid plate.  Nothing about alignment          04:19:38

16  in the claims.  Alignment isn't required for checkplate in the

17  specification.  ITC's own brief says the spec just teaches it's

18  a rigid plate.  That's what a checkplate is.  It's that simple.

19          The other terms they don't describe but I want to

20  cover it briefly, and I'm going to do it again using their             04:19:58

21  opening brief.

22          First going back to the claim language, what we know

23  is that this checkplate has a planar measurement service,

24  self-defining.  It's planar and it's a surface used for

25  measurement.  It's that simple.  It's a planar measurement             04:20:12

1  surface and it has a conductivity transition border.  Again,                04:20:15

2  it's a border which as you transition from one side to the

3  other, has differing conductivities.  It's truly a self-defined

4  term.

5          But if there's any question of what these terms mean,         04:20:27

6  we just need to look to ITC's opening brief where they talked

7  about these terms.  ITC said you have to look to the

8  prosecution history because the prosecution history, in

9  describing a planar measurement surface, said that it is

10 critical that the measurement surface of the checkplate be           04:20:44

11 planar and that there be no significant projections from the

12 measurement surface near the conductivity transition border so

13 that the probe points can slide along the measurement surface

14 without being damaged or unduly deflected.

15         API's construction lifts that language almost              04:21:01

16 verbatim.  It's ITC who has injected additional limitations

17 that aren't present in the claim, the claim language itself,

18 and aren't present in the written description or in the

19 prosecution history to limit the term.

20         Similarly, if we go to the final term in dispute,         04:21:17

21 which is the conductivity transition border, we can go to page

22 16 of ITC's opening brief and they say, "The conductivity

23 transition border is defined in the specification as the

24 interface between the conductive material and the insulative

25 material."                                                              04:21:38

United States District Court

1          Absolutely right.  That is why Applied Precision's          04:21:40

2   construction construes it based on what the specification

3   teaches.

4          It's a border between two materials having different

5   conductivities which may be used for conducting measurements.          04:21:50

6          Once again, if you look at ITC's definition, you're

7   going to see lots of limitations thrown into their

8   construction, limitations that aren't supported by the cites

9   they put in their own opening brief.  You can just read pages

10  14, 15, and 16 of their opening brief and where they cite and          04:22:05

11  see specifically what the spec required.

12         In addition, you can't be fooled by their limitation

13  of their focus on figures three and four.  Figures three and

14  four do disclose a specific checkplate with -- to a T, kind of,

15  of conductive materials and that is in some of the dependent          04:22:24

16  claims as you read through the patent.

17         Those aren't asserted and you can't limit checkplate

18  in other claims because some embodiments look to that kind of

19  T conductive surface.

20         Figure 10 is a conductive dot.  Applied Precision          04:22:41

21  invented that conductive dot to be used for measurements.  ITC

22  uses it and that is why they are trying to read limitations

23  into the terms that simply are not present.

24         That's all of my remarks on the Applied Precision

25  patent, Your Honor.          04:23:00

United States District Court

1          THE COURT:  Thank you.                              04:23:01

2          MR. CAMPBELL:  Can I just respond to one minor issue

3  there.  It will take me one minute or less?

4          THE COURT:  Sure.

5          MR. CAMPBELL:  Mrs. Muschamp's argument was basically  04:23:09

6  that we misled the court by saying Figure 3 was the invention

7  essentially and Figure 4 and that a checkplate required this

8  conductivity transition border.

9          So to say I was wrong, she cited to column 13 about

10  having a dot.  She cited to column 13 and it's actually lines  04:23:26

11  five through ten.  What it actually says is still another

12  embodiment of the checkplate is illustrated in figure ten.  The

13  checkplate 40 utilizes any of the combinations of conductivity

14  and insulators described above and has the addition of a small

15  dot.                                                          04:23:46

16          So the small dot wasn't a separate invention for

17  determining alignment.  It was one thing you could add.  I just

18  wanted to clear that.

19          Do you want us to go to our final remarks?

20          THE COURT:  Yes.                                     04:23:58

21          MR. CAMPBELL:  Your Honor, we presented what we

22  believe is the adequate and the correct definitions for all of

23  the claim terms and referred to you in all of the

24  specifications and all of the briefs we filed, the minibriefs,

25  where to find all of that and I rely on that.               04:24:13

United States District Court

1      I just want to bring up a couple of points.  Mostly        04:24:17

2  what they have hit us with today is they say the claim terms

3  are invalid.  They skipped claim construction and went right on

4  to invalidity.

5      Now, the key, and something I have heard from not at        04:24:28

6  all at the defendants, is their burden is to prove invalidity

7  by clear and convincing evidence.  And that is because the

8  Patent Office reviewed these patents and determined that every

9  single one of the qualifications they talk about today was met

10 because the Patent Office uses the correct definition of        04:24:44

11 algorithm.  They use the definition provided to them by the

12 federal circuit, not a definition which they cobble together by

13 looking at I think a definition from an Internet magazine and

14 also adding on whatever Dr. Wright believed should be part of

15 the definition.                                                  04:25:04

16     So since none of those things have anything to do

17 with what an algorithm truly is, all of that testimony can be

18 essentially disregarded and we can rely upon what the Patent

19 Office did because they relied on the correct algorithm and

20 determined that the claims under that algorithm are completely   04:25:23

21 valid.

22     THE COURT:  How does the definition from the federal

23 circuit differ from the definition that was provided to us by

24 Dr. Wright?

25     MR. CAMPBELL:  We showed you a number of definitions        04:25:37

1  at the very beginning.  And what the federal circuit has said     04:25:38

2  in their things that we find in our brief -- and we don't have

3  to put them up.  But what they said is that if a person of

4  ordinary skill in the art would understand what is being

5  conveyed by the name of something, that is enough.  It can be    04:25:52

6  generic.  It can be broad.  All you need to do is to convey to

7  a person of ordinary skill in the art what the bounds of the

8  invention are.  You don't have to lay out and specifically they

9  said down have to lay out code.  You don't have to lay out --

10       THE COURT:  Yes.  I know all of that.  But even           04:26:14

11  taking that definition as you have said it, what is it that you

12  have offered or that has been refuted by you that would

13  establish that the -- that someone in the ordinary skill would

14  understand precisely what has been set forth in the claims?

15       MR. CAMPBELL:  Well, at the beginning we offered the      04:26:33

16  testimony from Mr. Oberzeir and, in fact, Mr. Wright, that a

17  person of ordinary skill in the art would know what those terms

18  meant.  In fact, back in 1993 and the inventor himself,

19  Mr. Schwartz, testified that back at that time, people knew

20  what those terms meant.  It's a broad category of algorithms.   04:26:50

21       And according to the fed circuit, that's all you need

22  to do.  They say the point of novelty several times were the

23  algorithms and that's not true.  The point of novelty was for

24  the first time ITC created a probe card testing machine that

25  uses machine vision.  They didn't invent a certain type of a    04:27:10

United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1    best fit.  They didn't invent a certain type of blob analysis.     04:27:15

2            If that was the patent, if the patent was on here's a

3    new, novel method of blob analysis, it would have been written

4    wholly different.  There would have been code that would have

5    said, "Here's how do you blob analysis."  But they didn't care.   04:27:29

6            They said, "As long as you use a version of blob

7    analysis, it will do the job."  That's all that matters

8    according to the fed circuit because the fed circuit has said

9    all you need to do, as a person of ordinary -- is convey to a

10   person of ordinary skill in the art what the bounds of the       04:27:47

11   invention is or are.  And a person would obviously knew what a

12   viewing system is.  They can determine what a window is and

13   then we get to the computer means.

14           And all that person has to do is say, "Well, if I

15   have a viewing system and I have a window, do I have a            04:28:00

16   positioning means to determine the position?"  We say that

17   requires the use of blob analysis.  They can determine, "Am I

18   using blob analysis or am I not?"

19           Easy to make that determination.  Then best fit.

20   Okay.  That person determined, looking at the claim, am I using   04:28:20

21   best fit or am I not using best fit?  That is all the fed

22   circuit says is actually required.

23           API has talked about many, many different things.

24   They have tried to construct a patent that isn't our patent, a

25   patent that requires connectivity and thresholding and a number   04:28:36

CV-06-02182-PHX-ROS, January 23, 2008

1   of other things.  That is not the patent.  The patent isn't on      04:28:40

2   coming up with the best, the most efficient way of finding

3   probe tips.

4           In fact, I'm sure the machine today may do all of

5   those things and is far more efficient than the machine was in    04:28:56

6   1993.

7           All that the patent needs to do in 1993 is to convey

8   to a person of ordinary skill in the art what the bounds of the

9   invention was.  And very clearly you can look at the patent,

10  you can look at the claim and say, "I better not use blob          04:29:09

11  analysis to do my positioning means and I better not use best

12  fit to determine which probe is out of alignment."

13          Easily, easily that can be done and that is all the

14  federal circuit requires.

15          And since the Patent Office looked at it and said,          04:29:26

16  "Yeah, I find that in there," and since they used the

17  definition of algorithm which seemed to have no basis in

18  reality, we assert that's all you really need.  The fed circuit

19  says it's a very, very low threshold.  And clearly that low

20  threshold has been met.                                            04:29:42

21          That's all I have, Your Honor.

22          THE COURT:  All right.  Thank you.

23          We are adjourned.

24          MR. TUCKER:  Your Honor, we would like to move to

25  have our exhibits --                                               04:29:56

United States District Court

1        THE COURT:  They will be released.  They will all be          04:29:59

2    released and I just have copies.

3        MR. TUCKER:  We need to move to have our exhibits

4    from the brief, the exhibits on our exhibit list, and the

5    supplemental notice that we filed on Monday to be entered into   04:30:10

6    evidence.

7        MR. CAMPBELL:  No objection, I assume, from either

8    party?

9        MR. BLANKENHEIMER:  No.

10       THE COURT:  All right.  They are admitted.                    04:30:17

11       (Whereupon, these proceedings recessed at 4:30 p.m.)

12                        *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

                       United States District Court

CV-06-02182-PHX-ROS, January 23, 2008

1            C E R T I F I C A T E                          04:30:17

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of       04:30:17

6   Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    04:30:17

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15        DATED at Phoenix, Arizona, this 30th day of January,     04:30:17

16  2008.

17

18

19

20              s/Elaine M. Cropper                               04:30:17

21              _____

22              Elaine M. Cropper, RDR, CRR, CCP

23

24

25

              United States District Court